# Exhibit A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

BANK OF AMERICA, N.A., a national
banking association, as successor-in-interest to
LaSalle Bank National Association, in its
individual capacity and as authorized Agent,

       Plaintiff,

vs.

CHICAGO TITLE INSURANCE COMPANY,
a Nebraska corporation, as successor-in-interest
to Ticor Title Insurance Company,

       Defendant.

Case No.

**Jury Trial Demanded**



### COMPLAINT FOR BREACH OF CONTRACT AND BAD FAITH

Bank of America, N.A. ("Bank of America"), as successor by merger to LaSalle Bank

National Association, in its individual capacity and as authorized Agent for Associated Bank,

National Association, Mid-America Bank, fsb, and TierOne Bank, and their successors and

assigns, by its attorneys, for its complaint against Chicago Title Insurance Company ("Chicago

Title"), as successor by merger to Ticor Title Insurance Company, alleges as follows:

### NATURE OF THE ACTION

1.    This is an insurance coverage action. Bank of America seeks to establish its

rights under a title insurance policy sold by Chicago Title's predecessor-in-interest, Ticor Title

Insurance Company, to Bank of America's predecessor-in-interest, LaSalle Bank National

Association, in connection with a foreclosed mortgage secured by real property in Yorkville,

Illinois (the "Kendall Marketplace" shopping center).

2.    In the foreclosure action, *Bank of America, N.A. v. Cannonball LLC, et al.*,

No. 10-CH-0869, the Appellate Court of Illinois held that an agreement between the mortgagor

and Home Depot concerning responsibility for payment of a special tax was a covenant that

1

runs with the land.  Due to this encumbrance on the Kendall Marketplace property, Bank of America has suffered damages and losses of approximately $1,780,000.

3.      Chicago Title has denied coverage and refuses to indemnify Bank of America for its losses due to the encumbrance at Kendall Marketplace.  Bank of America seeks damages for Chicago Title's breach of contract, as Chicago Title has failed or refused to honor its obligations under its title insurance policy.  Bank of America further seeks damages due to Chicago Title's bad faith in handling and denying Bank of America's claim.

## THE PARTIES

4.      Bank of America is a national banking association organized under the laws of the United States of America with its principal place of business in Charlotte, North Carolina. Bank of America is the successor-in-interest to LaSalle Bank National Association ("LaSalle Bank").  Bank of America is the authorized Agent for Associated Bank, National Association, Mid-America Bank, fsb, and TierOne Bank, and their successors and assigns with respect to this action.

5.      Chicago Title Insurance Company is a Nebraska corporation with its principal place of business in Florida.  Chicago Title is the successor-in-interest to Ticor Title Insurance Company ("Ticor Title").  At all relevant times, Chicago Title was authorized to do business and was doing business in Illinois.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 735 ILCS 5/2-209 in that, among other things, Chicago Title does business in Illinois.

7.      Venue is proper in this Court pursuant to 735 ILCS 5/2-101 and 2-102 in that, among other things, Chicago Title does business in Cook County, Illinois.

### THE KENDALL MARKETPLACE TRANSACTION

8. In 2007, a company called Cannonball, LLC ("Cannonball") sought to purchase and develop real property in Yorkville, Illinois in order to build a shopping center called Kendall Marketplace.

9. LaSalle Bank and Cannonball entered into a construction loan agreement in connection with the development of Kendall Marketplace. The construction loan agreement was secured by a Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (the "Mortgage") on the property at Kendall Marketplace, to and for the benefit of LaSalle Bank.

10. In accordance with the construction loan agreement, LaSalle Bank assigned and sold a portion of its rights and obligations under the construction loan agreement to Associated Bank, National Association, Mid-America Bank, fsb, and TierOne Bank.

11. PNC Bank, National Association is successor by merger with National City Bank, successor by merger with MidAmerica, National Association, successor by conversion from Mid-America Bank, fsb. Great Western Bank, a bank chartered under the laws of the State of South Dakota, is successor-in-interest to TierOne Bank, a federally chartered savings bank, by acquisition of assets from the FDIC as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervision.

12. Pursuant to LaSalle Bank's assignments and the construction loan agreement, upon any event of default, LaSalle Bank (and its successor-in-interest Bank of America) is the authorized Agent of Associated Bank, National Association, Mid-America Bank, fsb, and TierOne Bank, and their successors and assigns, to exercise or pursue all remedies or causes of action permitted at law or in equity, including but not limited to enforcement of the title

insurance policy and any other instruments evidencing, securing or guarantying obligations of any party under the loan.

13.     As part of the project at Kendall Marketplace, Cannonball sold land to Home Depot pursuant to a Real Property Purchase Agreement (the "Purchase Agreement"). In the Purchase Agreement, Cannonball agreed to reimburse Home Depot for a portion of a special tax imposed on the property by the City of Yorkville (the "SSA Tax").

14.     Cannonball and Home Depot also executed a development agreement in connection with Home Depot's purchase of real property at Kendall Marketplace (the "Development Agreement"). The Development Agreement incorporated the SSA Tax reimbursement obligation in the Purchase Agreement. Additionally, the Development Agreement granted Home Depot the right to lien Cannonball's property if Cannonball failed to pay its portion of the tax.

15.     The Development Agreement expressly provided that Home Depot's rights would be subordinate to the Mortgage, reciting in Section 12.4 that any "such lien shall be subordinate to the lien of any first mortgage or deed of trust."

16.     Cannonball, Home Depot, and LaSalle Bank also entered into a payment and priority agreement (the "Payment and Priority Agreement") in connection with the development at Kendall Marketplace that expressly limited LaSalle Bank National Association's obligations. The Payment and Priority Agreement provided that the "Lender shall have no obligations to the City or any of the Anchors under the Development agreements unless Lender expressly assumes Developer's obligations thereunder in writing."

17.     At all times, LaSalle Bank intended and considered the Mortgage to be superior to any and all rights that Home Depot had or may have had to reimbursement from Cannonball for

the SSA Tax. The Development Agreement and Payment and Priority Agreement, among other documents and communications, reflected this intent and understanding.

18. Because the SSA Tax was agreed to be subordinate to the Mortgage, LaSalle Bank understood and intended that any of Home Depot's rights to reimbursement from Cannonball would be extinguished upon foreclosure of the Mortgage.

19. Near North National Title, Chicago Title's predecessor-in-interest, served as LaSalle Bank's closing agent for the transaction at Kendall Marketplace.

20. Near North National Title further placed the title insurance policy issued to insure LaSalle Bank in connection with the Mortgage, the details of which are discussed below beginning at Paragraph 23.

21. Near North National Title was advised and knew of the Purchase Agreement, the Development Agreement, and LaSalle Bank's instructions and intent that the Mortgage would be superior to any rights Home Depot may have had to reimbursement from Cannonball. In order to effectuate LaSalle Bank's instructions and intent, Near North National Title also determined the order in which the various documents would be recorded.

22. On May 24, 2007, the Purchase Agreement, Development Agreement, and Mortgage were recorded, in that order, with the Office of the Kendall County Recorder.

## CHICAGO TITLE'S INSURANCE POLICY

23. On May 24, 2007, in connection with the transaction at Kendall Marketplace, Chicago Title's predecessor, Ticor Title, issued title insurance policy No. N01070317 (the "Title Insurance Policy") to insure "LaSalle Bank National Association, a national banking association, its successors and/or assigns, as agent for itself and other Lenders."

- 5 -

24.     A copy of the Title Insurance Policy is attached as **Exhibit 1** and is incorporated by reference as if fully set forth herein.

25.     Chicago Title has received all premiums due to it under the Title Insurance Policy.

26.     The Title Insurance Policy insures Bank of America against any loss or damage sustained by reason of, *inter alia*, any encumbrance on title to the Kendall Marketplace property.  Specifically, the insuring clause in the Title Insurance Policy provides:

> **SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, TICOR TITLE INSURANCE COMPANY**, a California corporation, herein called the Company, insures, as of Date of Policy [sic] shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the Insured by reason of:

\* \* \* \*

> 2.     Any defect in or lien or encumbrance on the title;

\* \* \* \*

> 6.     The priority of any lien or encumbrance over the lien of the insured mortgage[.]

27.     Schedule A of the Title Insurance Policy defines the "Insured" as "LaSalle Bank National Association, a national banking association, its successors and/or assigns, as agent for itself and other Lenders."

28.     Schedule A of the Title Insurance Policy describes the Insured Mortgage as:

> **Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of May 1, 2007 and recorded May 24, 2007 as document number 200700016699 made by Cannonball, LLC, an Illinois limited liability company to and for the benefit of LaSalle Bank National Association, a national banking association, as agent for itself and other Banks, to secure an amount of indebtedness of $97,040,000.00.**

- 6 -

29. By an endorsement titled "**ALTA 9 ENDORSEMENT LOAN (COMPREHENSIVE)**," Chicago Title also insured LaSalle Bank against loss if an instrument listed on Schedule B (including the Development Agreement and Purchase Agreement) contains a "covenant, conditions or restrictions on the land" and "provides for a private charge or assessment":

> The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:
>
> 1. The existence, at Date of Policy, of any of the following:
>
>> (A) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.
>>
>> (B) Unless expressly excepted in Schedule B:
>>
>>> * * * *
>>>
>>> (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which in addition, . . . (iii) provides for a private charge or assessment; . . . .

30. In Schedule B Part II of the Title Insurance Policy, Chicago provided:

> In addition to the matters set forth in Part I of this schedule, the title to the estate or interest in the land described or referred to in schedule A is subject to the following matters, . . . :
>
> * * * *
>
> 4. Memorandum of Agreement recorded May 15, 2007 as document number 200700016696 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware Corporation, are parties to (1) a Real Property Purchase Agreement and (2) a Development Agreement, and the terms and provisions contained therein.
>
> * * * *
>
> 6. Memorandum of Development Agreement recorded May 15, 2007 as document number 200700016698 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware Corporation and the terms and provisions contained therein.

31.     Pursuant to Condition and Stipulation 11 of the Title Insurance Policy, once "liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter."

32.     Bank of America has complied in all material respects with the conditions and requirements of the Title Insurance Policy, and no exclusion applies to remove or bar coverage.

### THE FORECLOSURE LITIGATION AND SUBSEQUENT SALE OF KENDALL MARKETPLACE

33.     Cannonball defaulted on its loan obligations under the Mortgage.  Bank of America subsequently filed suit to foreclose the Mortgage, among other relief, in litigation captioned *Bank of America, N.A. v. Cannonball LLC, et al.*, No. 10-CH-0869 (Cir. Ct. Kendall Cnty.) (the "Foreclosure Litigation").  Home Depot was named as a defendant.

34.     Home Depot filed a counterclaim in the Foreclosure Litigation, seeking a declaration that its SSA Tax reimbursement rights under the Purchase Agreement and Development Agreement ran with the land and were binding on the grantees, successors and assigns of Cannonball, including Bank of America.  Home Depot subsequently moved for summary judgment on the SSA Tax reimbursement issue.

35.     The Circuit Court denied Home Depot's motion for summary judgment and granted judgment in favor of Bank of America, holding that the SSA Tax was personal between Cannonball and Home Depot, was not a covenant that ran with the land, and that foreclosure terminated Home Depot's reimbursement rights with respect to Bank of America and any subsequent purchaser of the property.

36.     On March 1, 2013, the Circuit Court issued a written Order of Default Judgment, Summary Judgment and Judgment of Foreclosure and Sale that provided:

> Bank of America's Motion for Summary Judgment against Home Depot, as it relates to Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien

Rights, is granted pursuant to 735 ILCS 5/2-1005. Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot and do not run with the Mortgaged Property. Upon entry of the final order in this case, Home Depot's Reimbursement Rights, Home Depot's SSA Tax Lien Rights and the Home Depot Claim of Lien are foreclosed and terminated pursuant to 735 ILCS 5/15-1506(c), provided, however, that Home Depot's Reimbursement Rights against Cannonball are not affected. The purchaser of the Mortgaged Property at foreclosure sale, as well as its grantees, successors and assigns, shall have no obligation to reimburse Home Depot, or any person(s) claiming by, through or under it, for any portion of the SSA Tax assessed against the Home Depot Tract.

37.    Bank of America subsequently purchased the mortgaged property at a judicial sale conducted by the Kendall County Sheriff's Department.

38.    On May 29, 2014, the Appellate Court of Illinois reversed the Circuit Court, holding that the obligation to reimburse Home Depot for a portion of the SSA Tax was a covenant that runs with the property. The court further held that Home Depot's tax reimbursement and lien rights were not extinguished by foreclosure.

39.    On November 26, 2014, the Illinois Supreme Court denied Bank of America's petition to appeal the Appellate Court's decision.

40.    On July 9, 2015, after a national marketing campaign, Bank of America sold the property at Kendall Marketplace for $6,060,000. The SSA Tax obligation was disclosed to potential buyers, which resulted in the sale price that was approximately $1,780,000 less than what Bank of America would have obtained without the SSA Tax obligation.

## CHICAGO TITLE'S REFUSAL AND FAILURE TO INDEMNIFY
## BANK OF AMERICA FOR ITS LOSS

41.    Chicago Title accepted its defense obligation under the Title Insurance Policy and defended Bank of America in connection with Home Depot's claims in the Foreclosure Litigation. Chicago Title has denied coverage, however, and has refused to indemnify Bank of America for losses Bank of America sustained due to the Appellate Court of Illinois'

determination that the Home Depot SSA Tax reimbursement obligation is a covenant that runs with the land and survived foreclosure.

42.     On January 14, 2015, counsel for Bank of America wrote to Chicago Title to inform Chicago Title that Home Depot sought payment for its share of the SSA taxes for Kendall Marketplace.  Bank of America therefore requested payment from Chicago Title pursuant to the Title Insurance Policy.  A copy of Bank of America's January 14, 2015 letter and its enclosure are attached as **Exhibit 2** and are incorporated by reference as if fully set forth herein.

43.     On January 23, 2015, Chicago Title responded to Bank of America's January 14, 2015 letter.  In that correspondence, Chicago Title denied coverage for amounts due to Home Depot for the SSA taxes associated with Kendall Marketplace.  A copy of Chicago Title's January 23, 2015 letter is attached as **Exhibit 3** and is incorporated by reference as if fully set forth herein.

44.     On March 2, 2015, Bank of America responded to Chicago Title's January 23 denial letter, explained why Chicago Title's position was unfounded, and requested that Chicago Title withdraw its denial of coverage.  A copy of Bank of America's March 2, 2015 letter and its enclosures are attached as **Exhibit 4** and are incorporated by reference as if fully set forth herein.

45.     On May 28, 2015, Chicago Title responded to Bank of America's March 2, 2015 letter.  In that correspondence, Chicago Title refused to withdraw its prior coverage position, but "before making a final coverage determination," asked Bank of America to provide documents on a number of topics.  These requested documents included materials related to Bank of America's — and Chicago Title's — understanding that the Mortgage was to have

priority over Home Depot's rights to reimbursement for a portion of the SSA taxes, and that any such rights held by Home Depot would be extinguished by foreclosure. A copy of Chicago Title's May 28, 2015 letter is attached as **Exhibit 5** and is incorporated by reference as if fully set forth herein.

46.     Additionally, Chicago Title's May 28, 2015 letter acknowledged that Bank of America had resold the property at Kendall Marketplace and requested a proof of loss.

47.     On August 21, 2015, in response to Chicago Title's information requests, counsel for Bank of America wrote to Chicago Title and enclosed documents related to Bank of America's intent and understanding in the Kendall Marketplace transaction.

48.     Also on August 21, 2015, and in compliance with Chicago Title's request, counsel for Bank of America sent to Chicago Title a proof of loss ("Proof of Loss") describing "the defect in, or lien or encumbrance on the title, [or] other matter insured against by" the Title Insurance Policy "which constitutes the basis of loss or damage" incurred by Bank of America. Bank of America's Proof of Loss also provided "the basis for calculating the amount of the loss or damage."

49.     Bank of America's Proof of Loss calculated its damages and losses in connection with the sale of Kendall Marketplace due to the SSA tax reimbursement obligation at approximately $1,780,000.

50.     In support of its Proof of Loss, Bank of America further enclosed:

(1) A copy of the Circuit Court's March 1, 2013 Order of Default Judgment, Summary Judgment and Judgment of Foreclosure and Sale;

(2) A copy of the Appellate Court of Illinois' May 29, 2014 Opinion;

(3) A signed and sworn affidavit from Stephen H. Malato, LaSalle Bank's attorney in connection with the Kendall Marketplace transaction, in which Mr. Malato attested to certain details of the transaction, LaSalle Bank's and Chicago Title's intent and knowledge that the Mortgage would be superior to all other rights, and the placement of the Title Insurance Policy; and

(4) A signed and sworn affidavit from Anthony Conrad, a Vice President at Bank of America who oversaw the 2015 sale of Kendall Marketplace, in which Mr. Conrad attested to the sale price of the property ($6,060,000), the cash flow analysis performed by Bank of America's listing broker in connection with the property sale, the amount of the SSA Tax reimbursement obligation for 2014, and Bank of America's loss and damage as a result of the SSA Tax encumbrance on Kendall Marketplace.

51. A copy of the Proof of Loss and its enclosures are attached as **Exhibit 6** and are incorporated by reference as if fully set forth herein.

52. To date, Chicago Title has not honored its contractual obligations and has not paid any portion of Bank of America's loss or damage due to the SSA Tax encumbrance on Kendall Marketplace.

## COUNT I
### (Breach of Contract)

53. Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54. Chicago Title sold title insurance to Bank of America to insure, among other things, the priority of Bank of America's rights above all other rights in connection with the property at Kendall Marketplace, as well as to insure against loss or damage caused by any defect, lien, covenant, conditions, restrictions, or encumbrance on Kendall Marketplace.

55.     Bank of America's actual monetary loss or damage due to the encumbrance on the Kendall Marketplace property is insured under the Title Insurance Policy.

56.     No exclusion in the Title Insurance Policy applies to remove or bar coverage for Bank of America's loss or damages.

57.     Bank of America has complied in all material respects with the conditions and requirements of the Title Insurance Policy.  All conditions precedent to recovery under the Title Insurance Policy have been satisfied, waived, or are otherwise inapplicable.

58.     Chicago Title has breached the Title Insurance Policy by failing and refusing to reimburse Bank of America for its actual monetary loss and damage due to the encumbrance on Kendall Marketplace.

59.     As a direct and proximate result of Chicago Title's breach of contract, Bank of America has been deprived of the benefit of the title insurance coverage it purchased, for which it paid substantial premiums, and it has incurred direct and continuing damage on account thereof in an amount no less than $1,780,000.

## COUNT II
### (Bad Faith)

60.     Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

61.     For nearly two years, Chicago Title has refused to acknowledge its indemnity obligation to Bank of America due to the encumbrance on Kendall Marketplace.  For nearly 15 months, it also has refused and failed to reimburse Bank of America for Bank of America's actual monetary loss incurred when selling Kendall Marketplace due to the SSA Tax encumbrance on that property.

62.     Chicago Title has no reasonable or justifiable basis for failing and refusing to honor its obligations under the Title Insurance Policy.  It sold a title insurance policy to Bank of America's predecessor that expressly insures against loss due to "Any defect in or lien or encumbrance on the title" to Kendall Marketplace, among other relevant language.  Its Title Insurance Policy, at Schedule B Part II, memorializes its knowledge of the Purchase Agreement, Development Agreement, and Cannonball's obligation to reimburse Home Depot for a portion of the SSA Tax.  Chicago Title also was aware of those agreements through communications with and between counsel for Bank of America and Chicago Title's agent.

63.     Chicago Title further knew that Bank of America intended and understood that its rights would be superior to all other rights concerning Kendall Marketplace, and that foreclosure would terminate or extinguish any rights held by Home Depot to reimbursement for a portion of the SSA Tax.

64.     Chicago Title further knew and understood that Bank of America sought to purchase title insurance in order to insure the priority of its rights above all other rights in connection with the property at Kendall Marketplace, as well as to insure against loss or damage caused by any defect, lien, covenant, conditions, restrictions, or encumbrance on Kendall Marketplace.

65.     The Circuit Court, in its March 2013 Order, affirmed both parties' understanding that the SSA Tax reimbursement obligation was personal between Cannonball and Home Depot and would not encumber the mortgaged property.  Only when the Appellate Court reversed this decision, in May 2014, and the Illinois Supreme Court denied Bank of America's petition to appeal, in November 2014, did it become clear that the SSA Tax reimbursement obligation encumbered the title on Kendall Marketplace.

66.     Chicago Title had expressly assumed this very risk, among others, when issuing its Title Insurance Policy: namely, that an encumbrance on Kendall Marketplace existed, and that it would cause loss or damage to Bank of America.

67.     Chicago Title has acted vexatiously, unreasonably, and in bad faith by refusing to honor its insurance obligations and indemnify Bank of America, as well as by engaging in conduct that has delayed payment to Bank of America under the Title Insurance Policy.

68.     As a result of Chicago Title's bad faith, Bank of America has incurred substantial damages in connection with the sale of Kendall Marketplace, and now will incur additional expenses to prosecute this current action against Chicago Title.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bank of America, N.A. respectfully prays that this Court:

(a)     With respect to Count I:

    (i)     Enter a judgment against Chicago Title Insurance Company that awards Bank of America, N.A. all direct and consequential money damages suffered as a result of Chicago Title Insurance Company's breach of the Title Insurance Policy, in an amount to be established through proof;

    (ii)     Award Bank of America, N.A. pre-judgment and post-judgment interest; and

    (iii)     Award Bank of America, N.A. any other and further relief to which it is entitled.

(b)     With respect to Count II:

    (i)     Enter a judgment against Chicago Title Insurance Company that awards Bank of America, N.A. its attorneys' fees and costs incurred in this litigation;

    (ii)     Award Bank of America, N.A. punitive damages; and

    (ii)     Award Bank of America, N.A. any other and further relief to which it is entitled.

## JURY DEMAND

Plaintiff Bank of America, N.A. hereby demands a trial by jury for any and all issues so triable.

Dated:  December 21, 2016

Respectfully submitted,

**Bank of America, N.A.**

By: *John S. Vishneski III /SW*

One of Its Attorneys

John S. Vishneski III
Stephen I. Winter
REED SMITH LLP
10 S. Wacker Dr., 40th Floor
Chicago, Illinois 60606
T: (312) 207-1000
jvishneski@reedsmith.com
swinter@reedsmith.com
Firm I.D.: 44486

US_ACTIVE-129985337.1

# EXHIBIT 1

## LBNA/SFB CLIO
### Document Type Checklist

| | |
|---|---|
| | **CANNONBALL LLC** |
| | **1467219120** |
| | **APPRAISAL** |
| | **ASSIGNMENT** |
| | **AUTHORIZATION DOCUMENTS** |
| | **CHECKLIST** |
| | **CLOSING BOOK** |
| | **CREDIT APPROVAL (SBA Authorization)** |
| | **DISBURSEMENT SCHEDULE** |
| | **ENVIRONMENTAL** |
| | **FEMA** |
| | **GUARANTY** |
| | **INSURANCE (BBLC ONLY)** |
| | **LEASE AGREEMENTS** |
| | **LOAN AGREEMENT** |
| | **MASTER LETTER OF CREDIT AGREEMENT** |
| | **MORTGAGE** |
| | **NOTE** |
| | **OTHER** |
| | **PARTICIPATION AGREEMENT** |
| | **PERMANENT WAIVER FORM** |
| | **PLEDGE AGREEMENT** |
| | **REGULATORY** |
| | **REIMBURSEMENT AGREEMENT** |
| | **RELEASE DEEDS** |
| | **SECURITY AGREEMENT** |
| | **SUBORDINATION AGREEMENT** |
| **X** | **TITLE POLICY** |
| | **UCC SEARCHES**   *SFB Commercial/BBLC only* |
| | **VEHICLE TITLE (BBLC ONLY)** |
| | **CROSS COLLATERALIZED** |
| **Name** | |
| **Obligor #** | |
| | **Ticor title ins. Pol. (#N0107317) re: Cannonball Trail & Rt.34, Yorkville, IL** |

Sent by:   S. Simkus
*(Print your name)*



**Policy No.** IL2257-48-N01070317-2007.74107-73800270

# Policy of Title Insurance

**American Land Title Association Loan Policy (10-17-92)**

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, TICOR TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;

4. Lack of a right to access to and from the land;

5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;

6. The priority of any lien or encumbrance over the lien of the insured mortgage,

7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:

   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or

   (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;

8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

NEAR NORTH NATIONAL TITLE
222 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60601
(312) 419-3900
FAX (312) 419-0569

IL2257      N01070317
Near North National Title, LLC
222 North LaSalle Street
Chicago, IL 60601
Tel:(312) 419-8154
Fax:(312) 419-0569

TICOR TITLE INSURANCE COMPANY

By:

ATTEST

President

Secretary

Authorized Signatory
John R. Lamberts

# NEAR NORTH NATIONAL TITLE LLC

ISSUING AGENT

## LENDER'S FORM

## SCHEDULE A

Number: N01070317
Underwriter Number: 74107-73800270
Date of Policy: May 24, 2007

Amount of Insurance: $97,040,000.00

1. Name of Insured:

   LaSalle Bank National Association, a national banking association, its successors and/or assigns, as agent for itself and other Lenders

2. The estate or interest in the Land that is encumbered by the Insured Mortgage is:

   Fee Simple as to Parcel 1 and Easement as to Parcel 2

3. Title is vested in:

   Cannonball, LLC, an Illinois limited liability company

4. The Insured Mortgage, and its assignments, if any, are described as follows:

   Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of May 1, 2007 and recorded May 24, 2007 as document number 200700016699 made by Cannonball, LLC, an Illinois limited liability company to and for the benefit of LaSalle Bank National Association, a national banking association, as agent for itself and other Banks, to secure an amount of indebtedness of $97,040,000.00.

5. The Land referred to in this policy is described as follows:

   See Exhibit A attached hereto and made a part hereof.

This policy valid only if Schedule B is attached.

# NEAR NORTH NATIONAL TITLE LLC
ISSUING AGENT

## LENDER'S FORM

## SCHEDULE B

Number:  N01070317

This policy does not insure against loss or damage by reason of the following:

1.  General real estate taxes for the years 2006 and 2007. Tax numbers :
    02-19-400-003-0000,
    02-29-100-001-0000 and
    02-20-351-002-0000.

    Note: The 2006 taxes and the 2007 taxes are not yet due and payable.

    (Affects the Land and other property)

2.  Ordinance Number 2006-125 made by the United City of Yorkville, Illinois, authorizing the execution of an Amended and Restated Development Agreement for Kendall Marketplace recorded January 24, 2007 as document 200700002839, and the terms and conditions contained therein.

3.  Terms and Conditions contained in Ordinance Number 2006-88 authorizing the execution of a Development Agreement for Kendall Marketplace dated August 22, 2006 and recorded January 10, 2007 as document number 200700001155.

4.  Operation and Easement Agreement for Kendall Marketplace Shopping Center, Yorkville, Illinois dated as of May 1, 2007 and recorded May 24, 2007 as document number 200700016695 made by and between Target Corporation, Home Depot U.S.A., Inc., Kohl's Illinois , Inc. and Cannonball, LLC.

5.  The land lies within the boundaries of United City of Yorkville Special Service Area No. 2006-113 as disclosed by Ordinance No. 2007-26 dated March 13, 2007 and recorded April 27, 2007 as document number 200700013896.

6.  Building lines, easements, covenants, conditions and restrictions as set fort on Plat of Kendall Marketplace, recorded May 7, 2007 as document number 200700014779.

7.  Any lien, or right to a lien, for services, labor or material furnished after May 15, 2007 (the sworn owner's statement date).

8.  Rights of mechanics and material suppliers who are named on the sworn owner's statement made by Cannonball, LLC, an Illinois limited liability company, dated May 15, 2007, and of mechanics and material suppliers claiming by, through or under them, to the extent, if any, that the amounts shown in said statement as being unpaid relate to services, labor and material actually in place on said land on the date covered by said statement.

**Lender's Form - Schedule B - Continued**

SCHEDULE B PART II

In addition to the matters set forth in Part I of this schedule, the title to the estate or interest in the land described or referred to in schedule A is subject to the following matters, if any be shown, but the Company insures that such matters are subordinate to the lien or charge of the insured mortgage upon said estate or interest:

1. Assignment of Rents and Leases dated as of May 1, 2007 and recorded May 24, 2007 as document number 200700016700 made by Cannonball, LLC, an Illinois limited liability company to and for the benefit of LaSalle Bank National Association, a national banking association, as agent for itself and other Banks.

2. Unrecorded Site Development Agreement dated May 15, 2007 entered into by and between Cannonball LLC, an Illinois limited liability company, and Kohl's Illinois, Inc., a Nevada corporation, and the terms and provisions contained therein.

   Note: Contains provisions to create a lien on the Land.

3. Unrecorded Site Development Agreement dated May 15, 2007 entered into by and between Cannonball LLC, an Illinois limited liability company, and Target Corporation, a Minnesota corporation, and the terms and provisions contained therein.

4. Memorandum of Agreement recorded May 15, 2007 as document number 200700016696 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware Corporation, are parties to (1) a Real Property Purchase Agreement and (2) a Development Agreement, and the terms and provisions contained therein.

   Note: Contains provisions to create a lien on the Land.

5. Memorandum of Repurchase Put Option recorded May 15, 2007 as document number 200700016697 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware Corporation and the terms and provisions contained therein.

6. Memorandum of Development Agreement recorded May 15, 2007 as document number 200700016698 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware Corporation and the terms and provisions contained therein.

   Note: Contains provisions to create a lien on the Land.

ISSUING AGENT

BY: _____
         AUTHORIZED SIGNATORY

NEAR NORTH NATIONAL TITLE LLC

**222 N. LaSalle Street**
**Chicago, IL 60601**

         **(312) 419-3900**
FAX:     **(312) 419-0778**

**Exhibit A**

Parcel 1:

Lots 1-19, 21, 24-52, 55 and 57 in Kendall Marketplace Subdivision; being a subdivision of part of the Southeast quarter of Section 19, the South half of Section 20, and the Northwest quarter of Section 29, Township 37 North, Range 7 East of the Third Principal Meridian, recorded May 7, 2007 as document number 200700014779 in the United City of Yorkville, Kendall County, Illinois.

Parcel 2:

Easements appurtenant for the benefit of Parcel 1 as created by the Operation and Easement Agreement dated as of May 1, 2007, recorded May 24, 2007 as document number 200700016695 for the following purposes:

1. Ingress, egress and parking;
2. Passage and accommodation of pedestrians and vehicles;
3. Passage and accommodation of pedestrians and vehicles (Affects developer, Kohl's and Home Depot only)
4. Utilities;
5. Surface storm water drainage and detention; and
6. Construction, maintenance and reconstruction easements.

Located upon and across the Parcels described in said documents.

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

**ALTA 9 ENDORSEMENT LOAN (COMPREHENSIVE)**

The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:

1.    The existence, at Date of Policy, of any of the following:

    (A)  Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.

    (B)  Unless expressly excepted in Schedule B:

        (1) Present violations on the land of any enforceable covenants, conditions or restrictions, and any existing improvements on the land which violate building setback lines shown on a plat of subdivision recorded or filed in the public records.

        (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which in addition, (i) establishes an easement on the land; (ii) provides a lien for liquidated damages; (iii) provides for a private charge or assessment; (iv) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

        (3) Any encroachment of existing improvements located on the land onto adjoining land, or any encroachment onto the land of existing improvements located on adjoining land.

        (4) Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule "B".

        (5) Any notices of violation of covenants, conditions and restrictions relating to environmental protection recorded or filed in the public records.

2.    Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the insured, provided the violation results in:

    (A)  Invalidity, loss of priority, or unenforceability of the lien of the insured mortgage; or

    (B)  Loss of title to the estate or interest in the land if the insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.

3.    Damage to existing buildings or improvements located on the land:

    (A)  Which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule "B", which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;

    (B)  Resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule "B".

4.    Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule "B".

**ALTA 9  ENDORSEMENT LOAN (COMPREHENSIVE)**
**continued**

5.    Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this endorsement the words "Covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(B) (1) and 5, the words "Covenants, conditions or restrictions" shall not bee deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC,** as issuing agent

Dated: May 24, 2007                                    By: _____

## ENDORSEMENT
### ISSUED BY

# Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### ALTA ENDORSEMENT - FORM 3.0
### ZONING

The Company insures the insured against loss or damage sustained by the insured in the event that, at Date of Policy:

1. According to applicable zoning ordinances and amendments thereto, the land is not classified zone **PUD Planned Unit Development with uses permitted within the B-3, R-2 and R-3 Zoning Classifications.**

2. The following use or uses are not allowed under that classification, but there shall be no liability under this paragraph (b) if the use or uses are not allowed as a result of any lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments thereto, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses: **Those set forth in Chapter 13 Section 10-13-7, "Development Standards" of the Yorkville Zoning Ordinance, and also those Permitted uses as set forth in Chapter 6 Article D Section 10-6D-1, Article E Section 10-6E-1 and Chapter 7 Article D Section 10-7D-1, including but not limited to Department Store as a permitted use.**

There shall be no liability under this endorsement based on the invalidity of the ordinances and amendments thereto until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

Loss or damage as to the matters insured against by this endorsement shall not include loss or damage sustained or incurred by reason of the refusal of any person to purchase, lease or lend money on the estate or interest covered by this Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC,** as issuing agent

Dated: May 24, 2007

By: _____

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### ZONING ENDORSEMENT 3.1 (PLANS AND SPECIFICATIONS)
### (TO BE ISSUED UPON THE REVIEW OF THE PLANS AND SPECIFICATIONS)

1.  The Company insures the Insured against loss or damage sustained by the insured in the event that, at Date of Policy:

    (a) According to applicable zoning ordinances and amendments thereto, the land is not classified

    (b) The following use or uses are not allowed under that classification but there shall be no liability under this paragraph 1(b) if the use or uses are not allowed as a result of any lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments thereto, including but not limited to the failure to secure necessary consents or authorizations, including but not limited to Site Plan approval or Part II approval, as a prerequisite to the use or uses :

2.  The Company further insures the insured against loss or damage arising from a final decree of a court of competent jurisdiction

    (a) prohibiting the use of the land with any structure presently located thereon or with any contemplated improvement completed thereon in accordance with the building plans entitled

    in each case as described in paragraph 1b) of this endorsement; or

    (b) requiring the removal or alteration of any such present structure or contemplated improvement

    on the basis that the applicable ordinances and amendments thereto in effect as of the Date of Policy have been violated with respect to any of the following matters :

    (i)    Area, width or depth of the land as a building site for the structure;
    (ii)   Floor space area of the structure;
    (iii)  Setback of the structure from the property lines of the land,
    (iv)   Height of the structure; or
    (v)    Required number of parking spaces.

There shall be no liability under this Endorsement based on the invalidity of the ordinances and amendments thereto until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

Loss or damage as to the matters insured against by this Endorsement shall not include loss or damage sustained or incurred by reason of the refusal of any person to purchase, lease or lend money on the estate or interest covered by this Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Near North National Title LLC, as issuing agent

Dated: May 24, 2007

By:

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### LOCATION ENDORSEMENT 5 - SURVEY

The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:

The failure of the plat of survey made by **SEC Group, Inc., dated March 22, 2007** , Job No. 060792, to accurately depict the location of the exterior boundaries of said land, show the proper dimensions of said boundaries and correctly reflect the absence of any encroachments or easements not otherwise expressly set forth in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC,** as issuing agent

Dated: May 24, 2007

By:

**ENDORSEMENT**
ISSUED BY

# Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

**LOCATION ENDORSEMENT 4 - CONTIGUITY**

The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:

The failure of the Parcels **of Land** described in Schedule A, to be contiguous to each other, without any gaps, gores or overlaps and, taken as tract, constitute one parcel of land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC**, as issuing agent

Dated: May 24, 2007

By:

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### LOCATION ENDORSEMENT 6 - ACCESS

The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:

The failure of said land to be contiguous to a physically open street known as **Cannonball Trail and U.S. Route 34.**

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC,** as issuing agent

Dated: **May 24, 2007**

By: _____

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### TAX PARCEL ENDORSEMENT - MODIFIED

The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:

At the Date of the Policy, the failure of:

1.  The land insured herein and described in Schedule A, taken as a tract, constitutes part of three (3) parcels for real estate tax purposes separate and apart from any other land.

2.  The land insured herein and described in Schedule A to be assessed for real estate tax purposes under the permanent index number(s) set forth at Schedule B, Exception no. 1, and said permanent index number(s) to affect only the land insured herein and other land. (Target Parcel, Kohl's Parcel, Home Depot Parcel, two (2) City of Yorkville Parcels, and two (2) excepted parcels not included in the Plat of Subdivision.)

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC,** as issuing agent

Dated: **May 24, 2007**

By: _____

# ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### UTILITY FACILITY ENDORSEMENT

The Company hereby insures the insured against loss or damage sustained by the insured in the event that, at Date of Policy:

Water, gas, electric, telephone, storm sewer and sanitary sewer services are not available to the land described in Schedule A either over, under or upon a public right of way directly adjacent to said land or over, under or upon easements (not terminable by the grantor thereof or by heirs, personal representative, successors and assigns of said grantor) appurtenant to and for the benefit of said land, or granted to the municipality or to the utility company, that connect to the public right of way.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC, as issuing agent**

Dated: May 24, 2007

By:

## ENDORSEMENT
### ISSUED BY

# Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### USURY ENDORSEMENT

The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:

The entry by any court of competent jurisdiction of an order or judgment which constitutes a final determination and adjudges that the lien of the mortgage referred to in Schedule A is invalid or unenforceable on the ground that the loan evidenced by the note or notes secured thereby is usurious under the laws of the State of Illinois.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC,** as issuing agent

Dated: May 24, 2007

By: _____

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### ALTA ENDORSEMENT - FORM 6.1
### VARIABLE RATE MORTGAGE ENDORSEMENT

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.  The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2.  Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as charged in accordance with the provisions of the insured mortgage, which loss or priority is caused by said changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage by reason of the failure of the insured to comply with the following statutes or regulations concerning variable rate mortgages:

NONE

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


**Near North National Title LLC,** as issuing agent


Dated: May 24, 2007

By: _____

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### SPECIAL POLICY MODIFICATION ENDORSEMENT - PRIORITY

The company hereby insures the insured that the priority of the lien of the mortgage insured in this Policy will not be impaired by the recordation of a lien document asserting lien rights arising under any of the following documents:

1. The Target Site Development Agreement dated May 15, 2007 and unrecorded;

2. The Home Depot Site Development Agreement recorded May 24, 2007 as document 200700016696; and

3. The Kohl's Site Development Agreement dated May 15, 2007 and unrecorded, but only to the extent that loan proceeds have been disbursed prior to the recordation of a lien arising under the Kohl's Site Development Agreement.

Nothing contained in this Policy or this endorsement should be construed as insuring the validity of the right to lien as created under the agreements described herein.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


**Near North National Title LLC**, as issuing agent


Dated: May 24, 2007

By: _____

## ENDORSEMENT
### ISSUED BY

## Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

### ENDORSEMENT 21 (CREDITORS' RIGHTS) SECTION IV-36

The Company insures against loss or damage sustained by the insured by reason of the avoidance in whole or in part, or a court order providing some other remedy, based on the voidablility of any estate, interest, or mortgage shown in Schedule A because of the occurrence on or before Date of Policy of a fraudulent transfer or a preference under federal bankruptcy, state insolvency or similar creditor's rights laws.

This Coverage provided by this endorsement shall include the payment of costs, attorneys' fees and expenses necessary to defend the insured against those counts, and no others, of any litigation seeking a court order which will result in loss or damage against which this endorsement provides insurance to the extent provided in the Conditions and Stipulations.

This endorsement does not insure against loss or damage if the insured: (a) knew when it acquired any estate, interest, or mortgage shown in Schedule A that the transfer, conveyance, or mortgage was intended to hinder, delay, or defraud any creditor; or (b) is found by a court not to be a transferee or purchaser in good faith.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC**, as issuing agent

Dated: **May 24, 2007**

By: _____

# ENDORSEMENT
## ISSUED BY

# Ticor Title Insurance Company

Attached to Policy No. N01070317

Underwriter No. 74107-73800270

**PENDING DISBURSEMENT ENDORSEMENT**

Anything in this policy and any endorsement thereto notwithstanding, the liability of the Company under said policy shall not exceed the sum of **$22,159,132.34** (being the amount actually disbursed of the proceeds of the loan secured by the mortgage described in Schedule A at Date of Policy) and costs which the Company is obligated under the Conditions and Stipulations to pay, but such liability shall be increased by the sum of subsequent disbursements made under said mortgage up to the face amount of the policy; subject, however, with respect to such increase, to any defects, liens, encumbrances, adverse claims or other matters which would be disclosed upon an examination of the title to the estate or interest in the land insured herein subsequent to the Date of Policy and down to and including the date of each such subsequent disbursement.

**INTERIM MECHANIC'S LIEN ENDORSEMENT**

The Company hereby insures the insured against loss or damage which the insured shall sustain in the event that :

The lien of the mortgage described in Schedule A is not first, prior and superior to any other liens (including mechanics' and material suppliers' liens) not shown in Schedule B of this policy to the extent of **$22,159,132.34** advanced out of the proceeds of said mortgage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**Near North National Title LLC**, as issuing agent

Dated: May 24, 2007                                By:

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

    (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land had been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters.

    (a) created, suffered, assumed or agreed to by the insured claimant;

    (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

    (c) resulting in no loss or damage to the insured claimant;

    (d) attaching or created subsequent to Date of Policy, or

    (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure to the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7.  Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

    (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

    (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or

    (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:

    (a) to timely record the instrument of transfer; or

    (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

## CONDITIONS AND STIPULATIONS

### 1. DEFINITIONS OF TERMS

The following terms when used in this policy mean:

(a) "insured" the insured named in Schedule A. The term "insured"

(i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contractor guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not,

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant", an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

### 2. CONTINUATION OF INSURANCE

(a) **After Acquisition of Title.** The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage, (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) **After Conveyance of Title.** The Coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from an insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured

(c) **Amount of Insurance.** The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(i) the Amount of insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the company may be liable by virtue of this policy, or (iii) if title to the estate or interest,

as insured, is rejected as unmarketable. If prompt notice shall not be given to the company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**4. DEFENSE AND PROSECUTION OF ACTIONS: DUTY OF INSURED CLAIMANT TO COOPERATE**

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, cost or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the term of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding , or effecting settlement, and (ii) in any other lawful act which f the opinion of the Company may be necessary or desirable to establish the title to the estate or interest, as insured. If the Company is prejudiced by the failure of the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

**5. PROOF OF LOSS OR DAMAGE**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the company, a proof of loss or damage signed and sworn to by the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage  If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insure under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insure claimant may reasonably be required to submit to examination under oath by an authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by an authorized representative of the Company the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance

(i) To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay, or

(ii) To purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for tin paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys; fees and expenses incurred by the insure claimant which were authorized by the Company up to the time of payment and which the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the company is obligated to pay.  Upon the exercise by the Company of either of the options provided for in paragraphs b(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**7. DETERMINATION, EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated I Schedule A; or, if applicable, the amount of insurance as defined in Section 2© of these Conditions and Stipulations;

(ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations

**8. LIMITATION OF LIABILITY**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall no be liable for any loss or damage caused thereby

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage

until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was a continued to be obligated to advance at and after Date of Policy.

## 9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of Company except as provided in Section 2(a) of these Conditions and Stipulations.

## 10. LIABILITY NONCUMULATIVE

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insure and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

## 11. PAYMENT OF LOSS

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 12. SUBROGATION UPON PAYMENT OR SETTLEMENT

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary to order to perfect this right of subrogation. The insured claimant shall permit the company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to these rights and remedies of the insured claimant after the insured claimant shall have recovered its principal interest, and costs of collection.

(b) The Insured's Rights and Limitations

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the from the lien of the insured mortgage, release any collateral security for the indebtedness. When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only the amount of any losses insured against by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-Insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

## 13. ARBITRATION

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating tot his policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the sites of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon Request.

## 14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any attached hereto by the Company is the entire policy and contract between the insured and the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

## 15. SEVERABILITY

In the event any provision of the policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect

## 16. NOTICES, WHERE SENT

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at Ticor Title Insurance Company, Claims Department, P.O. Box 45023, Jacksonville, Florida 32232-5023.

# EXHIBIT 2



**Traci S. Rea**
Direct Phone: +1 412 288 4184
Email: TRea@reedsmith.com

Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Tel +1 412 288 3131
Fax +1 412 288 3063
reedsmith.com

January 14, 2015

*VIA EMAIL AND OVERNIGHT DELIVERY*

Laura Maines Vasey
Vice President/Major Claims Counsel
Fidelity National Title Group
711 Third Avenue, Suite 500
New York, NY 10017

Re:  *Bank of America, N.A. v. Cannonball LLC, et. al.*
     **Insured:  Bank of America, N.A. as successor by merger to LaSalle Bank N.A.**
     **Policy No.:  N01070317**
     **Claim No.:  428868**
     **Property:  Kendall Marketplace Subdivision, Yorkville, Illinois**

Dear Ms. Vasey:

As you know, on November 26, 2014 the Illinois Supreme Court denied Bank of America's petition for leave to appeal in the case captioned *Bank of America, N.A. v. Cannonball LLC, et. al.*, Case No. 10 CH 869.  As a result, by letter dated January 6, 2015, Home Depot has demanded that Bank of America pay $44,143.44 as its share of 2013 SSA Taxes for Kendall Marketplace.  A copy of Home Depot's January 6, 2015 correspondence is enclosed for your reference.  Under the operative agreements, we understand payment to be due within thirty (30) days.

Under Ticor Title Insurance Policy No. IL 2257-48-N01070317, Chicago Title Insurance Company, as successor to Ticor, is responsible for any amounts due to Home Depot for SSA Taxes associated with Kendall Marketplace.  Kindly process this amount for immediate payment.  If you need additional information at this time or would like to discuss this further please let me know.  Given the time constraints involved with this payment, we appreciate your prompt response.

Very truly yours,

REED SMITH LLP

By:
     Traci S. Rea

TSR/seg

Enclosure

LAW OFFICES
**ROTHSCHILD, BARRY & MYERS LLP**
A LIMITED LIABILITY PARTNERSHIP
150 SOUTH WACKER DRIVE, SUITE 3025
CHICAGO, ILLINOIS 60606
(312) 372-2345

Michael J. Wall
wall@rbmchicago.com

January 6, 2015

<u>Via Email:</u>  PBlock@riemerlaw.com
Mr. Phillip J. Block
Riemer & Braunstein LLP
71 S. Wacker Drive
Suite # 3515
Chicago, IL 60606

　　　　　　　　Re:　　*Bank of America v. Cannonball LLC, et al.*
　　　　　　　　　　　**Case No. 10 CH 869**

Dear Mr. Block:

　　　　As we have discussed, it is the position of Home Depot that the plaintiff owes Home Depot a portion of the SSA Taxes, that have been assessed against Home Depot's property in the shopping center, since the date that the plaintiff took title to the property formerly owned by Cannonball LLC.

　　　　I have calculated the amount due as follows:  The Sheriff's Deed to the plaintiff is dated August 15, 2013, leaving 138 days of SSA Taxes due in 2013 for apportionment.  The full amount of the SSA Tax on Home Depot's parcel for 2013 was $167,155.85 and it was paid by Home Depot.  A copy of the 2013 tax bill is attached.  Home Depot's full share of that tax bill should have been only $50,398.50 (100,797 square feet x $0.50) per the terms of Section 22(h) of the Purchase Agreement and Section 7.8(c) of the Development Agreement.  That would have left $116,757.35 due from the plaintiff.  The daily rate for that amount is $319.88.  Thus, the amount due to Home Depot from the plaintiff for the 2013 SSA Taxes is $44,143.44 (138 x 319.88).

　　　　If your client agrees to this amount and a short date for payment, I can avoid raising this when we return to the trial court.  I assume that Home Depot will start billing the plaintiff directly when the first 2014 bill comes out.

　　　　Please call me if you have any questions.

　　　　　　　　　　　　　Michael J. Wall / sp

　　　　　　　　　　　　　Michael J. Wall

MJW:ap
Enclosure

1/6/2015                    Kendall County | Information for Parcel 02-20-381-001, Tax Year 2013 Payable 2014



# Kendall County, Illinois

## Information for Parcel 02-20-381-001, Tax Year 2013 Payable 2014
### Generated 01/06/15 at 12:19:59

### Property Information

| | |
|---|---|
| **Tax Year** 2013 | **Tax Code** BR069 - KENDALL MRKTPL 115 |
| **Township** Bristol Township | **Neighborhood** |
| **Property Class** 0060-IMPROVED COMMERCIAL | **Land Use** - |
| **Tax Status** Taxable | **Lot Size** IRREG |
| **Net Taxable Value** 1,713,853 | **Tax Rate** 20.988970 |
| **Site Address** 735 EDWARD LN YORKVILLE, IL 60560 | **Total Tax** $359,720.10 |
| **Owner Name and Address** HOME DEPOT USA INC PROPERTY TAX DEPARTMENT 6887 PO BOX 105842 ATLANTA, GA 30348-5842 | **Mailing Name and Address** HOME DEPOT USA INC PROPERTY TAX DEPARTMENT 6887 PO BOX 105842 ATLANTA, GA 30348-5842 |
| **Legal Description** LOT 20 KENDALL MARKETPLACE CITY OF YORKVILLE | |

### Assessments

| Level | Homesite | Dwelling | Farm Land | Farm Building | Mineral | Total |
|---|---|---|---|---|---|---|
| DOR Equalized | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |
| Department of Revenue | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |
| Board of Review Equalized | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |
| Board of Review | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |
| S of A Equalized | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |
| Supervisor of Assessments | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |
| Township Assessor | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |
| Prior Year Equalized | 603,089 | 1,229,126 | 0 | 0 | 0 | 1,832,215 |

### Payments

| Installment | Date Due | Tax Billed | Penalty Billed | Cost Billed | Drainage Billed | Total Billed | Amount Paid | Total Unpaid |
|---|---|---|---|---|---|---|---|---|
| First | 06/03/2014 | $179,860.05 | $0.00 | $0.00 | $0.00 | $179,860.05 | $179,860.05 | $0.00 |
| Second | 09/03/2014 | $179,860.05 | $0.00 | $0.00 | $0.00 | $179,860.05 | $179,860.05 | $0.00 |
| Total | | $359,720.10 | $0.00 | $0.00 | $0.00 | $359,720.10 | $359,720.10 | $0.00 |

### Payment Detail

1/6/2016     Kendall County | Information for Parcel 02-20-351-001, Tax Year 2013 Payable 2014

| Installment | Receipt Number | Date Paid | Paid By | Amount |
|---|---|---|---|---|
| First | 2013009981 | 05/22/2014 | HOME DEPOT USA INC | $179,860.05 |
| Second | 2013009981 | 08/22/2014 | HOME DEPOT USA INC | $179,860.05 |
| **Total** | | | | **$359,720.10** |

## No Exemption Information

## No Farm Land Information

## Parcel Genealogy

### Parent Parcels

| Child Of | Action | Tax Year | Change Effective Year | Completed? |
|---|---|---|---|---|
| 02-20-351-004 | Split | 2007 | 2007 | Yes |
| 02-20-351-005 | | 2007 | 2007 | Yes |

### Child Parcels

| Parent Of | Action | Tax Year | Change Effective Year | Completed? |
|---|---|---|---|---|

## Legal Descriptions

| Legal Description | Section/Township/Range | Document |
|---|---|---|
| LOT 20 KENDALL MARKETPLACE CITY OF YORKVILLE | | 0714779 |

## Related Names

| Name | Relationship | Status |
|---|---|---|
| HOME DEPOT USA INC | Parcel Owner | Current |

## Sales History

| Year | Document # | Sale Type | Sale Date | Valid Sale | Gross Selling Price | Net Selling Price |
|---|---|---|---|---|---|---|
| 2007 | 200716692 | Warranty Deed | 05/01/2007 | Yes | 1,841,720 | 1,841,720 |
| 2007 | 200716689 | Warranty Deed | 05/01/2007 | Yes | 14,682,692 | 14,682,692 |

## Tax Sale Summary

| Year | Certificate | Type | Date Sold | Sale Status | Status Date | Penalty Date |
|---|---|---|---|---|---|---|

## Site Addresses

| House Number | House Number Suffix | Street Name | |
|---|---|---|---|
| 735 | | EDWARD LN | |
| City | State | Zip Code | Location |
| YORKVILLE | IL | 60560 | |

## Taxing Bodies

| District | Tax Rate | Extension |
|---|---|---|
| COUNTY | 0.8009 | $13,726.94 |
| BRISTOL-KENDALL FPD | 0.7718 | $13,228.20 |
| FOREST PRESERVE | 0.1640 | $2,810.95 |
| JR COLLEGE #516 | 0.5690 | $9,752.98 |
| YORKVILLE LIBRARY | 0.3241 | $5,554.94 |
| YORKVILLE/BRISTOL SD | 0.0000 | $0.00 |
| KENDALL MRKTPL SSA 2006-113 | 9.7532 | $167,155.85 |
| BRISTOL TOWNSHIP | 0.1297 | $2,222.87 |
| BRISTOL ROAD DISTRICT | 0.2942 | $5,042.33 |
| SCHOOL DIST CU-115 | 7.4081 | $126,964.29 |
| CITY OF YORKVILLE | 0.7738 | $13,261.45 |
| **Total** | **20.9890** | **$359,720.10** |

## Images

| No images found. |
|---|

# EXHIBIT 3

# CHICAGO TITLE INSURANCE COMPANY



711 THIRD AVENUE, 5TH FLOOR, NEW YORK, NY 10017 (212) 880-1200 (800) 525-2511

Via E-Mail and Overnight Mail
(TRea@ReedSmith.com)

January 23, 2015

Traci S. Rea, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222-2716

Re: Claim No. 428868

Policy No. N01070317

| | |
|---|---|
| Insured Mortgage: | Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of May 1, 2007 and recorded May 24, 2007, made by Cannonball, LLC, to and for the benefit of LaSalle Bank National Association, as agent for itself and other Banks, to secure an amount of indebtedness of $97,040,000.00. |
| Property: | Lots 1-19, 21, 24-52, 55 and 57 in Kendall Marketplace Subdivision in the United City of Yorkville, Kendall County, Illinois, as more specifically described in Schedule A of the Policy. |
| Litigation: | *Bank of America, N.A. v. Cannonball LLC, et al.*, No. 10-CH-0869 (Circuit Ct., Kendall County, IL), appealed to the Appellate Court of Illinois, Second Judicial District (No. 2-13-0858). Petition for leave to appeal to Illinois Supreme Court denied on November 26, 2014. |

Dear Ms. Rea:

On behalf of Chicago Title Insurance Company (successor by merger to Ticor Title Insurance Company) (the "Company" or "Chicago Title"), I write concerning the above-referenced claim made by Bank of America, N.A. (as successor by merger to LaSalle Bank National Association ("LaSalle Bank")), in its individual capacity and as agent for other lenders (collectively, the "Bank"), and in response to your January 14, 2015 letter.[1]

---

[1] This letter supplements the correspondence sent by predecessor claims counsel Gregory A. Dawley, Esq. to the Bank's counsel, Jeffrey D. Ganz, Esq. and Phillip J. Block, Esq. of Riemer & Braunstein LLP, including but not limited to Mr. Dawley's letters dated April 13, 2012, April 27, 2012, May 3, 2012, June 1, 2012, July 26, 2012, and September 19, 2012. Subject to a complete reservation of Chicago Title's rights under the Policy and the applicable law, Chicago Title retained Riemer & Braunstein to defend the Bank against counterclaims and affirmative defenses asserted by Home Depot U.S.A. Inc. and Target Corporation in the above-captioned mortgage foreclosure Litigation.

This letter does not address the Bank's request for reimbursement of legal fees, costs, and expenses incurred before the Bank tendered its claim to Chicago Title (about 18 months after the Bank commenced the Litigation), or the Bank's request for reimbursement of amounts paid for document management services. These requests will be addressed in separate correspondence.

Ms. Traci S. Rea, Esq.
January 23, 2015
Page 2

### Overview

By way of background, in the above-referenced Litigation, the Illinois Appellate Court held that certain agreements between borrower/mortgagor Cannonball, LLC ("Cannonball") and adjacent property owner Home Depot U.S.A. Inc. ("Home Depot") – specifically, Cannonball's agreement to reimburse Home Depot for certain Special Service Area Taxes ("SSA Taxes") against its property, and to permit Home Depot to record a lien against Cannonball's Property if payment was not timely made (collectively, "Home Depot's lien rights") -- were covenants running with Cannonball's Property and not extinguished by the Bank's foreclosure of its Mortgage.[2] The Bank's petition for leave to appeal that decision to the Illinois Supreme Court was denied on November 26, 2014.

By letter dated January 6, 2015, Home Depot asked the Bank to pay a portion of the SSA Taxes assessed against its property after the Bank took title to the Property. In your January 14, 2015 letter, you requested immediate payment of the $44,143.22 demanded by Home Depot, claiming that Chicago Title is responsible for any amounts due to Home Depot for the SSA Taxes associated with Kendall Marketplace.

Chicago Title disagrees for several independent reasons, which are detailed below and briefly summarized here:

(1) Before the Policy was issued, the Bank knew and accepted that Cannonball's title would be subject to Home Depot's lien rights.[3] The Bank asked Chicago Title to insure, in the Policy to be issued, that Home Depot's lien rights were subordinate to the Bank's Mortgage lien. Chicago Title gave the requested special priority endorsement to the Policy and, in fact, the priority of the Bank's Mortgage lien was established in the Litigation.[4] Coverage Exclusion 3(a), which excludes coverage for defects, liens, and encumbrances "suffered, assumed or agreed to" by the insured, therefore bars the Bank's claim for indemnification.

---

[2] See Appellate Court Opinion dated May 29, 2014, modified on denial of petition for rehearing on August 5, 2014 (hereinafter, "Appellate Opinion").

[3] See, e.g., May 3, 2007 e-mail from LaSalle Bank's counsel (Stephen H. Malato, Esq. of Hinshaw & Culbertson LLP) to Chicago Title's agent, Near North National Title LLC (John R. Lamberts, EVP & General Counsel) (noting that the Home Depot Development Agreement provides for a lien that is inferior to a first mortgage lien, attaching Article 12 of that Development Agreement, and stating: "The issue is this: **the lender is recognizing Target's, Kohl's and Home Depot's rights under the site development agreements but is doing so on the assurances that the lien rights are inferior to the lender's mortgage.** We need you to provide a special endorsement that will provide assurances that the lender's lien is superior to the liens that might come out of the site development agreements.") (emphasis added). A copy of this email (without attachments) is attached to the May 8, 2012 Letter from Mr. Ganz to Mr. Dawley.

[4] The Circuit Court ordered that the proceeds of the sale be applied to satisfy amounts owed to the Bank before any proceeds were used to satisfy amounts due to Home Depot. See Circuit Court Order of Default Judgment, Summary Judgment and Judgment of Foreclosure and Sale dated March 1, 2013, at 18 (Application of Proceeds).

(2)     The Policy insures against defects, liens, or encumbrances on title to the Property on the Date of Policy (May 24, 2007) (subject to the Policy's Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions and Stipulations). However, as a matter of law, neither the future taxes that Cannonball would owe to Home Depot, nor the possibility that Home Depot would record a future lien against Cannonball's Property, constituted a "defect in or lien or encumbrance on the title" to the Property on the Date of Policy.

(3)     Home Depot has acknowledged that any SSA Taxes due and owing before the Bank acquired title to the Property (in August 2013) cannot be recovered from the Bank. The Bank's indemnification claim is based on post-Policy liens or encumbrances against the Property.[5] Such matters are excluded from coverage by Exclusion 3(d), which excludes coverage for defects, liens, and encumbrances "attaching or created subsequent to Date of Policy" (May 24, 2007).

(4)     The Bank's indemnification claim is also barred by the exceptions from coverage contained in Schedule B Part I of the Policy, which excepted from coverage any loss or damage arising out of the imposition of SSA Taxes under the SSA Tax Ordinance.

(5)     The Policy provisions that the Bank has previously cited in seeking indemnification – Schedule B Part II and the Special Priority Endorsement – insured only the priority of the Bank's Mortgage lien over Home Depot's lien rights. That priority was recognized and established in the Litigation.

## Factual Background

### The Construction Loan Agreement

The Bank and Cannonball entered into a Construction Loan Agreement dated May 1, 2007, as amended by subsequent Letter Agreements (collectively, the "Loan Agreement"). Under the Loan Agreement, the Bank agreed to lend up to $97,040,000 to Cannonball for purposes of: (i) acquiring title to certain land to be developed for retail and residential purposes, (ii) improving the retail tract with a 350,000 square foot retail center (the "Shopping Center"), and (iii) constructing certain off-site improvements necessary to make use of the retail and residential tracts, including constructing improvements on adjacent properties being acquired from Cannonball by Anchor Tenants Home Depot, Target Corporation ("Target"), and Kohl's Illinois, Inc. ("Kohl's").[6]

---

[5] Pursuant to Section 22(h) of the Real Property Purchase Agreement entered into between Cannonball and Home Depot (the "Purchase Agreement"), Home Depot is not permitted to record a lien against the Property unless the required SSA Tax reimbursement payment is not made within 30 days after Home Depot bills the Bank (as successor to Cannonball) for those taxes.

[6] Only Home Depot's rights are relevant. Any claims that Target and Kohl's made with respect to the Property were resolved during the course of the Litigation.

By Assignment and Acceptance agreements effective as of June 28, 2007, LaSalle Bank assigned interests in the Construction Loan Agreement to Associated Bank, National Association, Mid-America Bank, fsb (succeeded by PNC Bank), and TierOne Bank (succeeded by Great Western Bank) (collectively, the "Lenders"). In the Assignment and Acceptance agreements, each of the Lenders expressly "confirms that it has received a copy of the Loan Documents", which are defined in the Construction Loan Agreement as "[t]his Agreement, the documents specified in Article 5 hereof and any other instruments evidencing, securing or guarantying obligations of any party under the Loans."

The Construction Loan Agreement (Section 1.1) specifically defines "Development Agreements" as the separate Development Agreements between Cannonball and Home Depot, Target, and Kohl's. Furthermore, as a condition precedent to the Loan Opening (which occurred on May 15, 2007), Article 6.1(u) of the Construction Loan Agreement required Cannonball to deliver to the Bank certified copies of the Home Depot Development Agreement and any other documents entered into between Cannonball and Home Depot.

Home Depot's Tax Reimbursement and Lien Rights

In May 2007, Home Depot and Cannonball entered into a Real Property Purchase Agreement (the "Purchase Agreement") and a Development Agreement (the "Development Agreement"), which, together, established Home Depot's lien rights against Cannonball's Property. The Purchase Agreement required Cannonball to reimburse Home Depot for a portion of the SSA Taxes levied against Home Depot's property by the United City of Yorkville ("Yorkville"), and provided that if Cannonball failed to fulfill its reimbursement obligation, then Home Depot would have lien rights against Cannonball's Property under the terms set forth in the Development Agreement.

Specifically, Section 22(h) of the Purchase Agreement provides:

Seller [Cannonball] has disclosed to Purchaser [Home Depot] that, in conjunction with the Incentive (as hereinafter defined) and related bond sale to fund Site Work Improvements in the Shopping Center, Seller and the City are establishing a special service area ("SSA") which is to (i) include the Shopping Center Parcel, (ii) remain in existence for the term of the bonds which are secured by a portion of the Shopping Center sales tax revenues, and (iii) enable the City to levy an additional tax assessment against properties within the SSA. **Seller hereby agrees that Seller shall be obligated to reimburse Purchaser for any portion of such SSA tax assessment which exceeds an amount equal to $0.50 per square foot of Purchaser's Floor Area** (as defined in the OEA [Operation and Easement Agreement]), **exclusive of the garden center. If Seller fails to pay any such excess SSA tax assessment within thirty (30) days after Purchaser bills Seller therefor**, then in addition to any other rights and remedies available to Purchaser, **Purchaser shall have lien rights against Seller's land in the Shopping Center in accordance with the terms of the Development Agreement. The terms of this Section 22(h) shall survive the Closing and shall be included in a memorandum of agreement to be executed, delivered and recorded by Seller and Purchaser at Closing.** The form of the memorandum of agreement shall be approved by Seller and Purchaser within the Inspection Period; provided, however, Purchaser agrees that the memorandum of agreement shall not specifically

reference the economic terms of the foregoing reimbursement obligation but shall merely reference a reimbursement obligation from Seller to Purchaser pursuant to this Section 22(h), **which shall be a covenant which shall run with the land and bind Seller's grantees, successors and assigns.**

(emphasis added).[7]

The Development Agreement recites the terms of Cannonball's tax reimbursement obligation to Home Depot, as well as Home Depot's lien rights in the event Cannonball defaults on those obligations. Specifically, Section 7.8(c) of the Development Agreement provides, in relevant part:

> [P]ursuant to Section 22(h) of the Purchase Agreement, Developer is obligated to reimburse Home Depot for any portion of such Special Service Area tax assessment ..., which exceeds, in the aggregate, an amount equal to $0.50 per square foot of Floor Area .... **If Developer fails to pay any such excess Special Service Area tax assessment within thirty (30) days after Home Depot bills Developer therefor,** then in addition to any other rights and remedies available to Home Depot, **Home Depot shall have lien rights against Developer's Property in accordance with the terms of this Agreement.** ....

(emphasis added). The Development Agreement affords Home Depot the following lien rights, in relevant part:

> 12.1 <u>Grant of Lien</u>. Developer hereby grants and conveys to Home Depot a lien on Developer's Property to secure the performance by Developer of its obligations hereunder. ...
>
> * * *
>
> 12.4 <u>Priority</u>. The priority of a lien created pursuant to this Article 12 shall be established solely by reference to the date of the recordation of the Memorandum of Development Agreement pursuant to Section 17.4 below; provided, however, **such lien shall be subordinate to the lien of any first mortgage or deed of trust.**

(emphasis added).

The lien rights that Cannonball granted to Home Depot were made matters of record by the Memorandum of Agreement between Cannonball and Home Depot executed on May 15, 2007, and recorded against the Property on May 24, 2007:

---

[7] Cannonball's reimbursement obligation is also recited in Section 7.8(c) of the Development Agreement.

## MEMORANDUM OF AGREEMENT

CANNONBALL LLC, an Illinois limited liability company (**"Developer"**), and HOME DEPOT U.S.A., INC., a Delaware corporation, are parties to (1) a Real Property Purchase Agreement dated as of March 9, 2007 (as amended, the **"Purchase Agreement"**) with respect to certain real property located in the City of Yorkville, County of Kendall, State of Illinois, described on the attached **Exhibit "A"** which is incorporated herein by this reference, and affecting certain real property described on the attached **Exhibit "B"** incorporated herein by this reference, and (2) a Development Agreement dated as of the date hereof (the **"Development Agreement"**) affecting the real property described on **Exhibit "B"**.

Notice is hereby given of the execution and delivery by the parties of the Purchase Agreement (which Purchase Agreement is hereby incorporated herein by reference). Notice is specifically provided that Developer has certain reimbursement obligations under Section 22(h) of the Purchase Agreement and that if Developer fails to comply with such obligations, the Purchase Agreement creates a lien on the property described on **Exhibit "B"** in accordance with the lien provisions contained in the Development Agreement. Developer's obligations under Section 22(h) of the Purchase Agreement shall be a covenant which shall run with the land and shall be binding upon Seller's grantees, successors, and assigns.

## The Litigation

The Bank commenced the mortgage foreclosure Litigation following Cannonball's default on its loan obligations. The Bank's First Amended Verified Complaint filed on September 28, 2010 sought to foreclose its Mortgage, and to terminate any right or interest that Home Depot may have against the Property. The Bank alleged that any right or interest that Home Depot may have – including any actual or potential rights to record liens or exercise any other rights against the Property pursuant to the Purchase Agreement and the Development Agreement – were subordinate and inferior to the lien and interest of the Bank.

Home Depot filed an answer, affirmative defenses, and counterclaim, denying that its lien rights were inferior to those of the Bank.[8] Home Depot later filed an amended counterclaim, seeking a declaratory judgment that Home Depot's rights under the Purchase Agreement and the Development Agreement were covenants running with the Property.

The Bank moved for summary judgment, contending that Section 12.4 of the Development Agreement specifically subordinated Home Depot's lien rights against the Property to the Bank's Mortgage. Home Depot filed a cross-motion for summary judgment in its favor.

On March 1, 2013, the Circuit Court entered an Order of Default Judgment, Summary Judgment and Judgment of Foreclosure and Sale (the "Circuit Court Order"). The Circuit Court granted the Bank's motion for summary judgment against Home Depot, concluding that Home Depot's lien rights were personal as between Home Depot and Cannonball, did not run with the Mortgaged Property, were foreclosed and terminated except as to Home Depot's contractual

---

[8] Home Depot asserted a counterclaim against Cannonball seeking $50,395.50 plus attorneys' fees and costs, based on Cannonball's breach of its obligation to reimburse Home Depot for a portion of the SSA Taxes levied against its property. On March 16, 2011, Home Depot also recorded a "Notice of Current Amount Due under Lien Rights" against Cannonball's Property, giving notice of the amount owed. Home Depot later voluntarily dismissed this claim without prejudice, and conceded that it could not recover from the Bank any SSA Taxes owed prior to the Bank's taking title to Cannonball's Property. See Appellate Opinion at 6, 9.

rights against Cannonball, and that any purchaser of the Property at the foreclosure sale would have no obligation to reimburse Home Depot for any portion of the SSA Taxes assessed against the Home Depot property. See Circuit Court Order at 14 (¶ iv). The Circuit Court Order recognized and established the priority of the Bank's Mortgage lien over the lien rights of Home Depot.[9]

A judicial sale of the Property was conducted by the Kendall County Sheriff's Department on June 17, 2013. Bank of America purchased the Property with a credit bid of $17,024,000. By Order dated August 14, 2013, the Circuit Court confirmed the sale of the Property, and entered judgments against Cannonball in the amount of $34,821,158.33 and against guarantor David Bossy in the amount of $5,079,887.13. Bank of America acquired title to the Property by Sheriff's Deed executed on August 15, 2013.

Home Depot appealed. The Appellate Court reversed and granted summary judgment in Home Depot's favor. As an initial matter, the Court noted that:

> during oral argument, **Home Depot conceded that any lien it had against the mortgaged property for tax reimbursement payments that came due and owing before Bank of America obtained title to the property could <u>not</u> be enforced against Bank of America.** *See Pembrook Condominium Ass'n-One v. North Shore Trust and Savings*, 2013 IL App (2d) 130288, ¶ 14. **Thus, this case involves only whether Home Depot will be able to enforce its tax reimbursement and lien rights against Bank of America and its successors and assigns in the future.** Therefore, we must determine whether the covenants at issue run with the land.

Appellate Opinion at 9 (emphasis added).

The Appellate Court held that the lien rights Cannonball had granted to Home Depot constituted covenants running with the land, which were binding on the Bank notwithstanding the foreclosure of its Mortgage lien against the Property.[10] The Court stated:

> In this case, the LaSalle Bank mortgage was recorded on the same day, but after, Home Depot's memorandum of the purchase agreement and memorandum of the development agreement were recorded. Further, **LaSalle Bank had actual knowledge of the documents containing Home Depot's tax reimbursement and lien rights before it recorded its mortgage, because the purchase and development agreements were part of the closing documents.** The effective date of the mortgage lien is the date of its recording. *Aames Capital Corp. v.*

---

[9] See Circuit Court Order at 15-16 (ordering the sale of the Property "in order **to first satisfy** the amounts due and owing to Bank of America") (emphasis added), and at 18-19 (ordering that the foreclosure sale proceeds shall be applied to satisfy the Bank's claim before any proceeds may be used to satisfy Home Depot's claim for amounts owed by Cannonball for SSA Taxes). These provisions of the Circuit Court's Order were not challenged by Home Depot and were not reversed on appeal.

[10] The Court cited Section 22(h) of the Purchase Agreement and the recorded Memorandum of Agreement, which states that Section 22(h) is a covenant running with the land and binding on Cannonball's grantees, successors and assigns. The Court also cited Section 17.2 of the Development Agreement, which makes its terms binding upon the executing parties and their respective successors and assigns. See Appellate Opinion at 9-10.

*Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 703 (2000). Thus, Home Depot's tax reimbursement and lien rights, being in effect before the mortgage and running with the land, were not extinguished by foreclosure.

Appellate Opinion at 14 (emphasis added).[11]

The Court rejected the Bank's contention that Section 12.4 of the Development Agreement, which made Home Depot's rights subordinate to any first mortgage lien, should be interpreted as extinguishing Home Depot's rights following foreclosure of the Bank's Mortgage. The Court explained:

> Nothing in the provision at issue indicates the parties' intent to extinguish Home Depot's tax reimbursement and lien rights. Neither the word 'extinguish' nor any word with a similar meaning is contained in the provision. Rather, **the plain and ordinary meaning of the language indicates only that Home Depot's lien was 'assign[ed] a lower priority'** (see Black's Law Dictionary 1467 (8[th] ed. 2004)) **than Bank of America's first mortgage lien**. Therefore, Home Depot's tax reimbursement and lien rights were not extinguished by section 12.4 of the development agreement.

Appellate Opinion at 15 (emphasis added).

By letter dated November 26, 2014, the Illinois Supreme Court advised that it had denied the Bank's petition for leave to appeal from the Appellate Court's Opinion.

**Coverage Analysis**

In the Bank's prior correspondence to Chicago Title, the Bank contended that the Policy insures that Home Depot "would have no future rights against the Property" after the Bank's foreclosure of its Mortgage, and that Schedule B Part II and the "Special Policy Modification Endorsement – Priority" (the "Special Priority Endorsement") provide coverage for its claim.[12]

---

[11] According to Home Depot's opening Appellate Brief, the record (which does not appear to have been provided to Chicago Title by the Bank's litigation counsel) contains "a series of emails among the attorneys for Home Depot, Cannonball and LaSalle agreeing on the recording sequence." Home Depot App. Br. at 27 (citing R. C6180 – C6184). According to Home Depot, "[t]he recording sequence was intentional so that Home Depot's rights came first, except as modified by the one clause [Section 12.4] in the Development Agreement." Id. at 27-28.

[12] See, e.g., J. Ganz Letter dated May 8, 2012 at 2 ("the Bank seeks coverage for the Anchor Tenants' *rights* to lien the Property *after* the foreclosure contemplated by the Litigation is completed regardless of whether title is then held by the Bank, an affiliate of the Bank, or an unaffiliated third party") (emphasis in original), at 3 ("It is the Bank's position that the Anchor Tenants' Liens of Record and the Anchor Tenant' Lien Rights are subordinate and inferior to the lien of the Bank's Mortgage and should be terminated upon foreclosure of the Bank's Mortgage. … [S]hould the Court not foreclose and terminate the Anchor Tenants' Lien Rights would be an encumbrance on title for which the Company provided coverage under the Special Endorsement."); and at 4 ("pursuant to Schedule B Part II, the Company has already insured that the Anchor Tenants will have no future rights against the Property under the Target Site Development Agreement, Home Depot Memorandum of Agreement, and Home Depot Development Agreement following foreclosure of the Bank's Mortgage.").

These contentions are incorrect. As shown below, Schedule B Part II and the Special Priority Endorsement insured only that the Bank's Mortgage lien would have priority over Home Depot's lien rights, i.e., that Home Depot's lien rights were subordinate to the Bank's Mortgage lien. Neither of those provisions, nor any other provision of the Policy, insured that Home Depot had no lien rights with respect to the Property, or that Home Depot's lien rights would be extinguished by the Bank's foreclosure of its Mortgage.

I.      **The Policy's Insuring Provisions**

The Policy's insuring provisions provide, in relevant part:

> **SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS**, TICOR TITLE INSURANCE COMPANY, a California corporation, herein called the Company, **insures, as of Date of Policy shown in Schedule A**, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:
>
> 2.      Any defect in or lien or encumbrance on the title;
>
> * * *
>
> 6.      The priority of any lien or encumbrance over the lien of the insured mortgage;
>
> * * *

(emphasis added). As stated above, the Policy's insuring provisions require that any alleged defect exist "as of Date of Policy shown in Schedule A". This language has consistently been interpreted to require – as a prerequisite for coverage under any of the insuring provisions – that the alleged defect, lien, or encumbrance have been in existence on the effective date of the policy.[13] In addition, the coverage provided by the insuring provisions is expressly limited by the Policy's Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions and Stipulations.

---

[13] See, e.g., Joyce D. Palomar, Title Insurance Law, § 5.2 at p. 232 (2011-2012 ed.) (the phrase "as of Date of Policy" preceding the insuring clauses of ALTA title insurance policies "means that an insured is protected against loss by reason of a lien, encumbrance, or other title defect if it existed *prior to* the date the policy was issued.") (emphasis in original); Vestin Mortg., Inc. v. First Am. Title Ins. Co., 139 P.3d 1055, 1057 (Utah 2006) ("title insurance does not insure against future events. Thus, in order for a defect, lien, or encumbrance to fall within the insurance policy's coverage, it must have been in existence as of the effective date of the policy"); Lawyers Title Ins. Co., Inc. v. Novastar Mortg., Inc., 862 S. 2d 793, 797 (Fla. Dist. Ct. App. 2003) ("[T]itle insurance is protection against future loss because of past events."); Elysian Inv. Group v. Stewart Title Guaranty Co., 105 Cal. App. 4th 315, 322 (Cal. Ct. App., 2d Dist. 2002) ("Title insurance … insures against defects in title existing at the time when the policy is issued.") (citing cases).

**II.**    **Home Depot's Tax Reimbursement and Lien Rights Were Not a Defect, Lien, or Encumbrance on Title to the Property on the Date of the Policy.**

Neither Home Depot's right to reimbursement for future SSA Taxes imposed on its property, nor its right to record a lien against Cannonball's Property if Cannonball defaulted on its reimbursement obligation, constituted a defect, lien, or encumbrance on title to the Property as of the Date of the Policy (May 24, 2007). This is shown by, among other authorities, Rhone v. First Am. Title Ins. Co., 401 Ill. App. 3d 802 (Ill. App., 1st Dist. 2010).

In Rhone, the Illinois Appellate Court considered whether unassessed property taxes covering 2004 and 2005 constituted a lien or encumbrance on title to the property when the title insurance policy was issued in 2006. Id. at 807-808, 812. There was no dispute that under the Illinois Tax Code (35 ILCS 200/21-75) (which provision applies to the SSA Taxes at issue here, see supra footnote 15), the unassessed taxes did not become a lien on the insureds' property until 2008, when the taxes were levied. The Court concluded that the unassessed taxes were neither a lien nor an encumbrance on title to the insureds' property as of the date of the policy. The Court explained:

> [T]he prospect of a future tax lien does not give rise to an encumbrance on the title before the tax is levied. … To be clear, unassessed property taxes cannot constitute an encumbrance on title at any point before the tax is levied pursuant to statute, at which point the tax constitutes both a lien and an encumbrance, as each term is used in a title insurance policy. Put another way, a title insurance policy "'operates to protect … against defects in or incumbrances on a title existing at the date of such insurance.'" …

401 Ill. App. 3d at 814-15 (citations omitted). The Court rejected the argument that the unassessed taxes constituted an encumbrance on title as of the policy date:

> For the reasons we make clear below, in the context of a title insurance policy, we reject the Rhones' reliance on a broad use of the term "encumbrance" to bring their claim regarding unassessed and unlevied taxes within the title policy. We hold that by operation of the Tax Code, the bills regarding the unassessed taxes acquired status as tax liens on January 1, 2008. The additional tax bills for 2004 and 2005, based on the 2007 reassessment of the property as improved, could not constitute an encumbrance on the title by way of any 'unexercised authority' of the Cook County assessor on or before August 31, 2006. To hold otherwise would so enlarge the term "encumbrance" to make it virtually impossible to determine whether an encumbrance exists at the time a title insurance policy is issued.

Id. at 812.

In concluding that the unassessed taxes were neither liens nor encumbrances on title to the property on the policy date, the Court noted: "First American no more agreed with the Rhones to protect them against liability for the unpaid assessment in question than it undertook to indemnify the Rhones for taxes to be levied against the premises after the delivery of the policy." Id. at 815.

In reaching its decision, the Rhone Court relied on cases from other jurisdictions, the facts of which are strikingly similar to the facts present here. See, e.g., Edwards v. St. Paul Title

Insurance Co., 39 Colo. App. 235, 236 (1977) (rejecting plaintiff's claim that assessment for water and sanitation district levied two years after the policy date constituted a "'defect in or lien or encumbrance on the title'" because "the mere existence of the [water and sanitation] district and the prospect of taxes in the future was not a lien, encumbrance, or defect as of the date of issuance of the policy"); Butcher v. Burton Abstract Title Co., 52 Mich. App. 98, 101-102 (Mich. Ct. App. 1974) (rejecting plaintiffs' argument that special assessments and prospective general ad valorem taxes encumbered title on the date the title insurance policy was issued, where the charges were neither due nor constituted liens on the property as of that date: "Granting that the broadest definition of the word 'encumbrance' might include prospective charges, the general rule is that a special assessment does not become an encumbrance until it has achieved lien status. ... Furthermore, ad valorem taxes not yet due are not liens or encumbrances within the meaning of a title insurance policy.") (citations omitted); Mayers v. Van Schaick, 268 N.Y. 320, 323-24 (1935) (unpaid installments of assessment for village park, payable concurrently with general village tax, did not constitute a defect, lien or encumbrance on title to the property as of the date the insurer issued the certificate of title, where unpaid installments would not become a lien on the property until after the date of the insurance certificate).

As Rhone and the other decisions show, neither the future taxes that Cannonball would owe to Home Depot, nor the possibility that Home Depot would record a future lien against Cannonball's Property constituted a "defect in or lien or encumbrance on the title" to the Property on the Policy Date. Under the terms of the Purchase Agreement, Cannonball was obligated to pay a portion of Home Depot's SSA Taxes within 30 days after being invoiced for those taxes by Home Depot. Home Depot's lien rights against the Property would arise, if at all, only after Cannonball defaulted on that reimbursement obligation. However, as of the Policy Date (May 24, 2007), no SSA Taxes had been levied against Home Depot's property, and Home Depot had no lien for the payment of such taxes against Cannonball's Property.[14] Insuring Clause No. 2 therefore provides no coverage for the Bank's claim.

---

[14] The Special Service Area was created by an ordinance dated March 13, 2007 and recorded April 27, 2007 (less than one month before the issuance of the Policy). See Ordinance No. 2007-26, establishing United City of Yorkville Special Service Area Number 2206-113 (the "SSA Tax Ordinance"). The purpose of the Special Service Area was "to provide special services to the Special Service Area in addition to services provided in the City generally" and "so that bonds may be issued for the purposes aforesaid (the "Bonds"), payable from ad valorem taxes levied on real property in the Special Service Area." SSA Tax Ordinance, Section 4. Under Illinois law, SSA Taxes are levied annually and become a lien on the property on the first day of January in the year in which the taxes are levied. See 35 ILCS 200/27-45. ("Issuance of Bonds. ... The county clerk shall annually extend taxes against all of the taxable property situated in the county and contained in the special service area in amounts sufficient to pay maturing principal and interest of those bonds...."); 35 ILCS 200/27-75 ("Extension of tax levy. If a property tax is levied, the tax shall be extended by the county clerk in the special service area in the manner provided by Articles 1 through 26 of this Code based on equalized assessed values as established under Articles 1 through 26...."); 35 ILCS 200/21-75 ("Lien for Taxes. The taxes upon property ... shall be a prior and first lien on the property, superior to all other liens and encumbrances, from and including the first day January in the year in which the taxes are levied until the taxes are paid or until the property is sold under this Code.").

Ms. Traci S. Rea, Esq.
January 23, 2015
Page l 2

**III.   Schedule B Part I Excepts from Coverage the SSA Taxes Imposed by the SSA Tax Ordinance.**

Even assuming *arguendo* that Home Depot's lien rights constituted a lien or encumbrance on title to the Property on the Date of the Policy, Schedule B Part I of the Policy excepted from coverage the SSA Taxes that are the subject of Home Depot's lien rights.

Schedule B (Part I) provides, in relevant part:

This policy does not insure against loss or damage by reason of the following:

\* \* \*

5.      Ordinance No. 2007-26 establishing United City of Yorkville Special Services Area Number 2206-113, dated March 13, 2007 and recorded April 27, 2007 as document number 200700013896.

By excepting from coverage any loss or damage by reason of the SSA Tax Ordinance that authorized the imposition of SSA Taxes on the Shopping Center, the Policy excepted coverage for any claim based on Home Depot's lien rights (except insofar as the Policy affirmatively insured the priority of the Bank's Mortgage over Home Depot's lien rights).

**IV.    The Policy Insured the Priority of the Bank's Mortgage over Home Depot's Lien Rights, Which Priority Has Been Established.**

Insuring Clause No. 6 insures against any lien or encumbrance having priority over the lien of the insured mortgage.  As discussed below, Schedule B Part II of the Policy and the Special Priority Endorsement made clear that title to the Property was subject to Home Depot's lien rights, but insured the priority of the Bank's Mortgage over Home Depot's rights.  In fact, the priority of the Bank's Mortgage over Home Depot's lien rights was recognized and established in the Litigation.

**A.      Schedule B Part II insures that Home Depot's Rights are Subordinate to the Bank's Mortgage.**

Schedule B Part II identifies additional matters that affect title to the Property, but which are insured as being subordinate to the insured mortgage lien.  Specifically, Schedule B Part II provides, in relevant part:

In addition to the matters set forth in Part I of this schedule, **the title to the estate or interest in the land** described or referred to in Schedule A **is subject to the following matters, if any be shown, but the Company insures that such matters are subordinate to the lien or charge of the insured mortgage** upon said estate or interest:

\* \* \*

4.      Memorandum of Agreement recorded May 15, 2007 as document number 200700016696 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware Corporation, are parties to (1) a Real Property Purchase Agreement and (2) a Development Agreement, and the terms and provisions contained therein.

Ms. Traci S. Rea, Esq.
January 23, 2015
Page 13

**Note: Contains provisions to create a lien on the Land.**

\* \* \*

(emphasis added).

Schedule B Part II makes clear that Cannonball's Property is subject to the recorded Memorandum of Agreement, and that said Agreement contains provisions to create a lien on the Property. As shown above, the Memorandum of Agreement expressly gave notice of Home Depot's tax reimbursement and lien rights against Cannonball's Property under the terms of the Purchase Agreement and the Development Agreement. Schedule B Part II does not insure against the existence of the rights set forth in the Memorandum of Agreement, but insures only that the matters set forth in said Agreement are "subordinate" to Bank's Mortgage lien. In fact, in the Litigation, Home Depot's lien rights were found to be subordinate to the Bank's Mortgage lien.

**B.      The Special Priority Endorsement Insures the Priority of the Bank's Mortgage Lien over any Recorded Lien Document arising under Home Depot's Development Agreement.**

Similarly, the Special Priority Endorsement also insured only that the priority of the Bank's Mortgage lien would not be impaired by the recordation of a lien document asserting lien rights arising under Home Depot's Development Agreement. Specifically, the Endorsement provides:

The company hereby insures the insured that **the priority of the lien of the mortgage insured in this Policy will not be impaired by the recordation of a lien document** asserting lien rights arising under any of the following documents:

\*\*\*

2. The Home Depot Site Development Agreement recorded May 24, 2007 as document 2000700016696.

\*\*\*

(emphasis added).

Again, the priority of the Bank's Mortgage lien over any lien recorded by Home Depot was established in the foreclosure Litigation.[15]

---

[15] The Circuit Court ordered that the proceeds of the sale be applied to satisfy amounts owed to the Bank before any proceeds were used to satisfy amounts due to Home Depot. <u>See</u> Circuit Court Order at 18 (Application of Proceeds).

V.     **Coverage Exclusions 3(a) and 3(d) Exclude Coverage for the Bank's Claim.**

   A.     **Exclusion 3(a) Applies to the Bank's Claim Because the Bank Had Actual Knowledge of and Agreed to Home Depot's Tax Reimbursement and Lien Rights.**

   The Bank's claim for indemnification is independently excluded from coverage by Coverage Exclusion 3(a). Exclusion 3(a) excludes coverage for defects, liens, encumbrances, adverse claims and other matters that are "suffered, assumed or agreed to" by the insured. Here, there can be no dispute that prior to the issuance of the Policy, LaSalle Bank (acting in its personal capacity and as agent for the other Lenders) had actual knowledge of and assented to Home Depot's lien rights, requesting only that the Policy insure that the Bank's Mortgage lien had priority. The Policy provided that requested "priority" insurance, and the priority of the Bank's Mortgage lien was established in the Litigation.

   Prior to the closing of the transaction and the issuance of the Policy, LaSalle Bank recognized and accepted that Cannonball's title to the Property was subject to Home Depot's lien rights. In an email dated May 3, 2007, LaSalle Bank's counsel (Stephen H. Malato, Esq.) expressly noted Home Depot's rights under the Development Agreement and attached Article 12 of that Agreement (setting forth Home Depot's lien rights against Cannonball's Property). Mr. Malato requested only that Chicago Title's agent (Near North National Title) issue a special endorsement to the Policy, insuring the priority of the Bank's Mortgage lien over the rights of Home Depot and the other Anchor Tenants:

   > I need you to consider one other issue. **There are three site development agreements, one with Home Depot, one with Target and one with Kohl's. Each will likely have a memo recorded with respect thereto.** There will be a multi-party agreement signed by those entities, the City and the Lender. Each of the site development agreements provides for the owner of the shopping center (the borrower) will prepare the site and each contributes to the cost thereof, including the borrower. It also allows for self help in the event the borrower is not proceeding quick enough with construction. The multi-party agreements set out the priority among the parties in implementing the self help remedy. If there is a take over, then the borrower owes its share to the party that took over. **Two of the three site development agreements provided for liens.**

   > The Target site development agreement, I don't believe, provides for a lien. **The Home Depot site development agreement does provide for a lien, but it is explicitly inferior to a first mortgage lien.** The Kohl's site development agreement provides for a lien, but says it "attaches" when the claim for lien is recorded. **I have attached the relevant provisions from the Home Depot and Kohl's site development agreements which address their lien rights.**

   > The issue is this: **the lender is recognizing** Target's, Kohl's and **Home Depot's rights under the site development agreement but is doing so on the assurances that the lien rights are inferior to the lender's mortgage. We need you to provide a special endorsement that will provide assurances that the**

**lender's lien is superior** to the liens that might come out of the site development agreement.

May 3, 2007 E-Mail (emphasis added).

By e-mail dated May 4, 2007, John Lamberts, Esq. (EVP & General Counsel of Near North Title), responded, in relevant part: "An endorsement for the Home Depot Lien Rights is not a problem, it is subordinate to the lien of the construction mortgage." The Policy's Special Priority Endorsement provided the coverage requested by LaSalle Bank.

In granting summary judgment to Home Depot, the Appellate Court found that "LaSalle Bank had actual knowledge of the documents containing Home Depot's tax reimbursement and lien rights before it recorded its mortgage, because the [P]urchase and [D]evelopment [A]greements [which established Home Depot's tax reimbursement and lien rights] were part of the closing documents." Appellate Opinion at 14. See id. at 12-13 ("Home Depot's tax reimbursement and lien rights are part of agreements that Bank of America's predecessor was aware of when it entered into the construction loan agreement with Cannonball."). As discussed above (at pgs. 3-4), LaSalle Bank executed the Construction Loan Agreement on behalf of itself and the other Lenders to which LaSalle Bank later assigned rights thereunder, and the Lenders confirmed receipt of the Loan Documents, which included the agreements containing Home Depot's tax reimbursement and lien rights.

Because the Bank had actual knowledge of and accepted that Cannonball's title was subject to Home Depot's tax reimbursement and lien rights, the Bank's claim for indemnification is barred by Exclusion 3(a). The First Circuit's recent decision in First American Title Ins. Co. v. Lane Powell PC, 764 F.3d 114 (1st Cir. 2014), is instructive.

In Lane Powell, the Court held that **"[a]n insured party 'assumes' or 'agrees' to a lien pursuant to Exclusion 3(a) when it takes property that is subject to an existing encumbrance it has knowledge of."** Id. at 122 (emphasis added). There the insured obtained two loan policies of title insurance for mortgages securing indebtedness. At the time the policies were issued, the insured was aware that the subject properties were already encumbered by prior-recorded mortgages and understood that those mortgages would be superior to the insured's mortgages. The policies issued, however, did not except the senior mortgages from coverage due to a clerical error. When the senior mortgages foreclosed, the insured sought indemnification from the insurer under the terms of the policies.

The First Circuit affirmed summary judgment for the title insurer based on Exclusion 3(a). The Court explained that there was no dispute that the insured accepted that its mortgages would be subordinate to existing mortgages encumbering the properties. Id. at 120. The Court concluded that because the insured agreed to take mortgages "that were inferior in rank to the existing mortgages on both properties", the insured "assumed" and "agreed to" junior positions for its mortgages against the properties. Id. (citing Nat'l Credit Union Admin. v. Ticor Title Ins. Co., 873 F. Supp. 718, 729 (D. Mass. 1995) (holding that insured-mortgagor "suffered, assumed or agreed to" an existing superior mortgage where insured's officers were aware of the superior mortgage and knowingly agreed to a junior lien position, thus barring coverage under Exclusion 3(a) despite error in title insurance policy)).

Notably, in holding that Exclusion 3(a) applied to bar coverage of the insured's claim, the First Circuit noted:

> To find otherwise would effectively morph the title insurance the parties agreed to into a credit insurance policy of sorts that Lane Powell did not pay for, and that neither party intended. More importantly, extending coverage to the loss incurred by Lane Powell caused by the foreclosure of the superior mortgages would result in a windfall to Lane Powell that neither party ever expected or agreed to. ... Equity will simply not have it.

Lane Powell PC, 764 F.3d at 122 (citation omitted).

The same analysis applies here. Exclusion 3(a) applies to the Bank's claim because the Bank had actual knowledge of and accepted that Cannonball's title to the Property was subject to Home Depot's lien rights. The Bank did not bargain for (much less pay for) the indemnity coverage it now seeks. Rather, the Bank bargained for and obtained insurance that the Bank's Mortgage lien would have priority over any lien that Home Depot may record against the Property, which priority it achieved in the Litigation.

**B.      Exclusion 3(d) Applies to Home Depot's Post-Foreclosure Claims Against the Property.**

The Bank's claim is also barred by Exclusion 3(d), which excludes coverage for matters "attaching or created subsequent to Date of Policy." Home Depot's recent demand makes clear that it is seeking reimbursement for a portion of the SSA Taxes assessed against its property beginning with the 2013 tax year (years after the Date of Policy). Because Home Depot's demand is based on SSA Taxes levied after the Date of the Policy, Exclusion 3(d) applies.

* * *

We invite you to provide Chicago Title with any documents, information, cases or other authority that you believe supports the Bank's claim for indemnification. If you do so, please provide me with the documents identified in footnote 11 and any related documents.

Chicago Title does not waive and expressly reserves any and all rights, claims, and defenses that it may have under the Policy and under the law with respect to the claim made by the Bank. Chicago Title also reserves the right to supplement and/or modify the foregoing coverage analysis based on any additional documents or information that the Bank may provide or that Chicago Title may discover.

Ms. Traci S. Rea, Esq.
January 23, 2015
Page | 7

Should you have any questions regarding the foregoing, please feel free to contact me.

Sincerely,

Laura Maines Vasey
Vice President/Major Claims Counsel
Fidelity National Title Group
711 Third Avenue, Suite 500
New York, New York 10017
(212) 880-1212 (telephone)
laura.vasey@fnf.com (e-mail)

# EXHIBIT 4

# ReedSmith

Traci S. Rea
Direct Phone: +1 412 288 4184
Email: TRea@reedsmith.com

Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Tel +1 412 288 3131
Fax +1 412 288 3063
reedsmith.com

March 2, 2015

*VIA EMAIL AND U.S. MAIL*

Laura Maines Vasey, Esquire
Vice President/Major Claims Counsel
Fidelity National Title Group
711 Third Avenue, Suite 500
New York, NY 10017

Re:  *Bank of America, N.A. v. Cannonball LLC, et. al.*
 **Insured: Bank of America, N.A. as successor by merger to LaSalle Bank N.A.**
 **Policy No.: N01070317**
 **Claim No.: 428868**
 **Property: Kendall Marketplace Subdivision, Yorkville, Illinois**

Dear Ms. Vasey:

 I am writing on behalf of Bank of America, N.A. ("Bank of America"), as successor in interest to LaSalle Bank National Association ("LaSalle Bank"), and in response to your letter of January 23, 2015. In your January 23 letter, Chicago Title Insurance Company ("Chicago Title"), as successor to Ticor Title Insurance Company, denied coverage to Bank of America for amounts due to Home Depot U.S.A. Inc. ("Home Depot") for certain Special Service Area Taxes (the "SSA Taxes") associated with Kendall Marketplace. For the reasons stated below, Bank of America strongly disagrees with Chicago Title's position that its Policy of Title Insurance No. N0107317 (the "Policy") does not cover the Home Depot SSA Taxes.

 As an initial matter, Chicago Title's coverage position is based on the faulty premise that Bank of America's insurance claim involves solely future liens that Home Depot may levy on the property. As you know, and as your correspondence acknowledges, the Illinois Appellate Court held that the obligation to reimburse Home Depot for the SSA Taxes was a covenant running with the property and was therefore not extinguished by Bank of America's foreclosure of its mortgage. *See* Appellate Opinion at 14. That covenant is reflected in the Memorandum of Development Agreement of May 15, 2007 (the "Home Depot Memorandum Agreement") which predates issuance of the Policy. The covenant to pay the Home Depot SSA Taxes is separate and apart from any right that Home Depot may have to place a lien on the property. Bank of America is seeking coverage for loss arising out of that covenant and the Policy insures against that covenant as an encumbrance on the property.

 It is axiomatic that a covenant that runs with the land is an encumbrance on the property. *See* Powell on Real Property § 81.03 (2014) ("A covenant running with the land is commonly treated as an encumbrance, whether it is affirmative or negative in operation, and whether it is enforceable in law as a real covenant or in equity as an equitable servitude"); *Chicago Title Ins. Co. v. Aurora Loan Servs.,*

March 2, 2015
Page 2

ReedSmith

*LLC*, 996 N.E.2d 44, 50 (Ill. App. Ct. 2013) ("Encumbrances include not merely liens such as mortgages, judgments liens, or taxes but also attachments, leases, inchoate dower rights, water rights, easements, restrictions on use, or any right in a third party which diminishes the value or limits the use of the land granted"); Black's Law Dictionary (9th ed. 2009) (defining encumbrance as a "claim or liability that is attached to property or some other right and that may lessen its value" that "remains after the property or right is transferred"). As an encumbrance on the property, the covenant to pay the Home Depot SSA Taxes is covered by the Policy's clear terms.

The Policy's primary coverage grant insures against loss or damage sustained or incurred by the Insured by reason of "[a]ny defect in or lien *or encumbrance on the title*." Policy at 1 (emphasis added). It further insures against "[t]he priority of any lien *or encumbrance* over the lien of the insured mortgage." *Id.* (emphasis added). While the Policy insures against encumbrances as of the date of the Policy, as noted above, the covenant to pay the Home Depot SSA Taxes was created and recorded before the Policy was issued. Accordingly, Chicago Title's contention that the obligation to pay the Home Depot SSA Taxes is not a covered encumbrance due to the Policy's temporal language is incorrect.

Moreover, Schedule B of the Policy specifically insures that **"such matters"** contained in the agreements listed on Part II are "subordinate to the lien or charge of the insured mortgage." Policy at Schedule B Part II (emphasis added). The Home Depot Memorandum Agreement is scheduled on Part II of Schedule B. *Id.* As your correspondence recognizes, the obligation to pay the Home Depot SSA Taxes is contained in the Home Depot Memorandum Agreement. As a "matter" contained in the Home Depot Memorandum Agreement, Part II of Schedule B insures that the covenant is subordinate to the insured mortgage and not an encumbrance that would survive foreclosure.

The ALTA 9 Endorsement to the Policy similarly provides coverage for losses arising from the covenant to pay the Home Depot SSA Taxes. Under this endorsement, Chicago Title explicitly insured against loss or damage sustained by reason of "[a]ny instrument referred to in Schedule B as containing a covenant, conditions or restrictions on the land" which also "provides for a private charge or assessment." ALTA 9 Endorsement at 1(B)(2). Because the Home Depot Memorandum Agreement is specifically listed on Schedule B, the covenant to pay the Home Depot SSA Taxes is covered by this endorsement as well.

In short, the Home Depot Memorandum Agreement was recorded as of the issuance of the Policy and contained a covenant that was later held to encumber the property. Chicago Title knew about the Home Depot Memorandum Agreement, scheduled it as a covered agreement on Part II of Schedule B, and expressly insured that any covenant it contained would be subordinate to and eliminated by foreclosure of Bank of America's mortgage. When the Policy was placed, the parties believed that Bank of America's mortgage would be superior to any rights created by the Home Depot Memorandum Agreement. In fact, the trial court agreed with that assessment. The Illinois Appellate Court, however, held that the covenant to pay the Home Depot SSA Taxes is an encumbrance that runs with the land that is neither subordinate to the mortgage nor extinguished by its foreclosure. That is the precise risk that Chicago Title knowingly agreed to insure.

Chicago Title's contrary position ignores the forgoing and focuses myopically on the fact that Home Depot also has the right to assert a lien on the property should the SSA Taxes remain unpaid. Home Depot's right to impose a lien on the property for unpaid SSA Taxes, however, does not change

March 2, 2015
Page 3

**ReedSmith**

the fact that the Policy separately insures against the covenant as an encumbrance on the property. Bank of America is not seeking coverage for a potential or future lien on the property; rather it is seeking and is entitled to coverage for an encumbrance on the property that was in place when the Policy was issued and for which Chicago Title agreed to provide title insurance.

For this reason, the cases in your January 23 letter are inapposite. Cases relating to unassessed property taxes levied after title insurance was placed have no bearing on Bank of America's coverage for the covenant at issue here. *See, e.g., Rhone v. First Am. Title Ins. Co.*, 928 N.E.2d 1185, 1193-94 (Ill. App. Ct. 2010) (unassessed taxes are not liens until the bills were issued which was after the policy's effective date); *Edwards v. St. Paul Title Ins. Co.*, 563 P.2d 979 (1977) (finding mere existence of potential taxes that may be imposed by the district in the future are not liens); *Butcher v. Burton Abstract Title Co.*, 216 N.W.2d 434 (Mich. Ct. App. 1974) (holding charges imposed by township ordinance were not lien or encumbrance); *Mayers v. Van Schaick*, 197 N.E. 296 (N.Y. 1935) (tax assessment levied by local taxing authority was not a lien). Bank of America is not seeking coverage for a future lien, but rather, for the present obligation to reimburse Home Depot for the SSA Taxes which is a covenant that was created before the Policy was issued. Because the covenant was in place when the Policy was issued, neither the Policy's temporal language nor Exclusion 3(d) preclude coverage.

Similarly, Chicago Title's assertion that Exclusion 3(a) bars coverage is unfounded. Bank of America did not agree to subordinate its mortgage to the covenant to pay the Home Depot SSA Taxes. Unlike the situation in *First American Title Ins. Co. v. Lane Powell*, 764 F.3d 114 (1st Cir. 2014), where the insured knew of the superiority of an encumbrance and tried to obtain coverage that was never intended, the Policy was purchased to insure against this exact situation. Both LaSalle Bank and Chicago Title knew the Home Depot Development Agreement was in place. The parties never envisioned, however, that the property would be encumbered by a covenant to pay SSA Taxes post-foreclosure. No one, including the trial court, believed the agreements should be interpreted in that manner. Put simply, neither LaSalle Bank nor Bank of America can be said to have agreed to the encumbrance when the covenant was first held to survive the foreclosure only on appeal.[1]

Finally, the Policy's reference to Ordinance No. 2007-26 is immaterial to Bank of America's claim for coverage. Schedule B, Part I states that the Policy does not insure against loss or damage by reason of the fact that "[t]he land lies within the boundaries of United City of Yorkville Special Service Area No. 2006-113, as disclosed by Ordinance No. 2007-26." Bank of America's loss is directly attributable to the covenant to pay the Home Depot SSA Taxes, not the mere fact that the land is located within the special service area. Loss due to the covenant to pay the Home Depot SSA Taxes is specifically insured under Part II of Schedule B. In order to exclude coverage, an insurance policy must do so clearly and unambiguously. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Glenview Park Dist.*, 632 N.E.2d 1039, 1042 (Ill. 1994) ("Exclusionary provisions are applied only where the terms are clear, definite, and explicit"). Any ambiguity in the language of the Policy is construed in the insured's favor. *See Rosalind Franklin Univ. of Med. & Sci. v. Lexington Ins. Co.*,

---

[1]  Per your request, I have enclosed the documents referenced in footnote 11 of your January 23 letter from the record on appeal. As you will see, the email correspondence reflected in those documents is predominately between attorneys for Home Depot and attorneys for Cannonball, LLC. Those emails are largely irrelevant to the issue of what was understood and agreed to by the Insured, LaSalle Bank. While LaSalle Bank's attorney agreed to the order in which the deal documents would be recorded, as set forth above, Chicago Title was fully aware of each of the prerecorded documents and specifically insured that any matters they contained would be subordinate to, and extinguished upon foreclosure of, the mortgage.

March 2, 2015
Page 4

**ReedSmith**

8 N.E.3d 20, 36 (Ill. App. Ct. 2014) ("if the words [of a policy] are susceptible to more than one reasonable interpretation, all doubts and ambiguities will be resolved in favor of the insured"). Here, Bank of America's loss is attributable to the covenant, not the mere location of the project in the special service area. Part I's tangential reference to Ordinance No. 2007-26 does not vitiate the Policy's express coverage grants for loss attributable to the covenant to pay the Home Depot SSA Taxes.[2]

In light of the foregoing, Chicago Title's coverage position is unfounded. Bank of America requests that Chicago Title withdraw its coverage denial. Once you have had an opportunity to consider this correspondence, kindly contact me to discuss Chicago Title's position in this matter. In the interim, Bank of America continues to reserve all of its rights and privileges under the Policy, at law and in equity. Nothing herein shall be construed as a limitation or waiver of any of those rights or privileges.

Very truly yours,

REED SMITH LLP

By: _Traci S Rea_
    Traci S. Rea

Enclosures

---

[2] Your correspondence recognizes this by conceding that the exclusion relating to Ordinance No. 2007-26 does not apply "insofar as the Policy affirmatively insured the priority of the Bank's Mortgage over Home Depot's lien rights." January 23 Letter at 12.

*[handwritten: Attorney for Home Depot     Attorney for developer Cannonball]*

**From:** Dorman, Gregg
**Sent:** Monday, March 05, 2007 11:50 AM
**To:** 'Greg Fix'
**Cc:** 'Delach, Dave'; 'Costello, Tim'; 'Paul Machalek'; Lampert, Andrew; Ruedi, Kristin M
**Subject:** Home Depot - Yorkville, IL / revision to 22(h) of Purchase Agreement

**Greg - let me know if the following revisions are acceptable. We modified to provide for the reimbursement obligation to be a surviving covenant in the Purchase Agreement evidenced by the memorandum of agreement to be signed at closing as we discussed.**

(h)     Seller has disclosed to Purchaser that, in conjunction with the Incentive (as hereinafter defined) and related bond sale to fund Site Work Improvements in the Shopping Center, Seller and the City are establishing a special service area ("SSA") which is to (i) include the Shopping Center Parcel, (ii) remain in existence for the term of the bonds which are secured by a portion of the Shopping Center sales tax revenues, and (iii) enable the City to levy an additional tax assessment against properties within the SSA.  Seller ~~agrees that the Development Agreement shall provide (and the Memorandum of Development Agreement shall include) Seller's obligation~~**hereby agrees that Seller shall be obligated** to reimburse Purchaser for any portion of such SSA tax assessment which exceeds an amount equal to $0.50 per square foot of Purchaser's Floor Area (as defined in the OEA), exclusive of the garden center.  If Seller fails to pay any such excess SSA tax assessment within thirty (30) days after Purchaser bills Seller therefor, then in addition to any other rights and remedies available to Purchaser, Purchaser shall have lien rights against Seller's land in the Shopping Center in accordance with the terms of the Development Agreement.  **The terms of this Section 22(h) shall survive the Closing and shall be included in a memorandum of agreement to be executed, delivered and recorded by Seller and Purchaser at Closing.  The form of the memorandum of agreement shall be approved by Seller and Purchaser within the Inspection Period; provided, however, Purchaser agrees that the memorandum of agreement shall not specifically reference the economic terms of the foregoing reimbursement obligation but shall merely reference a reimbursement obligation from Seller to Purchaser pursuant to this Section 22(h) which shall be a covenant which shall run with the land and bind Seller's grantees, successors and assigns.**


**If this is OK, then we can complete the preparation of execution copies of the Purchase Agreement.**



From the desk of .......

Gregg M. Dorman
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577

Direct Telephone:  (312) 460-5290
Direct Fax:  (312) 460-7290
Email:  gdorman@seyfarth.com

Firm Telephone:  (312) 460-5000
Firm Fax:  (312) 460-7000
Firm Website:  www.seyfarth.com

| From: | Greg Fix [GFix@harlemirving.com] |
| Sent: | Monday, March 05, 2007 12:19 PM |
| To: | Dorman, Gregg |
| Cc: | Delach, Dave; Costello, Tim; Paul Machalek; Lampert, Andrew; Ruedi, Kristin M |
| Subject: | RE: Home Depot – Yorkville, IL / revision to 22(h) of Purchase Agreement |

Gregg – This language is fine, but check this language: "Seller's obligationhereby agrees that Seller shall be obligated to reimburse Purchaser . . . "  I think we want to say "Seller hereby agrees that Seller shall be obligated to reimburse Purchaser . . . ."  Greg


Gregory E. Fix
Vice President & General Counsel
The Harlem Irving Companies, Inc.
4104 N. Harlem Avenue
Norridge, Illinois 60706
(773) 625-3036
(773) 625-0056 – Facsimile


-----Original Message-----
From: Dorman, Gregg [mailto:gdorman@seyfarth.com]
Sent: Monday, March 05, 2007 11:50 AM
To: Greg Fix
Cc: Delach, Dave; Costello, Tim; Paul Machalek; Lampert, Andrew; Ruedi, Kristin M
Subject: Home Depot – Yorkville, IL / revision to 22(h) of Purchase Agreement

Greg – let me know if the following revisions are acceptable.  We modified to provide for the reimbursement obligation to be a surviving covenant in the Purchase Agreement evidenced by the memorandum of agreement to be signed at closing as we discussed.

(h)      Seller has disclosed to Purchaser that, in conjunction with the Incentive (as hereinafter defined) and related bond sale to fund Site Work Improvements in the Shopping Center, Seller and the City are establishing a special service area ("SSA") which is to (i) include the Shopping Center Parcel, (ii) remain in existence for the term of the bonds which are secured by a portion of the Shopping Center sales tax revenues, and (iii) enable the City to levy an additional tax assessment against properties within the SSA.  Seller agrees that the Development Agreement shall provide (and the Memorandum of Development Agreement shall include) Seller's obligationhereby agrees that Seller shall be obligated to reimburse Purchaser for any portion of such SSA tax assessment which exceeds an amount equal to $0.50 per square foot of Purchaser's Floor Area (as defined in the OEA), exclusive of the garden center.  If Seller fails to pay any such excess SSA tax assessment within thirty (30) days after Purchaser bills Seller therefor, then in addition to any other rights and remedies available to Purchaser, Purchaser shall have lien rights against Seller's land in the Shopping Center in accordance with the terms of the Development Agreement.  The terms of this Section 22(h) shall survive the Closing and shall be included in a memorandum of agreement to be executed, delivered and recorded by Seller and Purchaser at Closing.  The form of the memorandum of agreement shall be approved by Seller and Purchaser within the Inspection Period; provided, however, Purchaser agrees that the memorandum of agreement shall not specifically reference the economic terms of the foregoing reimbursement obligation but shall merely reference a

| | |
|---|---|
| **From:** | Greg Fix [GFix@harlemirving.com] |
| **Sent:** | Friday, May 11, 2007 7:40 AM |
| **To:** | Dorman, Gregg; David French; Lampert, Andrew |
| **Cc:** | Ruedi, Kristin M; jgalkin@ngelaw.com; John.Lamberts@nnnt.com |
| **Subject:** | Re: Home Depot/Yorkville Additional Agreements |

*attorney to Bank*

Malato confirmed with me that the OEA will definitely be recorded prior to the mortgage. David check with Malato to see if SDAs will be prior.

Sent from my BlackBerry Wireless Handheld

*attorney for developer*

—–Original Message—–
From: Dorman, Gregg <gdorman@seyfarth.com>
To: David French; Lampert, Andrew <ALampert@seyfarth.com>
CC: Ruedi, Kristin M <KRuedi@seyfarth.com>; Greg Fix; jgalkin@ngelaw.com <jgalkin@ngelaw.com>; John.Lamberts@nnnt.com <John.Lamberts@nnnt.com>
Sent: Fri May 11 07:28:31 2007
Subject: RE: Home Depot/Yorkville Additional Agreements

Again, it is our understanding and the understanding of all anchors that the OEA is going ahead of the mortgage. As to Home Depot's various memorandum, we have no preference as to order provided that the lender consents and subordinates to each if the mortgage will be recorded ahead of them

> —–Original Message—–
> From: David French [mailto:DFrench@harlemirving.com]
> Sent: Friday, May 11, 2007 7:26 AM
> To: Dorman, Gregg; Lampert, Andrew
> Cc: Ruedi, Kristin M; Greg Fix; jgalkin@ngelaw.com; John.Lamberts@nnnt.com
> Subject: Re: Home Depot/Yorkville Additional Agreements
>
>
>   I will confirm the order of recording with our outside counsel. Jeff, what does the bank is insist our order or recording be?   John, do you have an overwhelming preference or concern?
>
>   David
>
>
>
>   David W French, Esq.
>   The Harlem Irving Companies, Inc.
>   4104 N. Harlem Avenue
>   Chicago, Illinois 60634-1298
>   Tel: 773.625.3036
>   Cell: 312.402.4464
>   Fax:  773.625.0056
>   E-Mail: dfrench@harlemirving.com
>
>   —–Original Message—–
>   From: Dorman, Gregg <gdorman@seyfarth.com>
>   To: David French; Lampert, Andrew <ALampert@seyfarth.com>
>   CC: Ruedi, Kristin M <KRuedi@seyfarth.com>
>   Sent: Fri May 11 05:40:56 2007
>   Subject: RE: Home Depot/Yorkville Additional Agreements
>
>   if 54 and 56 are Target and Kohl's, they should be removed from Dev's

1

C 618

parcel legal.

David - if these Memos will be recorded ahead of the Mortgage, we will not need the lender's consent and subordination.

-----Original Message-----
From: David French [mailto:DFrench@harlemirving.com]
Sent: Thursday, May 10, 2007 5:43 PM
To: Lampert, Andrew
Cc: Dorman, Gregg; Ruedi, Kristin M
Subject: RE: Home Depot/Yorkville Additional Agreements

I need to confer with Greg and Don as to the amendment to the PSA but I've updated the documents with Lender information and have slightly modified the legal description of the developer's tract - Lot 21 is no longer part of the shopping center.   Also I am conferring with Greg to confirm that the developer tract is properly described in the attached documents (specifically Lots 54 and 56).

Please let me know if you have any questions

David W. French, Esq.
The Harlem Irving Companies, Inc.
4104 N. Harlem Avenue
Chicago, Illinois 60634-1298
Tel: 773.625.3036
Cell: 312.402.4464
Fax: 773.625.0056
E-Mail: dfrench@harlemirving.com

-----Original Message-----
From: Lampert, Andrew [mailto:ALampert@seyfarth.com]
Sent: Thursday, May 10, 2007 1:52 PM
To: David French
Cc: Dorman, Gregg; Ruedi, Kristin M
Subject: Home Depot/Yorkville Additional Agreements

David:

I have attached for your review drafts of the following documents:

1.    Memorandum re: reimbursement obligations

2.    Memorandum of Development Agreement

3.    Memorandum of Put Option

4.    First Amendment to Purchase Agreement (reflecting the agreements of the parties regarding the Letter of Credit).

Please let us know if you have questions or comments.

Andrew

<<HD - Yorkville Memorandum of SSA obligations_v2.DOC>> <<HD Yorkville Memorandum of Development Agreement_v2.DOC>> <<HD - Yorkville Memorandum of Put Option_v2.DOC>> <<HD Yorkville First Amendment to Purchase Agreement_v3.DOC>>

2
C 6 1 8 3

From: Greg Fix [GFix@harlemirving.com]
Sent: Friday, May 11, 2007 1:49 PM
To: Dorman, Gregg; Ruedi, Kristin M
Subject: FW: Recording.

Please see below - malato consents to recording the DA's prior to the mortgage. Could someone let Andrew Lampert know - I have no e-mail address for him.

Gregory E. Fix
Vice President & General Counsel
The Harlem Irving Companies, Inc.
4104 N. Harlem Avenue
Norridge, Illinois 60706
(773) 625-3036
(773) 625-0056 - Facsimile

*Attorney for Bank*

From: Stephen H. Malato [mailto:smalato@hinshawlaw.com]
Sent: Friday, May 11, 2007 1:46 PM
To: Greg Fix
Subject: Re: Recording.

Given that our relative rights are addressed in the Payment and Priority Agreement, I am ok with their being recorded before the mortgage.

Stephen H. Malato
222 N. LaSalle Street
Suite 300
Chicago, Illinois 60601
312-704-3114
smalato@hinshawlaw.com

## HINSHAW
& CULBERTSON LLP

BUSINESS LAW

"Greg Fix" <GFix@harlemirving.com>

05/11/2007 07:41 AM

To smalato@hinshawlaw.com
cc
Subject Recording.

Can anchor SDAs be recorded prior to the mortgage?

F C 6 1 3 4

# EXHIBIT 5

# CHICAGO TITLE INSURANCE COMPANY

711 THIRD AVENUE, 5TH FLOOR, NEW YORK, NY 10017 (212) 880-1200 (800) 525-2511



May 28, 2015

<u>Via E-Mail and Federal Express</u>

Traci S. Rea, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222-2716

Re: Claim No. 428868

Policy No. N01070317

| | |
|---|---|
| Insured Mortgage: | Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of May 1, 2007 and recorded May 24, 2007, made by Cannonball, LLC ("Cannonball"), to and for the benefit of LaSalle Bank National Association, as agent for itself and other Banks, to secure an amount of indebtedness of $97,040,000.00. |
| Property: | Lots 1-19, 21, 24-52, 55 and 57 in Kendall Marketplace Subdivision in the United City of Yorkville, Kendall County, Illinois (the "City"), as more specifically described in Schedule A of the Policy. |
| Litigation: | *Bank of America, N.A. v. Cannonball LLC, et al.*, No. 10-CH-0869 (Circuit Ct., Kendall County, IL), appealed to the Appellate Court of Illinois, Second Judicial District (No. 2-13-0858). Petition for leave to appeal to Illinois Supreme Court denied on November 26, 2014. |

Dear Ms. Rea:

On behalf of Chicago Title Insurance Company (successor by merger to Ticor Title Insurance Company) (the "Company" or "Chicago Title"), I write in response to your March 2, 2015 letter ("Letter") concerning the above-referenced Claim made by Bank of America, N.A., as successor by merger to LaSalle Bank National Association ("LaSalle Bank"), in its individual capacity and as agent for other lenders (collectively, the "Bank").[1]

## Overview and Request for Documents

The Bank's Claim arises out of certain tax reimbursement and lien rights that Cannonball granted to Home Depot U.S.A., Inc. ("Home Depot") under the terms of their Real Property Purchase Agreement (the "Purchase Agreement") and their Development Agreement. In the Litigation, the Illinois Appellate Court determined that the Bank had actual knowledge of the

---

[1] This letter supplements the coverage analysis set forth in my January 23, 2015 letter to you.

Purchase and Development Agreements prior to making its loan to Cannonball,[2] which determination the Bank does not dispute. As acknowledged in your Letter (at 3 n. 1), the Bank even agreed to the order in which the transaction documents were recorded against the Property, thereby allowing the Memorandum of Agreement (which expressly identified Cannonball's reimbursement obligation as a covenant running with the land) to be recorded prior to the Mortgage.[3] As explained by the Appellate Court, the Bank could not "extinguish" Home Depot's rights by foreclosing its Mortgage because the Bank had actual knowledge of those rights, which ran with the land and were in effect before the Mortgage. See Ill. App. Op. at 14.

As clarified in your Letter (at 1, 3), the Bank is not making a Claim based on any potential or future lien that Home Depot may record against the Property. Instead, the Bank's Claim is based on the covenant out of which Home Depot's lien rights arise – namely, Cannonball's covenant to reimburse Home Depot for a portion of certain Special Service Area Taxes ("SSA Taxes") that the City might assess against Home Depot's property in the future.

The Bank contends that the Policy insured that foreclosure of the Mortgage would "eliminate" or "extinguish" the covenant. See Letter at 2 & 3 n.1. However, nothing in the Policy provided that insurance. Rather, the Policy made clear that title to the Property was encumbered by the rights set forth in the recorded Memorandum of Agreement, but insured the priority of the Mortgage lien, i.e., that the proceeds from the sale of the Property would be used first to satisfy the Mortgage debt. That priority was established in the Litigation.[4]

The Bank also contends that Exclusion 3(a) does not bar coverage for its Claim because the Bank "did not agree to subordinate its mortgage to the covenant" and "never envisioned" that the covenant would encumber the Property after foreclosure of the Mortgage. See Letter at 3. However, as discussed below, that subordination and continued encumbrance is precisely what the Bank agreed to: the Bank itself ensured that the covenant would survive foreclosure of the Mortgage by agreeing that the Memorandum of Agreement would be recorded before the Mortgage.[5]

Your Letter suggests that the Bank and its counsel did not understand the express terms of the Purchase Agreement, the Development Agreement, and the Memorandum of Agreement, or did not understand the legal effect of agreeing that the Memorandum of Agreement would be recorded before the Mortgage. Specifically, your Letter (at 2) states: "When the Policy was placed, the parties believed that Bank of America's mortgage would be superior to any rights created by the Home Depot Memorandum Agreement." Your Letter (at 3) also acknowledges that LaSalle Bank "knew the Home Depot Development Agreement was in place",

---

[2] See Ill. App. Op. at 12, 14.

[3] The Memorandum of Agreement expressly states that Cannonball "has certain reimbursement obligations under Section 22(h) of the Purchase Agreement" and that those obligations "shall be a covenant which shall run with the land and shall be binding upon Seller's grantees, successors, and assigns."

[4] See Circuit Court's 3/1/13 Order of Default Judgment, Summary Judgment, and Judgment of Foreclosure and Sale ("3/1/13 Order"), at 15 (ordering that the Property be sold "in order to first satisfy the amounts due and owing to Bank of America as set forth in this Judgment of Foreclosure") (emphasis added).

[5] See Letter at 3. n. 1 ("LaSalle Bank's attorney agreed to the order in which the deal documents would be recorded").

but vaguely asserts that "[t]he parties never envisioned, however, that the property would be encumbered by a covenant to pay SSA Taxes post-foreclosure. No one, including the trial court, believed the agreements should be interpreted in that manner."

You have not identified any documents supporting your statements about what "the parties" allegedly "believed" and "never envisioned."[6]  Nevertheless, in light of your statements, before making a final coverage determination, Chicago Title requests that the Bank provide all documents (including e-mails and other electronic data) within its possession, custody, or control: (a) supporting or otherwise relating to what the Bank allegedly "believed" or "never envisioned" at the time of the loan transaction; (b) relating to the Bank's agreement to the recording of the Memorandum of Agreement and the Memorandum of Development Agreement before the Mortgage; (c) relating to the form "Consent and Subordination of Lender" attached to the Development Agreement (at p. 61); (d) relating to Home Depot's tax reimbursement and lien rights, including whether those rights were intended to survive foreclosure of the Mortgage; and (e) the priority of the Mortgage.

Furthermore, as you recently advised that the Bank has accepted an offer for the purchase of the Property, Chicago Title requests that the Bank provide a proof of loss statement, signed and sworn to by the Bank in accordance with Section 5 of the Policy's Conditions and Stipulations, including a copy of the sale agreement and any related documents once finalized.

Subject to Chicago Title's receipt and consideration of the documents requested in the two preceding paragraphs, I set forth hereafter Chicago Title's coverage analysis to date.

### Coverage Analysis

The Bank contends (Letter at 1-2) that Cannonball's covenant to reimburse Home Depot for future SSA Taxes constituted an encumbrance on title to the Property on the Date of Policy, bringing its Claim within Insuring Clause No. 2 (insuring against "[a]ny defect in or lien or encumbrance on the title") and Insuring Clause No. 6 (insuring against "[t]he priority of any lien or encumbrance over the lien of the insured mortgage").

Even assuming *arguendo* that Cannonball's covenant constituted an "encumbrance" within the meaning of these provisions, as shown below, the covenant did not have "priority" over the Bank's Mortgage because the proceeds from the foreclosure sale were ordered to be used to satisfy the Mortgage before paying any amounts owed to Home Depot for SSA Taxes. Furthermore, the coverage provided by these insuring provisions is subject to the Policy's Exceptions from Coverage contained in Schedule B and the Policy's Exclusions from Coverage, which bar coverage for the Bank's Claim.

---

[6] Indeed, the Appellate Court rejected the Bank's interpretation of the Purchase and Development Agreements (and various other agreements relating to the Property), and concluded that "the explicit terms of the pertinent recorded documents and the sequence of recording those documents" created covenants running with the land, binding on the Bank.  Ill. App. Op. at 2.

**I.      Schedule B Part II of the Policy Did Not Insure that Foreclosure of the Mortgage Would Extinguish the Covenant.**

Schedule B Part II of the Policy makes clear that title to the Property "is subject to" the matters set forth in the Memorandum of Agreement (i.e., Cannonball's reimbursement obligation and Home Depot's related lien rights), insuring only that "such matters are subordinate to the lien or charge of the insured mortgage" on such title. The Bank contends that by insuring that the matters set forth in the Memorandum of Agreement were "subordinate" to the Bank's Mortgage, Schedule B Part II thereby insured that Cannonball's covenant would be "extinguished" or "eliminated" by foreclosure of the Bank's Mortgage. See Letter at 2 & 3 n.1. That contention is incorrect.  By insuring that the matters set forth in the Memorandum of Agreement were "subordinate" to the Mortgage, the Policy insured only that those matters would have a lower priority than the Mortgage – not that the subordinate matters would be extinguished or eliminated by foreclosure of the Mortgage.

The Bank made the same argument in the Litigation, and the Appellate Court rejected it. The Bank there argued that because Section 12.4 of the Development Agreement made Home Depot's lien rights "subordinate" to the lien of any first mortgage or deed of trust, Home Depot's tax reimbursement and lien rights were "extinguished" by the Bank's foreclosure of its Mortgage. See Ill. App. Op. at 14. Home Depot countered that the subordination provision meant only "that the construction loan was to be paid before Home Depot's lien could be enforced." Id. The Court agreed with Home Depot, explaining:

> Nothing in the provision at issue indicates the parties' intent to extinguish Home Depot's tax reimbursement and lien rights. Neither the word "extinguish" nor any word with a similar meaning is contained in the provision. Rather, the plain and ordinary meaning of the language indicates only that Home Depot's lien was "assign[ed] a lower priority" (Black's Law Dictionary 1467 (8[th] ed. 2004)) than Bank of America's first mortgage lien.  Therefore, Home Depot's tax reimbursement and lien rights were not extinguished by section 12.4 of the development agreement.

Ill. App. Op. at 15.

The Appellate Court's holdings apply here:  Schedule B Part II's use of the word "subordinate" did not insure that foreclosure of the Mortgage would "extinguish" Home Depot's tax reimbursement and lien rights. Rather, it insured only that Home Depot's rights would be assigned a lower priority than the Bank's Mortgage, and they were:  the Circuit Court ordered that the proceeds from the sale of the Property be used to satisfy amounts owed to the Bank before satisfying amounts due to Home Depot for SSA Taxes owed as of the date of the confirmation of the sale. See 3/13/13 Order at 18-19.

The Bank next contends (Letter at 2) that Chicago Title had knowledge of the Memorandum of Agreement (having listed it on Schedule B Part II) and therefore "knowingly agreed to insure" against Cannonball's reimbursement obligation being an encumbrance on title to the Property, not extinguished by foreclosure of the Mortgage.  This argument fails because

Ms. Traci S. Rea, Esq.
May 28, 2015
Page 5

Schedule B Part II excepts coverage for the matters set forth in the Memorandum of Agreement, other than insuring the priority of the Mortgage lien as discussed above.

## II.     The ALTA 9 Endorsement Does Not Provide Coverage for the Bank's Claim.

The Bank next contends (Letter at 2) that the Policy's ALTA 9 Endorsement provides coverage for losses arising from the covenant to pay Home Depot's SSA Taxes because that covenant is contained in the Memorandum of Agreement listed on Schedule B. In support of this argument, the Bank states that Section 1(B)(2) of the Endorsement "insured against loss or damage sustained by reason of '[a]ny instrument referred to in Schedule B as containing a covenant, conditions or restrictions on the land' which also 'provides for a private charge or assessment.'" The Bank's contention fails in light of (a) the language in bold below, which language is omitted from your Letter's quotation of Section 1(B)(2), and (b) the exceptions contained in Schedule B Part II.

Section 1(B)(2) provides:

> The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:
>
> 1. The existence, at Date of Policy, of any of the following:
>
> ***
>
> **(B) Unless expressly excepted in Schedule B:**
>
> ***
>
> (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which in addition, … (iii) provides for a private charge or assessment; ….

(emphasis added). Assuming *arguendo* that Home Depot's right to reimbursement for certain SSA Taxes is a "private charge or assessment" (as the Bank suggests without citing any authority), Section 1(B)(2) still does not apply – because Schedule B Part II expressly excepts coverage for Home Depot's rights against the Property.

Schedule B Part II lists as exceptions the recorded Memorandum of Agreement between Cannonball and Home Depot concerning the Purchase Agreement and the Development Agreement (Exception No. 4), and the recorded Memorandum of Development Agreement between Cannonball and Home Depot (Exception No. 6). The Schedule's statement of these Exceptions is followed, in each instance, by the statement: **"Note: Contains provisions to create a lien on the Land."** (emphasis added).

Schedule B Part II expressly excepts from coverage the recorded Memorandum of Agreement between Cannonball and Home Depot, specifically identifying the Purchase and Development Agreements and noting that those instruments contained provisions giving Home Depot a right to record a lien against the Property, which the Bank knew stemmed from

Cannonball's covenant to pay a portion of Home Depot's SSA Taxes. Thus, Section 1(B)(2) of the ALTA 9 Endorsement does not provide coverage for the covenant.

Finally, even if *arguendo* the ALTA 9 Endorsement could be construed as providing such coverage, the Bank's Claim is nevertheless barred by Exclusion 3(a), discussed next.

## III. Independent of the Policy's Insuring Provisions, Exclusion 3(a) Bars Coverage for the Bank's Claim.

The Bank's Claim is also barred by Exclusion 3(a), which excludes coverage for "[d]efects, liens, encumbrances, adverse claims or other matters" that are "created, suffered, assumed or agreed to" by the Bank. The Bank asserts (Letter at 3) that Exclusion 3(a) does not exclude coverage for its Claim because the Bank "did not agree to subordinate its mortgage to the covenant" to pay Home Depot's SSA Taxes, and "never envisioned … that the property would be encumbered by a covenant to pay SSA Taxes post-foreclosure." However, the Bank's assertions are not supported by the facts, as shown below.

The Bank does not dispute that it had actual knowledge of Home Depot's tax reimbursement and lien rights prior to making its loan to Cannonball. The Appellate Court found that the Bank had actual knowledge of the Purchase Agreement and the Development Agreement, and both of those Agreements recite Cannonball's reimbursement obligation and Home Depot's corresponding lien rights.[7] See Purchase Agreement, Section 22(h); Development Agreement, Section 7.8(c) (discussed below).

The Bank further admits that it agreed to the Memorandum of Agreement and the Memorandum of Development Agreement being recorded before the Mortgage. See Letter at 3 n.1 ("LaSalle Bank's attorney agreed to the order in which the deal documents would be recorded…."). As established in the Litigation, the legal effect of the Bank's said agreement was to ensure that Home Depot's tax reimbursement and lien rights survived foreclosure of the Mortgage. As the Appellate Court explained:

> In this case, **the LaSalle Bank mortgage was recorded** on the same day, but **after, Home Depot's memorandum of the purchase agreement and memorandum of the development agreement were recorded.** Further, LaSalle Bank had actual knowledge of the documents containing Home Depot's tax reimbursement and lien rights before it recorded its mortgage, because the purchase and development agreements were part of the closing documents. **The effective date of a mortgage is the date of its recording.** *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 703 (2000). Thus, **Home Depot's tax reimbursement and lien rights, being in effect before the mortgage and running with the land, were not extinguished by foreclosure.**

---

[7] See Ill. App. Op. at 12 ("Home Depot's tax reimbursement and lien rights are part of agreements that Bank of America's predecessor was aware of when it entered into the construction loan agreement with Cannonball."); at 14 ("LaSalle Bank had actual knowledge of the documents containing Home Depot's tax reimbursement and lien rights before it recorded its mortgage, because the purchase and development agreements were part of the closing documents.").

Ill. App. Op. at 14 (emphasis added).

That Cannonball's reimbursement obligation was intended to run with the land, to bind Cannonball's grantees, successors and assigns, and to survive foreclosure of the Bank's Mortgage is abundantly clear from the express terms of the Purchase Agreement, the Development Agreement, and the recorded Memorandum of Agreement:

First, Section 22(h) of the Purchase Agreement expressly provides that Cannonball's reimbursement obligation "shall be a covenant which shall run with the land and bind Seller's [Cannonball's] grantees, successor and assigns."

Second, Section 20(l) of the Purchase Agreement provides: "This Agreement shall be binding upon and shall insure to the benefit of the respective successors and assigns of the parties hereto (as permitted pursuant to the provisions of this Agreement)."

Third, the recorded Memorandum of Agreement states that Cannonball's obligations under Section 22(h) "shall be a covenant which shall run with the land and shall be binding upon Seller's grantees, successors, and assigns."

Fourth, Section 7.8(c) of the Development Agreement recites Cannonball's obligation to reimburse Home Depot for certain of its SSA Taxes under Section 22(h) of the Purchase Agreement, which if not timely paid gives Home Depot lien rights against Cannonball's Property, in accordance with Article 12 of the Development Agreement.

Fifth, Section 7.8(e) of the Development Agreement provides that the terms of Section 7.8 "shall survive the termination of this Agreement."

Sixth, Section 17.2 of the Development Agreement provides: "Subject to any provisions restricting assignment, this Agreement shall be binding upon and inure to the benefit of the executing parties and their respective successors, assigns, heirs, executors and administrators."

Seventh, Section 12.4 of the Development Agreement subordinates any lien that Home Depot may record against the Property to the priority of the Mortgage lien.[8] As the Appellate Court already concluded, such subordination was not intended to extinguish Home Depot's tax reimbursement and lien rights. See Ill. App. Op. at 15.

Eighth, the Development Agreement (at p. 61) attaches a form "Consent and Subordination of Lender," which was to be signed by the Bank unless the Memorandum of Development Agreement was recorded before the Mortgage, as occurred here. This form agreement reflects the intent of Cannonball and Home Depot, stating that the Development Agreement "shall survive any foreclosure, deed in lieu of foreclosure and/or exercise of any remedy by Lender and/or exercise of any remedy by Lender pursuant to the Mortgage."

---

[8] See Section 12.4 ("The priority of a lien created pursuant to this Article 12 shall be established solely by reference to the date of the recordation of the Memorandum of Development Agreement pursuant to Section 17.4 below; provided, however, **such lien shall be subordinate to the lien of any first mortgage or deed of trust**.") (emphasis added).

Ms. Traci S. Rea, Esq.
May 28, 2015
Page 8

The foregoing demonstrates that the Bank knew and agreed that Cannonball's reimbursement obligation encumbered title to the Property and was a covenant running with the land, binding on Cannonball's grantees, successors, and assigns. By agreeing that the Memorandum of Agreement would be recorded before the Mortgage, the Bank created the situation in which Cannonball's reimbursement obligation could not be terminated by foreclosure of the Mortgage. The Bank's Claim is thus squarely within the bar of Coverage Exclusion 3(a).

\* \* \*

Before making a final coverage determination, Chicago Title requests that the Bank provide the documents requested hereinabove for Chicago Title's consideration.

Chicago Title does not waive and expressly reserves any and all rights, claims, and defenses that it may have under the Policy and under the law with respect to the Bank's Claim. Chicago Title also reserves the right to supplement and/or modify the foregoing coverage analysis based on any additional documents or information that the Bank may provide or that Chicago Title may discover.

Sincerely,

Laura Maines Vasey
Vice President/Major Claims Counsel
Fidelity National Title Group
711 Third Avenue, Suite 500
New York, New York 10017
(212) 880-1212 (telephone)
Laura.Vasey@fnf.com (e-mail)

# EXHIBIT 6

# ReedSmith

**Traci S. Rea**
Direct Phone: +1 412 288 4184
Email: TRea@reedsmith.com

Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Tel +1 412 288 3131
Fax +1 412 288 3063
reedsmith.com

August 21, 2015

*VIA EMAIL AND OVERNIGHT DELIVERY*

Laura Maines Vasey, Esquire
Vice President/Major Claims Counsel
Fidelity National Title Group
711 Third Avenue, Suite 500
New York, NY 10017

Re:  ***Bank of America, N.A. v. Cannonball LLC, et. al.*  Proof of Loss**
     **Insured:  Bank of America, N.A. as successor by merger to LaSalle Bank N.A.**
     **Policy No.: N01070317**
     **Claim No.: 428868**
     **Property:  Kendall Marketplace Subdivision, Yorkville, Illinois**

Dear Ms. Vasey:

I am writing on behalf of Bank of America, N.A. ("Bank of America"), as successor in interest to
LaSalle Bank National Association ("LaSalle Bank"), and in response to your letter of May 28, 2015.  In
that letter, Chicago Title Insurance Company ("Chicago Title"), as successor to Ticor Title Insurance
Company, requested a proof of loss statement (a "Proof of Loss") for the above claim under Section 5 of
the Conditions and Stipulations of Policy of Title Insurance No. N01070317 (the "Policy").  Please
consider this correspondence and its attachments as the requested Proof of Loss.  This Proof of Loss
incorporates by reference my prior correspondence to you dated March 2, 2015, as well as the previous
documentation Bank of America has provided to Chicago Title in connection with this claim.  Given the
timing of your request, this Proof of Loss should be considered preliminary and Bank of America
reserves the right to supplement this Proof of Loss as necessary.  Should you need any additional
information after reviewing this Proof of Loss in order to process this claim, please let me know.

## I.    <u>Nature of the Claim</u>

As you know, this claim involves loss and damages sustained by Bank of America in connection with a
Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing (the
"Mortgage") dated as of May 1, 2007 and recorded May 24, 2007 as document number 20070016699
made by Cannonball LLC ("Cannonball"), an Illinois limited liability company to and for the benefit of
LaSalle Bank to secure an amount of indebtedness of $97,040,000.00.

The Mortgage was secured by property Cannonball proposed to develop in connection with the Kendall
Marketplace shopping center project located in Yorkville, Illinois ("Kendall Marketplace").  As part of
that project, Cannonball also entered into a purchase agreement with Home Depot U.S.A. ("Home
Depot") under which Home Depot purchased approximately 10 and a half-acres of land from

ABU DHABI • ATHENS • BEIJING • CENTURY CITY • CHICAGO • DUBAI • FRANKFURT • HONG KONG • HOUSTON • KAZAKHSTAN • LONDON • LOS ANGELES • MUNICH • NEW YORK • NORTHERN
VIRGINIA PARIS • PHILADELPHIA • PITTSBURGH • PRINCETON • RICHMOND • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • WASHINGTON, D.C. • WILMINGTON

August 21, 2015
Page 2

**ReedSmith**

Cannonball (the "Purchase Agreement"). Pursuant to the Purchase Agreement, Cannonball agreed to reimburse Home Depot for part of a special tax (the "SSA Tax") imposed on the property by the City of Yorkville. Cannonball and Home Depot also executed a development agreement (the "Development Agreement") which incorporated the SSA Tax reimbursement obligation and granted Home Depot the right to lien Cannonball's property should it fail to pay its portion of the SSA Tax.

Cannonball defaulted on its loan obligations by failing to make principal and interest payments on or before the June 1, 2010 maturity date, among other defaults. Bank of America filed suit to foreclose the Mortgage, among other relief, in the Circuit Court of Kendall County, Illinois as Case No. 10-CH-0869 on June 17, 2010 (the "Litigation"). The Bank filed its First Amended Verified Complaint for Breach of Construction Loan Agreement, Master Letter of Credit Agreement and Guaranty, and to Foreclose Mortgage (the "Complaint") on September 23, 2010, naming as defendants, Cannonball, David Bossy, Target Corporation, Home Depot, Kohl's Illinois Inc., Unknown Owners and Non-Record Claimants.

In response to the Complaint, on January 18, 2011, Home Depot filed an answer and affirmative defense. Home Depot subsequently counterclaimed, seeking a declaration that its SSA Tax reimbursement rights under the Purchase Agreement and Development Agreement ran with the land and were binding on the grantees, successors and assigns of Cannonball, including Bank of America.[1] Home Depot filed a motion for summary judgment on the SSA Tax reimbursement issue.

On October 9, 2012, the trial court denied Home Depot's summary judgment motion and granted summary judgment in favor of Bank of America, holding that the SSA Tax was personal between Cannonball and Home Depot and was not a covenant that ran with the land. On May 1, 2012, the trial court issued a written order of default judgment, summary judgment and judgement of foreclosure and sale. A copy of the May 1, 2012 Order is attached as Exhibit A. The order provided:

> Bank of America's Motion for Summary Judgment against Home Depot, as it relates to Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights, is granted pursuant to 735 ILCS 5/2-1005. Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot and do not run with the Mortgaged Property. Upon entry of the final order in this case, Home Depot's Reimbursement Rights, Home Depot's SSA Tax Lien Rights and Home Depot['s] Claim of Lien are foreclosed and terminated pursuant to 735 ILCS 5/15-1506(c), provided, however, that Home Depot's Reimbursement Rights against Cannonball are not affected. The purchaser of the Mortgaged Property at foreclosure sale, as well as its grantees, successors and assigns, shall have no obligation to reimburse Home Depot, or any person(s) claiming by, through or under it, for any portion of the SSA Tax assessed against the Home Depot Tract.

Home Depot appealed the ruling against it. On May 29, 2014, the Illinois Appellate Court reversed the trial court, holding that the obligation to reimburse Home Depot for the SSA Tax was a covenant running with the property and was therefore not extinguished by Bank of America's foreclosure of the Mortgage. A copy of the Appellate Court Decision is attached as Exhibit B. Bank of America petitioned the Supreme Court of Illinois to appeal the Appellate Court Decision. The Illinois Supreme Court denied the Petition to Appeal on November 26, 2014.

---

[1] Chicago Title approved the retention of Jeffrey D. Ganz, Esquire and Phillip J. Block, Esquire of Riemer & Braunstein LLP to defend Bank of America against Home Depot's claims.

August 21, 2015
Page 3

**ReedSmith**

In this claim, Bank of America seeks, *inter alia*, coverage under the Policy for losses it has sustained due to the encumbrance established by the Superior Court's holding that the Home Depot SSA Tax reimbursement obligation is a covenant that runs with the land and, accordingly, survived foreclosure of the Mortgage.[2]

## II.   Placement Of The Policy

In connection with the Mortgage, LaSalle Bank purchased the Policy in order to insure the priority of the Mortgage over other interests, including those of Home Depot. Attorney Steven H. Malato ("Malato") represented LaSalle Bank in closing the loan transaction with Cannonball and procuring the Policy. *See* Affidavit of Stephen H. Malato, attached hereto as Exhibit C, at ¶¶ 2-3. At all points in the transaction, LaSalle Bank intended the Mortgage to be superior to any and all rights that Home Depot may have had to reimbursement from Cannonball for the SSA Tax. *Id.* at ¶ 9. Malato and LaSalle Bank understood and intended that any rights Home Depot may have had relating to the SSA Tax would be extinguished upon foreclosure of the Mortgage. *Id.*

Chicago Title's predecessor, Near North National Title ("NNNT") served as LaSalle Bank's closing agent on the Mortgage transaction. *Id.* at ¶ 4. As the closing agent, NNNT was responsible for coordinating with the other agents to the transaction in order to record the documentation in the appropriate order to fulfill the instructions given to it. *Id.* NNNT knew that it was Malato and LaSalle Bank's intent that the Mortgage would be superior to all other rights and its foreclosure would extinguish any rights Home Depot may have had. *Id.* at ¶ 10. NNNT was fully advised and knew of the Purchase and Development Agreements. NNNT determined the order in which the various documents were recorded and was required to do so in conformance with LaSalle Bank's instructions and intent that the Mortgage would be superior to any rights Home Depot may have had. *Id.*

While Malato agreed that the Development Agreement could be recorded before the Mortgage, he did so with the express understanding that this sequence would not affect the priority of the Mortgage over Home Depot's SSA Tax reimbursement rights. *Id.* at ¶ 12. Specifically, the parties had agreed in a Payment and Priority Agreement that the Mortgage was superior to any rights created in the Development Agreement and that LaSalle Bank would have no obligation to Home Depot under the Development Agreement unless it expressly assumed those obligations in writing. *Id.*

It was never Malato's intention or understanding that Home Depot's rights would survive foreclosure. *Id.* at ¶ 13. The Superior Court's later ruling that the Home Depot covenant ran with the land was not an encumbrance that Malato or LaSalle Bank created, suffered or assumed. *Id.* Malato specifically placed the Policy in order to insure, *inter alia,* against the risk that a court might find another party's interest superior to the Mortgage such that it would survive foreclosure. *Id.* at ¶¶ 13-14. Based on his personal knowledge and involvement in the transaction, Malato understands and believes that any loss sustained by Bank of America due to the survival of Home Depot's SSA Tax reimbursement rights post-foreclosure is covered by the Policy. *Id.*

---

[2] Bank of America further seeks the amounts it incurred in connection with defending against Home Depot's claims in the Litigation. Bank of America previously submitted that fee information to Chicago Title and incorporates by reference its request for reimbursement of all fees incurred in connection with the defense of Home Depot's claims.

August 21, 2015
Page 4

**ReedSmith**

## III.    Coverage for the Loss

It is axiomatic that a covenant that runs with the land is an encumbrance on the property. *See* Powell on Real Property § 81.03 (2014) ("A covenant running with the land is commonly treated as an encumbrance, whether it is affirmative or negative in operation, and whether it is enforceable in law as a real covenant or in equity as an equitable servitude"); *Chicago Title Ins. Co. v. Aurora Loan Servs., LLC*, 996 N.E.2d 44, 50 (Ill. App. Ct. 2013) ("Encumbrances include not merely liens such as mortgages, judgments liens, or taxes but also attachments, leases, inchoate dower rights, water rights, easements, restrictions on use, or any right in a third party which diminishes the value or limits the use of the land granted"); Black's Law Dictionary (9th ed. 2009) (defining encumbrance as a "claim or liability that is attached to property or some other right and that may lessen its value" that "remains after the property or right is transferred"). As an encumbrance on the property, the covenant to pay the Home Depot SSA Tax is covered by the Policy's clear terms.

The Policy's primary coverage grant insures against loss or damage sustained or incurred by the Insured by reason of "[a]ny defect in or lien *or encumbrance on the title*." Policy at 1 (emphasis added). It further insures against "[t]he priority of any lien *or encumbrance* over the lien of the insured mortgage." *Id.* (emphasis added). Schedule B of the Policy specifically insures that *"such matters"* contained in the agreements listed on Part II are "subordinate to the lien or charge of the insured mortgage." Policy at Schedule B Part II (emphasis added). The Home Depot Memorandum Agreement is scheduled on Part II of Schedule B. *Id.* The obligation to pay the Home Depot SSA Tax is contained in the Home Depot Memorandum Agreement. As a "matter" contained in the Home Depot Memorandum Agreement, Part II of Schedule B insures that the covenant is subordinate to the insured mortgage and not an encumbrance that would survive foreclosure.

The ALTA 9 Endorsement to the Policy similarly provides coverage for losses arising from the covenant to pay the Home Depot SSA Tax. Under this endorsement, Chicago Title explicitly insured against loss or damage sustained by reason of "[a]ny instrument referred to in Schedule B as containing a covenant, conditions or restrictions on the land" which also "provides for a private charge or assessment." ALTA 9 Endorsement at 1(B)(2). Because the Home Depot Memorandum Agreement is specifically listed on Schedule B, the covenant to pay the Home Depot SSA Tax is covered by this endorsement as well.

Exclusion 3(a) does not apply to this claim. As set forth above, LaSalle Bank did not agree to subordinate the Mortgage to the covenant to pay the Home Depot SSA Tax. Both LaSalle Bank and Chicago Title knew the Purchase and Development Agreements were in place before issuing the Policy. In fact, Chicago Title expressly agreed to insure that any matter that they contained would be subordinate to the Mortgage. *See* Policy Schedule B Part II. The parties never envisioned that the property would be encumbered by a covenant to pay SSA Tax post-foreclosure. *See* Malato Affidavit at ¶¶ 9, 13, 14. Even the trial court did not believe the agreements should be interpreted in that manner. Rather, the Home Depot SSA Tax covenant was first held to survive the foreclosure only on appeal.

## IV.    Calculation of Damages

On July 9, 2015, after a national marketing campaign, Bank of America sold the retail portion of Kendall Marketplace for $6,060,000. *See* Affidavit of Anthony Conrad, attached hereto as Exhibit D, at ¶ 6. Based on this purchase price, the property's net operating income and the 2014 SSA Tax amount, Bank of America has calculated the value of Kendall Marketplace without the SSA Tax obligation to be

August 21, 2015
Page 5

**ReedSmith**

$7,838,948. *Id.* at ¶ 12. This is $1,778,948 more than the actual purchase price. *Id.* Bank of America further calculated the value of the SSA Tax obligation, assuming a 7.89% capitalization rate, to be $1,778,948. *Id.* at ¶ 11. The damages and losses Bank of America has suffered in connection with the sale of Kendall Marketplace due to the SSA Tax reimbursement obligation therefore are approximately **$1,780,000**. *Id.* at ¶ 14. This amount is in addition to all fees and costs that Bank of America incurred in connection with the Litigation.

Bank of America continues to reserve all of its rights and privileges under the Policy, at law and in equity. Nothing herein shall be construed as a limitation or waiver of any of those rights or privileges.

Very truly yours,

REED SMITH LLP

By: *Traci S Rea*

Traci S. Rea

Enclosures

# EXHIBIT A

## IN THE SIXTEENTH JUDICIAL CIRCUIT COURT
### KENDALL COUNTY, ILLINOIS

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., as successor by merger to LaSalle Bank National Association, in its individual capacity and as authorized Agent, | ) ) ) ) | **FILED IN OPEN COURT** |
| | ) | MAR 0 1 2013 |
| Plaintiff, | ) ) | **BECKY MORGANEGG** CIRCUIT CLERK KENDALL CO. |
| v. | ) ) | Case No. 10-CH-0869 |
| CANNONBALL LLC, DAVID BOSSY, TARGET CORPORATION, HOME DEPOT U.S.A., INC., KOHL'S ILLINOIS, INC., UNKNOWN OWNERS and NON-RECORD CLAIMANTS, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### ORDER OF DEFAULT JUDGMENT, SUMMARY JUDGMENT AND JUDGMENT OF FORECLOSURE AND SALE
### (Lots 1-19, 21, 24-52, 55 and 57 in Kendall Marketplace Subdivision, Route 34 and Cannonball Trail, Yorkville, Illinois)

THIS CAUSE comes before the Court on the Motion for Default Judgment, Summary Judgment and for Judgment of Foreclosure and Sale ("Bank of America's Motion for Judgment"), brought by the Plaintiff, Bank of America, N.A., as successor by merger to LaSalle Bank National Association, in its individual capacity and as agent for certain co-lenders (hereinafter, "Bank of America" or the "Plaintiff") and on Home Depot U.S.A., Inc.'s ("Home Depot") Cross-Motion for Summary Judgment on Count II of its Counterclaim ("Home Depot's Motion for Summary Judgment"). Bank of America and Home Depot having served due notice of said Motions on all parties, the Court having jurisdiction over the subject matter of this case and the parties served, both Motions having been fully briefed and the Court being fully advised in the premises, the Court hereby grants Bank of America's Motion for Judgment and Home Depot's Motion for Summary Judgment, each in part, as follows:

### IT IS HEREBY FOUND THAT:

1. **Jurisdiction.**

A. On June 17, 2010, the Plaintiff filed its Verified Complaint for Breach of Construction Loan Agreement, Master Letter of Credit Agreement and Guaranty, and to Foreclose Mortgage (the "Complaint"). On September 23, 2010, the Plaintiff filed its First Amended Verified Complaint for Breach of Construction Loan Agreement, Master Letter of Credit Agreement and Guaranty, and to Foreclose Mortgage (the "Amended Complaint") asking

the Court: (i) in Count I for a money judgment against Cannonball LLC ("Cannonball") for breach of the Construction Loan Agreement dated as of May 1, 2007 and for breach of four promissory notes made pursuant to the Construction Loan Agreement; (ii) in Count II for a money judgment against Cannonball for breach of the Master Letter of Credit Agreement dated as of May 1, 2007; (iii) in Count III for a money judgment against David Bossy ("Bossy" or the "Guarantor") for breach of the Guaranty of Payment and Completion dated as of May 1, 2007; and (iv) in Count IV to foreclose upon the Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of May 1, 2007, and also asking the Court to enter a money judgment against Cannonball for any deficiency following the judicial sale.

B.    On July 29, 2010, the Plaintiff recorded a Notice of Foreclosure in the Office of the Kendall County Recorder as Document No. 201000012996 and filed the Notice of Foreclosure with this Court on September 1, 2010.

C.    The following Defendants were served in accordance with the Illinois Code of Civil Procedure and the Supreme Court Rules, with a Summons and a copy of the Complaint and/or the Amended Complaint:

  i.    Cannonball LLC;

  ii.    David Bossy;

  iii.    Target Corporation;

  iv.    Home Depot U.S.A., Inc.;

  v.    Kohl's Illinois, Inc.;

Defendants Unknown Owners and Non-Record Claimants were also served in accordance with the Illinois Code of Civil Procedure and the Supreme Court Rules, via publication on July 8, 2010.

D.    This Court has jurisdiction over all parties and over the subject matter of this action pursuant to 735 ILCS 5/2-209 and 735 ILCS 5/15-1103.

2.    **Findings of Fact.**

A.    The Plaintiff, Bank of America, N.A., as successor by merger to LaSalle Bank National Association, in its individual capacity and as agent for certain co-lenders, entered into a certain Construction Loan Agreement (the "Original Construction Loan Agreement") with Cannonball on May 1, 2007, which provided for Cannonball to borrow up to $97,040,000.00 for property acquisition and construction purposes. The Original Construction Loan Agreement was modified on April 7, 2010 (the "First Modification to Construction Loan Agreement") and again on April 30, 2010 (together with the Original Construction Loan Agreement and the First Modification to Construction Loan Agreement, the "Construction Loan Agreement").

B.      Pursuant to certain Assignment and Acceptance Agreements dated as of June 28, 2007 (the "Assignment") and in accordance with the Construction Loan Agreement, Bank of America assigned and sold a portion of its rights and obligations under the Construction Loan Agreement to Associated Bank, National Association, Mid-America Bank, fsb, and TierOne Bank, and under which Bank of America is the Agent for Associated Bank, National Association, Mid-America Bank, fsb, and TierOne Bank.

C.      Under Article 12 of the Construction Loan Agreement, upon any event of default, Bank of America is the authorized Agent of Associated Bank, National Association, Mid-America Bank, fsb and TierOne Bank, and their successors and assigns, empowered to exercise all remedies or causes of action permitted in law or in equity under the Construction Loan Agreement and all other "Loan Documents" as defined therein, the Master Letter of Credit Agreement identified below, the letters of credit identified below, Notes 1 – 4 identified below, the Mortgage identified below, and the Guaranty identified below. The Plaintiff brings this action in its capacity as the authorized Agent for Associated Bank, National Association, Mid-America Bank, fsb and TierOne Bank, and their successors and assigns.

D.      On June 28, 2007, and pursuant to the Construction Loan Agreement and Assignment, Cannonball executed and delivered to Associated Bank a certain Promissory Note in the original principal amount of $20,993,774.73 ("Note 1").

E.      On June 28, 2007, and pursuant to the Construction Loan Agreement and Assignment, Cannonball executed and delivered to Mid-America Bank, fsb, a certain Promissory Note in the original principal amount of $8,068,322.34 ("Note 2"). PNC Bank, National Association, is the holder of Note 2 and indebtedness thereunder by virtue of being successor by merger with National City Bank, which was successor by merger with MidAmerica, National Association, and successor by conversion from Mid-America Bank, fsb.

F.      On May 1, 2007, and pursuant to the Construction Loan Agreement and Assignment, Cannonball executed and delivered to TierOne Bank a certain Promissory Note in the original principal amount of $20,993,774.73 ("Note 3"). Great Western Bank, a bank chartered under the laws of the State of South Dakota ("Great Western"), is assignee of the loans of TierOne Bank, by assignment from the FDIC as Receiver of TierOne Bank, which was closed by the Office of Thrift Supervision on June 4, 2010. Great Western is the holder of Note 3 and the indebtedness thereunder.

G.      On June 28, 2007, and pursuant to the Construction Loan Agreement and Assignment, Cannonball executed and delivered to LaSalle Bank National Association a certain Promissory Note in the original principal amount of $28,239,128.19 ("Note 4"). As set forth above, Bank of America, N.A. is successor by merger to LaSalle Bank National Association. Bank of America is the holder of Note 4 and the indebtedness thereunder.

H.      On May 1, 2007, Cannonball executed and delivered to Bank of America a certain Master Letter of Credit Agreement (the "Master Letter of Credit Agreement").

I.      On May 14, 2007, and pursuant to the Construction Loan Agreement and Master Letter of Credit Agreement, Bank of America issued a Standby Letter of Credit No. S598575 on

3

behalf of Cannonball and for the benefit of Target Corporation ("Target"), in the amount of $430,000.00 (the "Target LC").

J.     On May 1, 2007, and to secure its indebtedness under the Construction Loan Agreement, Notes 1-4, and the Target LC, among other documents, agreements and instruments, Cannonball executed and delivered to Bank of America a Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of May 1, 2007 (the "Original Mortgage") encumbering the property commonly known as Lots 1-19, 21, 24-52, 55 and 57 in Kendall Marketplace Subdivision, Yorkville, Illinois (the "Mortgaged Property.") The Original Mortgage was recorded in the Office of the Kendall County Recorder on May 24, 2007 as Document No. 20070001669. The Original Mortgage was amended pursuant to the First Amendment to Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of April 30, 2010 (the "First Amendment to Mortgage" and together with the Original Mortgage, the "Mortgage"). The First Amendment to Mortgage was recorded in the Office of the Kendall County Recorder on May 20, 2010 as Document No. 201000009029.

K.     On May 1, 2007, Bossy executed and delivered to Bank of America a Guaranty of Payment and Completion (the "Guaranty") thereby guarantying the payment and performance of Cannonball's indebtedness under the Construction Loan Agreement, under Notes 1-4, and under the Letters of Credit.

L.     On April 27, 2007, United City of Yorkville Ordinance No. 2007-26, entitled An Ordinance Establishing United City of Yorkville Special Service Area Number 2006-13 (the "SSA Ordinance"), was recorded in the Office of the Kendall County Recorder as Document No. 200700013896. Pursuant to the SSA Ordinance, a special tax (the "SSA Tax") may be assessed against parcels within Kendall Marketplace Subdivision (the "Shopping Center").

M.     On November 1, 2006, Cannonball and Kohl's Illinois, Inc. ("Kohl's") entered into a Purchase and Sale Agreement (the "Kohl's Purchase Agreement") under which, among other things, Kohl's purchased certain real estate (the "Kohl's Tract") which is part of the Shopping Center and adjacent to the Mortgaged Property.

N.     On November 1, 2006, Cannonball and Kohl's entered into a Site Development Agreement (the "Kohl's SDA") regarding, among other things, the construction and development of the Kohl's Tract.

O.     On May 11, 2007, Cannonball and Target entered into a Purchase Agreement (the "Target Purchase Agreement") under which, among other things, Target purchased certain real estate (the "Target Tract") which is part of the Shopping Center and adjacent to the Mortgaged Property.

P.     On May 15, 2007, Cannonball and Target entered into a Site Development Agreement (the "Target SDA") regarding, among other things, the construction and development of the Target Tract.

Q.     On November 7, 2008, Cannonball and Target entered into an Agreement of Covenants (the "Target Agreement of Covenants") under which, among other things, Cannonball agreed to reimburse Target for all of the SSA Tax levied against the Target Tract ("Target's

4

Reimbursement Rights"). The Target Agreement of Covenants provides, among other things, that Target may have lien rights against the Mortgaged Property in the event that Cannonball failed to reimburse Target according to Target's Reimbursement Rights, as set forth more fully in the Target Agreement of Covenants ("Target's Potential and Contingent SSA Tax Lien Rights").

      R.      On March 13, 2007, Cannonball and Home Depot entered into a Real Property Purchase Agreement (the "Home Depot Purchase Agreement") under which among other things: (i) Home Depot purchased certain real estate (the "Home Depot Tract") which is part of the Shopping Center and adjacent to the Mortgaged Property; (ii) Cannonball agreed to reimburse Home Depot for any portion of the SSA Tax levied against the Home Depot Tract that exceeded an amount equal to $0.50 per square foot of Home Depot's floor area ("Home Depot's Reimbursement Rights"); and (iii) Home Depot was granted lien rights in the Mortgaged Property, in accordance with the terms of the Development Agreement to be executed with Cannonball, in the event that Cannonball failed to reimburse Home Depot according to Home Depot's Reimbursement Rights. A Memorandum of Agreement was recorded against the Mortgaged Property in the Office of the Kendall County Recorder on May 24, 2007 as Document No. 200700016696 (the "Home Depot Memorandum of Purchase Agreement"). A Memorandum of Repurchase Put Option was recorded against the Mortgaged Property in the Office of the Kendall County Recorder on May 24, 2007 as Document No. 200700016697 (the "Home Depot Memorandum of Put Agreement").

      S.      On May 15, 2007, Cannonball and Home Depot entered into a Development Agreement (the "Home Depot Development Agreement") regarding, among other things, the construction and development of the Home Depot Tract and which (i) restated the terms of Home Depot's Reimbursement Rights, and (ii) set forth the terms of Home Depot's lien rights in the Mortgaged Property if Cannonball failed to reimburse Home Depot according to Home Depot's Reimbursement Rights ("Home Depot's SSA Tax Lien Rights"). A Memorandum of Development Agreement was recorded against the Mortgaged Property in the Office of the Kendall County Recorder on May 24, 2007 as Document No. 200700016698 (the "Home Depot Memorandum of Development Agreement").

      T.      On March 16, 2011, Home Depot recorded a Notice of Current Amount Due Under Lien Right against the Mortgaged Property in the Office of the Kendall County Recorder as Document No. 201100004776 (the "Home Depot Claim of Lien").

      U.      On May 15, 2007, Target, Kohl's, Home Depot and Cannonball entered into the Operation and Easement Agreement (the "Original Operation and Easement Agreement") regarding, among other things, the development and operation of the Shopping Center. The Original Operation and Easement Agreement was recorded in the Office of the Kendall County Recorder on May 24, 2007 as Document No. 200700016695. On December 27, 2007, Target, Kohl's, Home Depot and Cannonball entered into the First Amendment to Operation and Easement Agreement (the "First Amendment to Operation and Easement Agreement" and together with the Original Operation and Easement Agreement, the "OEA"). The First Amendment to Operation and Easement Agreement was recorded in the Office of the Kendall County Recorder on January 7, 2008 as Document No. 200800000363.

V.      On May 15, 2007, Cannonball, Target, Home Depot, Kohl's, the United City of Yorkville, Bank of America, as successor by merger to LaSalle Bank National Association, and Near North National Title LLC entered into the Payment and Priority Agreement (the "PPA") regarding, among other things, the parties' respective rights and obligations concerning Project Site Improvement Work (as defined in the PPA).

W.      Bank of America brought Count I of its Amended Complaint seeking a money judgment against Cannonball for breach of the Construction Loan Agreement and to recover the outstanding indebtedness owed by Cannonball under Notes 1-4.

X.      Bank of America brought Count II of its Amended Complaint seeking a money judgment against Cannonball for breach of the Master Letter of Credit Agreement.

Y.      Bank of America brought Count III of its Amended Complaint seeking a money judgment against Bossy for breach of his Guaranty of amounts due and owing under the Construction Loan Agreement, Notes 1-4 and the Master Letter of Credit Agreement.

Z.      Bank of America brought Count IV of its Amended Complaint seeking to foreclose the Mortgage as follows:

    i.      **Nature of Instrument:** Construction Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing.

    ii.     **Date of Mortgage:** May 1, 2007. The Mortgage was amended on April 30, 2010.

    iii.    **Name of Mortgagor:** Cannonball LLC.

    iv.     **Name of Mortgagee:** LaSalle Bank National Association, as Agent. Bank of America is successor by merger with LaSalle Bank National Association.

    v.      **Date & Place of Recording:** The Mortgage was recorded on May 24, 2007 in the Office of the Kendall County Recorder of Deeds. The First Amendment was recorded on May 20, 2010 in the Office of the Kendall County Recorder of Deeds.

    vi.     **Identification of Recording:** Mortgage Document No. 200700016699. First Amendment Document No. 201000009029.

    vii.    **Interest Subject to Mortgage:** Fee simple.

    viii.   **Amount of Original Indebtedness:** The Mortgage secures the obligations set forth in the Constriction Loan Agreement and Notes 1-4, in the original aggregate principal amount of up to $97,040,000.00.

ix.     **The Legal Description of the Real Estate and the Common Address:**

(1)     Legal Description

Parcel 1:

Lots 1-19, 21, 24-52, 55 and 57 in Kendall Marketplace Subdivision; being a subdivision of part of the Southeast quarter of Section 19, the South half of Section 20, and the Northwest quarter of Section 29, Township 37 North, Range 7 East of the Third Principal Meridian, recorded May 7, 2007 as document number 200700014779 in the United City of Yorkville, Kendall County, Illinois.

Parcel 2:

Easements appurtenant for the benefit of Parcel 1 as created by the Operation and Easement Agreement dated as of May 15, 2007 and recorded contemporaneously herewith for the following purposes:

1.  Ingress, egress and parking;
2.  Passage and accommodation of pedestrians and vehicles;
3.  Passage and accommodation of pedestrians and vehicles
    (Affects developer, Kohl's and Home Depot only)
4.  Utilities;
5.  Surface storm water drainage and detention; and
6.  Construction, maintenance and reconstruction easements.

Located upon and across the Parcels described in said documents

(2)     Common Address: Lots 1-19, 21, 24-52, 55 and 57 in Kendall Marketplace Subdivision, Route 34 and Cannonball Trail, Yorkville, Illinois.

x.      **Statement as to Defaults:** Cannonball is in default under Section 16(a) of the Mortgage because it has failed to pay all outstanding principal, interest and other charges upon the June 1, 2010 maturity date of Notes 1-4 as required by the Construction Loan Agreement.

(1)     As of August 24, 2012, the following amounts were due and payable under Note 1, plus interest accrued and accruing thereafter, advances pursuant to the terms of the Mortgage, the Construction Loan Agreement and Note 1, court costs, title costs, and Agent's attorney's fees:

| i.   | Principal due: | $12,308,356.27 |
|------|----------------|----------------|
| ii.  | Interest due:  | $909,416.98    |
| iii. | Balance Due:   | $13,217,773.25 |

Interest continues to accrue on Note 1 after August 24, 2012 at a *per diem* of $1,111.17.

(2)     As of August 24, 2012, the following amounts were due and payable under Note 2, plus interest accrued and

7

accruing thereafter, advances pursuant to the terms of the Mortgage, the Construction Loan Agreement and Note 2, court costs, title costs, and Agent's attorney's fees:

| i. | Principal due: | $4,730,344.41 |
|------|----------------|---------------|
| ii. | Interest due: | $349,506.91 |
| iii. | Balance Due: | $5,079,851.32 |

Interest continues to accrue on Note 2 after August 24, 2012 at a *per diem* of $427.04.

(3)     As of August 24, 2012, the following amounts were due and payable under Note 3, plus interest accrued and accruing thereafter, advances pursuant to the terms of the Mortgage, the Construction Loan Agreement and Note 3, court costs, title costs, and Agent's attorney's fees:

| i. | Principal due: | $12,308,356.27 |
|------|----------------|----------------|
| ii. | Interest due: | $909,416.98 |
| iii. | Balance Due: | $13,217,773.25 |

Interest continues to accrue on Note 3 after August 24, 2012 at a *per diem* of $1,111.17.

(4)     As of August 24, 2012, the following amounts were due and payable under Note 4, plus interest accrued and accruing thereafter, advances pursuant to the terms of the Mortgage, the Construction Loan Agreement and Note 4, court costs, title costs, and Agent's attorney's fees:

| i. | Principal due: | $16,556,205.61 |
|------|----------------|----------------|
| ii. | Interest due: | $1,223,274.17 |
| iii. | Balance Due: | $17,779,479.78 |

Interest continues to accrue on Note 4 after August 24, 2012 at a *per diem* of $1,494.66.

8

    xi.    **Name of Owner(s) of the Real Estate Prior to Judicial Sale Ordered Hereby**: Cannonball LLC.

    xii.    **Names of Other Persons Who were Joined as Defendants** and whose interest in or lien on the Mortgaged Property were sought to be terminated:

        a.    Cannonball LLC.

        b.    David Bossy.

        c.    Target Corporation.

        d.    Home Depot U.S.A., Inc.

        e.    Kohl's Illinois, Inc.

        f.    Unknown Owners.

        g.    Non-Record Claimants.

    xiii.    **Capacity in Which the Plaintiff Brings this Foreclosure:** Bank of America brought Count IV of the Amended Complaint as Mortgagee and as the authorized Agent of the holders of Notes 1-4 and indebtedness, which is secured by the Mortgage.

    xiv.    **Facts in Support of Waiver of the Right of Redemption:** Section 27(a) of the Mortgage provides that Cannonball waived any and all rights of redemption and reinstatement under the Illinois Mortgage Foreclosure Law.

    xv.    **Facts in Support of Request for Attorneys' Fees and of Costs and Expenses, if Applicable:** By virtue of the defaults found herein, Bank of America was required to retain counsel for the prosecution of this foreclosure and to incur attorney's fees, court costs, title insurance or abstract costs, and other expenses that should be added to the balance secured by the Mortgage, pursuant to Sections 17(b) and 29(a) of the Mortgage.

AA.    Home Depot brought Count II of its Counterclaim seeking a declaratory judgment that the rights and obligations in the Home Depot Purchase Agreement, Home Depot Development Agreement and the OEA run with the land and are binding on the grantees, successors and assigns of Cannonball, including Bank of America, and that Home Depot be awarded its attorneys' fees incurred in bringing this action.

BB.    Target brought its Counterclaim ("Target's Counterclaim") seeking a declaratory judgment that the Covenant (as defined in Target's Counterclaim) runs with the land, encumbers the Mortgaged Property, is not subject to and cannot be extinguished by Bank of America in these foreclosure proceedings or otherwise, among other declaratory relief.

3. **Conclusions of Law.**

    A.     **Bank of America's Amended Complaint – Count I**

        i.     The Amended Complaint is verified by the Plaintiff and the Plaintiff has submitted an Affidavit and Supplemental Affidavit in support of its request for a judgment under Count I of its Amended Complaint.

        ii.     Cannonball has not affirmatively denied any of the allegations against it in Count I of the Amended Complaint.

        iii.     Under the Construction Loan Agreement, the entire principal balance plus all accrued and unpaid interest under Notes 1-4 was required to be paid by Cannonball to Bank of America on or before the June 1, 2010 maturity date of Notes 1-4.

        iv.     Cannonball has defaulted under the terms of the Construction Loan Agreement because it has failed to make full payment of principal and interest under Notes 1-4, as required by the Construction Loan Agreement, on or before the June 1, 2010 maturity date, among other defaults.

        v.     Therefore, the allegations in Count I of the Amended Complaint are true as set forth and Bank of America's Motion for Summary Judgment against Cannonball under Count I of the Amended Complaint is granted.

        vi.     As of August 24, 2012, Bank of America is entitled to a money judgment against Cannonball in the following amounts under Notes 1-4, together with the costs incurred in the collection of such amounts due, including attorney's fees and court costs:

Note 1

| i. | Principal due: | $12,308,356.27 |
|------|------|------|
| ii. | Interest due: | $909,416.98 |
| iii. | Balance Due: | $13,217,773.25 |

Interest continues to accrue on Note 1 after August 24, 2012 at a *per diem* of $1,111.17.

Note 2

| i. | Principal due: | $4,730,344.41 |
|------|------|------|
| ii. | Interest due: | $349,506.91 |
| iii. | Balance Due: | $5,079,851.32 |

10

Interest continues to accrue on Note 2 after August 24, 2012 at a *per diem* of $427.04.

Note 3

| i.   | Principal due: | $12,308,356.27 |
|------|----------------|----------------|
| ii.  | Interest due:  | $909,416.98    |
| iii. | Balance Due:   | $13,217,773.25 |

Interest continues to accrue on Note 3 after August 24, 2012 at a *per diem* of $1,111.17.

Note 4

| i.   | Principal due: | $16,556,205.61 |
|------|----------------|----------------|
| ii.  | Interest due:  | $1,223,274.17  |
| iii. | Balance Due:   | $17,779,479.78 |

Interest continues to accrue on Note 4 after August 24, 2012 at a *per diem* of $1,494.66.

vii. The final judgment against Cannonball under Count I will be determined at the foreclosure sale confirmation stage to account for the proceeds from the foreclosure sale, and to add interest and charges accruing after August 24, 2012 and the Bank's attorney's fees, court costs and filing fees.

B. **Bank of America's Amended Complaint – Count II**

i. The Amended Complaint is verified by the Plaintiff and the Plaintiff has submitted an Affidavit and Supplemental Affidavit in support of its request for a judgment under Count II of its Amended Complaint.

ii. Cannonball filed its Answer to the Amended Complaint, but has not affirmatively denied any of the allegations against it in Count II of the Amended Complaint.

iii. Under the Master Letter of Credit Agreement, any event of default under the Construction Loan Agreement or Notes 1-4 also constitutes a default under the Master Letter of Credit Agreement.

iv. Cannonball has defaulted under the terms of the Master Letter of Credit Agreement because it has failed to make full payment of principal and

11

interest under Notes 1-4, as required by the Construction Loan Agreement, on or before the June 1, 2010 maturity date, among other defaults.

v.  Therefore, the allegations in Count II of the Amended Complaint are true as set forth and Bank of America's Motion for Summary Judgment against Cannonball under Count II of the Amended Complaint is granted.

vi.  As of August 24, 2012, Bank of America is entitled to a money judgment against Cannonball in the following amounts under the Target LC, together with the costs incurred in the collection of such amounts due, including attorney's fees and court costs:

| i. | Principal due (incl. draw fee): | $431,120.00 |
| ii. | Interest due: | $37,348.76 |
| iii. | Balance Due: | $468,468.76 |

Interest continues to accrue on the Target LC after August 24, 2012 at the per diem of $74.85.

vii.  The final judgment against Cannonball under Count II will be determined at the foreclosure sale confirmation stage to account for the proceeds from the foreclosure sale, and to add interest and charges accruing after August 24, 2012 and the Bank's attorney's fees, court costs and filing fees.

C.  **Bank of America's Amended Complaint – Count III**

i.  The Amended Complaint is verified by the Plaintiff and the Plaintiff has submitted an Affidavit and Supplemental Affidavit in support of its request for a judgment under Count III of its Amended Complaint.

ii.  Bossy filed his Answer to the Original Complaint, which shall stand as his Answer to the Amended Complaint as the allegations in the Original Complaint against Bossy are identical to those against Bossy in the Amended Complaint. Bossy has not affirmatively denied any of the allegations against him in Count III of the Amended Complaint.

iii.  Under the Guaranty, Bossy guaranteed Cannonball's obligations under the Construction Loan Agreement, Notes 1-4, the Master Letter of Credit Agreement and the Target LC, up to a limit of $4,500,000.00, plus (a) interest accruing thereof at the Default Rate (as defined in the Construction Loan Agreement) from June 7, 2010, having been the date that the Bank demanded payment from Bossy, through the date of final judgment, and (b) all fees, costs and expenses incurred by Bank of America in connection with the collection of amounts due from

12

Cannonball, including, without limitation, reasonable attorney's fees, court costs and filing fees.

iv.     Bossy has defaulted under the terms of the Guaranty because he has failed to pay to Bank of America all amounts due under the Construction Loan Agreement and Notes 1-4 upon maturity and amounts due under the Master Letter of Credit Agreement, among other defaults.

v.      Therefore, the allegations in Count III of the Amended Complaint are true as set forth and Bank of America's Motion for Summary Judgment against Bossy under Count III of the Amended Complaint is granted.

vi.     The final judgment against Bossy under Count III will be determined at the foreclosure sale confirmation stage to account for the proceeds from the foreclosure sale, and to add interest and charges accruing after August 24, 2012 and the Bank's attorney's fees, court costs and filing fees.

**D.      Bank of America's Amended Complaint – Count IV**

i.      Cannonball has not affirmatively denied any of the allegations against it in Count IV of the Amended Complaint. The Amended Complaint is verified by the Plaintiff and the Plaintiff has submitted an Affidavit and Supplemental Affidavit in support of its request for a judgment. Therefore, the allegations directed to Cannonball in Count IV of the Amended Complaint are true as set forth and Bank of America's Motion for Summary Judgment against Cannonball under Count IV of the Amended Complaint is granted pursuant to 735 ILCS 5/15-1506(c). Cannonball is found and declared to have no interest in the Mortgaged Property superior to that of Bank of America.

ii.     Bossy has not affirmatively denied any of the allegations against it in Count IV of the Amended Complaint. The Amended Complaint is verified by the Plaintiff and the Plaintiff has submitted an Affidavit and Supplemental Affidavit in support of its request for a judgment. Therefore, the allegations directed to Bossy in Count IV of the Amended Complaint are true as set forth and Bank of America's Motion for Summary Judgment against Bossy under Count IV of the Amended Complaint is granted pursuant to 735 ILCS 5/15-1506(c). Bossy is found and declared to have no interest in the Mortgaged Property superior to that of Bank of America.

iii.    Bank of America's Motion for Summary Judgment against Target, as it relates to Target's Reimbursement Rights and Target's Potential and Contingent SSA Tax Lien Rights, is granted pursuant to 735 ILCS 5/2-1005. Target's Reimbursement Rights and Target's Potential and Contingent SSA Tax Lien Rights are personal between Cannonball and Target and do not run with the Mortgaged Property. Upon entry of the

13

final order in this case, Target's Reimbursement Rights and Target's Potential and Contingent SSA Tax Lien Rights are foreclosed and terminated pursuant to 735 ILCS 5/15-1506(c), provided, however, that Target's Reimbursement Rights against Cannonball are not affected. The purchaser of the Mortgaged Property at foreclosure sale, as well as its grantees, successors and assigns, shall have no obligation to reimburse Target, or any person(s) claiming by, through or under it, for any portion of the SSA Tax assessed against the Target Tract. This judgment does not otherwise affect Target's other rights and obligations, including, but not limited to, Target's rights and obligations under the Target Purchase Agreement, Target SDA and the OEA, and Target's rights in the Target Tract.

iv. Bank of America's Motion for Summary Judgment against Home Depot, as it relates to Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights, is granted pursuant to 735 ILCS 5/2-1005. Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot and do not run with the Mortgaged Property. Upon entry of the final order in this case, Home Depot's Reimbursement Rights, Home Depot's SSA Tax Lien Rights and the Home Depot Claim of Lien are foreclosed and terminated pursuant to 735 ILCS 5/15-1506(c), provided, however, that Home Depot's Reimbursement Rights against Cannonball are not affected. The purchaser of the Mortgaged Property at foreclosure sale, as well as its grantees, successors and assigns, shall have no obligation to reimburse Home Depot, or any person(s) claiming by, through or under it, for any portion of the SSA Tax assessed against the Home Depot Tract. Notwithstanding the existence of the Home Depot Memorandum of Purchase Agreement, the Home Depot Memorandum of Put Agreement and the Home Depot Memorandum of Development Agreement, this Order of Default Judgment, Summary Judgment and Judgment of Foreclosure and Sale shall control with respect to Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights. To the extent that Bank of America's Motion for Summary Judgment may have sought relief against Home Depot beyond the foreclosure and termination of Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights, such relief is denied.

v. Unknown Owners and Non-Record Claimants were served but have failed to appear or answer in this action. Therefore, Bank of America's Motion for Default Judgment against Unknown Owners and Non-Record Claimants under Count IV of the Amended Complaint is granted pursuant to 735 ILCS 5/2-1301 and a judgment of foreclosure is entered against these defendants in accordance with 735 ILCS 5/15-1506(c).

vi. Bank of America's costs, attorney's fees, expenses and disbursements are recoverable under the Construction Loan Agreement, Mortgage and Notes

1-4. The amount of Bank of America's costs, attorney's fees, expenses and disbursements shall be determined at the sale confirmation stage and shall be added to and become part of Bank of America's judgment against Cannonball and Bossy.

E.     **Home Depot's and Target's Counterclaims**

   i.     Bank of America has no objection to the relief sought in Count II of Home Depot's Counterclaim, except as it relates to Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights.

   ii.     As set forth in Section 3(D)(iv) above, Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot, do not run with the Mortgaged Property, and are not binding against Bank of America or any purchaser of the Mortgaged Property at this foreclosure sale, and Home Depot's Motion for Summary Judgment is denied as it relates to such rights. Home Depot's Motion for Summary Judgment is granted in regard to all other rights and obligations in the Home Depot Purchase Agreement, Home Depot Development Agreement and the OEA, which rights and obligations run with the Mortgaged Property and are binding on the purchaser of the Mortgaged Property at this foreclosure sale and its grantees, successors and assigns. Home Depot's request for attorney's fees and costs under Counts I and II of Home Depot's Counterclaim is reserved for further proceeding, providing that any such award for attorney's fees and costs would not result in a lien against the Mortgaged Property, and provided that Bank of America reserves its right to oppose any request that Home Depot be awarded its attorney's fees and costs pursuant to Count II of Home Depot's Counterclaim.

   iii.     As a result of this Court's findings and rulings with respect to Bank of America's Motion for Judgment, the relief sought in Target's Counterclaim is denied.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:**

4.     **Order for Foreclosure.**

   An accounting has been taken of the amounts due and owing Bank of America and they are declared herein.

   The Mortgaged Property shall be sold as directed by the Court in order to first satisfy the amounts due and owing to Bank of America as set forth in this Judgment of Foreclosure. In the event of such sale, all rights of redemption having been waived: (i) Cannonball, Bossy, Unknown Owners and Non-Records Claimants, as well as any person(s) claiming by, through or under them, are each forever barred of any right, title, interest, claim, lien or right to redeem in and to the Mortgaged Property; (ii) Target, as well as its grantees, successors and assigns, as well as any person(s) claiming by, through or under it, including without limitation any subsequent

15

owner of the Target Tract, is forever barred of any right, title, interest, claim or lien on the Mortgaged Property arising pursuant to Target's Reimbursement Rights or Target's Potential and Contingent SSA Tax Lien Rights; and (iii) Home Depot, as well as its grantees, successors and assigns, as well as any person(s) claiming by, through or under it, including without limitation any subsequent owner of the Home Depot Tract, is forever barred of any right, title, interest, claim or lien on the Mortgaged Property arising pursuant to Home Depot's Reimbursement Rights or Home Depot's SSA Tax Lien Rights.

**5.**     **Order Upon Special Matters.**

    A.     The Mortgaged Property will be sold in accordance with the provisions of the Illinois Mortgage Foreclosure Law ("IMFL"), 735 ILCS 5/15-1101 et seq.

       The sale shall be a public auction.

       The sale shall be by open, verbal bid.

       The sale shall be conducted by the Kendall County Sheriff's Department or its designated agent, or by the Judicial Sales Corporation.

    Exceptions to which title to the Mortgaged Property shall be subject shall include: (1) general real estate taxes for the current year and for the preceding years (if any) which have not become due and payable as of the date of this Judgment of Foreclosure; (2) any special assessments upon the real estate; and (3) easements, restrictions of liens of record not specifically adjudicated in this Decree.

**6.**     **Order for Judicial Sale.**

    A.     The Mortgaged Property will be sold in accordance with the provisions of the IMFL and as provided in this Judgment of Foreclosure.

       i.     The place of the sale shall be at 807 West John, Law Library, Yorkville, Illinois (if conducted by Sheriff) or at 105 West Veterans Parkway, Yorkville, Illinois (if conducted by the Judicial Sales Corp).

       ii.     The date and time shall be as provided by Bank of America's counsel.

    B.     Notice of Sale: The Notice of Sale shall include the following information, but an immaterial error in the information shall not invalidate the legal effect of the notice. Public notice of the time, place and terms of the sale shall be given as follows:

       i.     the name, address and telephone number of the person to contact for information regarding the Mortgaged Property;

       ii.     the common address and other common description (other than legal description), if any, of the Mortgaged Property;

    iii.    a legal description of the Mortgaged Property sufficient to identify it with reasonable certainty;

    iv.    a description of the improvements on the Mortgaged Property;

    v.    whether the Mortgaged Property may be inspected prior to sale upon making reasonable arrangements with the person identified in subparagraph I above;

    vi.    the time and place of the sale;

    vii.    the terms of the sale;

    viii.    the case title, case number and the court in which the foreclosure was filed; and

    ix.    no other information is required.

C.    Publication of Notice of Sale: The Notice of Sale shall be published at least three consecutive calendar weeks (Sunday through Sunday), once each week, the first such notice to be published not more than 45 days prior to the sale, the last such notice to be published not less than 7 days prior to the sale, by:

    i.    An advertisement in a newspaper circulated to the general public in the county in which the Mortgaged Property is located, in the section of that newspaper where legal notices are commonly placed and a separate advertisement in the section of such newspaper, which may be the same newspaper, in which real estate other than real estate being sold as part of legal proceedings is commonly advertised to the general public; provided, however, that where both advertisements could be published in the same newspaper and that newspaper does not have separate legal notices and real estate advertisement a single notice shall be sufficient; and

    ii.    No other publications shall be required.

    iii.    Bank of America also shall give notice to all parties in this action, if any, who have appeared and have not heretofore been found by the Court to be in default for failure to plead. Such notice shall be given in the manner provided in the applicable rules of court for service of papers other than process and complaint, not more than 45 days nor less than 7 days prior to the day of sale. After notice is given as required in this Section, a copy thereof shall be filed in the office of the clerk of this Court, together with a certificate of counsel or other proof that notice has been served in compliance with this Section.

    iv.    No other notice by publication or posting shall be necessary.

17

    v.    The person named in the notice of sale to be contacted for information about the Mortgaged Property shall not be required to provide additional information other than that set forth in the notice of sale.

    vi.    The sale may be adjourned in the discretion of the party conducting such sale, at which time the person conducting the sale shall announce the date, time and place that the adjourned sale shall be held, and no further notice shall be necessary, provided, however, that if the adjourned sale is to occur more than sixty (60) days after the last scheduled sale, notice must be given again in accordance with paragraph 6(i), above.

    D.    Upon the sale of the Mortgaged Property, the person conducting the sale shall give a certificate of sale to the purchaser which certificate of sale may be recorded.

**7.**     **Transfer of Title.**

    A.    Upon or after confirmation of sale, the person who conducted the sale or the Court shall execute a deed to the holder of the certificate of sale sufficient to convey title to the Mortgaged Property, which deed shall identify the Court and the caption of the case in which judgment was entered authorizing issuance of the deed. Signature and the recital in the deed of the title or authority of the person signing the deed as grantor, of authority pursuant to this Judgment of Foreclosure and of the giving of the notices required by statute shall be sufficient proof of the facts recited and of such authority to execute the deed, but such deed shall not be construed to contain any covenant on the part of the person executing it.

    B.    Delivery of the deed executed on the sale of the Mortgaged Property, even if the purchaser or holder of the certificate of sale is a party to the foreclosure, shall be sufficient to pass title thereto.

**8.**     **Application of Proceeds.**

    The proceeds resulting from the sale ordered herein shall be applied in the following order:

    i.    The reasonable expenses of sale;

    ii.    The reasonable expenses of securing possession before sale, holding, maintaining and preparing the Mortgaged Property for sale, including payment of taxes and other governmental charges, premiums on hazard and liability insurance, and, to the extent provided for in the Mortgage and not prohibited by law, reasonable attorney's fees, payments made pursuant to 735 ILCS 5/15-1505, and other legal expenses incurred by Bank of America;

    iii.    Satisfaction of the claim of Bank of America as adjudicated in this Judgment of Foreclosure, plus any additional amounts found due and owing to Bank of America pursuant to any further orders of this Court;

      iv.    Satisfaction of the amounts due to Home Depot from Cannonball for SSA Taxes as of the date of the confirmation of the sale; and if any surplus remains thereafter

      v.    Pursuant to further order of this Court.

**9.**    **Redemption.**

Non-Residential. This is not a foreclosure of a mortgage on residential real estate. All rights of redemption have been waived by the Mortgagor.

**10.**    **Other Matters.**

    A.    Report of Sale.

The person conducting the sale shall file a Report of Sale with the Clerk of this Court specifying the amount of proceeds of sale realized and the disposition thereof, and seeking confirmation of the sale.

    B.    Homestead Waiver.

The Mortgaged Property is commercial in nature and not subject to homestead or other exemptions, and the Defendants are barred from claiming any right to homestead or other exemptions in the Mortgaged Property.

    C.    Possession.

Bank of America is authorized to take possession of the Mortgaged Property subject to the recorded rights of the parties and as adjudicated herein. After the sale as ordered herein, the purchaser shall have Bank of America's right to be placed in possession of the real estate on the date that the sale is confirmed by the Court without prior notice.

    D.    Deficiency.

If the money arising from said sale shall be insufficient to pay the amounts due to Bank of America, with interest, attorney's fees and the costs and expenses of sale, the person conducting the sale shall specify the amount of such a deficiency in the report of sale, and a judgment shall be entered for that amount at the sale confirmation hearing, if appropriate.

E.      Retention of Jurisdiction.

The Court retains jurisdiction over the subject matter of this action and all the parties to determine and enforce this judgment, confirm the sale, determine any deficiency judgment against the Mortgagor and Guarantor, and matters regarding possession of the Mortgaged Property.

DATED:_____, 2013                    ENTER:

                                           Timothy J. McCann
                                           _____
                                           Judge

# EXHIBIT B

2014 IL App (2d) 130858
No. 2-13-0858
Opinion filed May 29, 2014

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., as Successor by Merger to LaSalle Bank National Association, Individually and as Authorized Agent, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | |
| Plaintiff and Counterdefendant-Appellee, | ) ) | |
| v. | ) ) | No. 10-CH-869 |
| | ) | |
| CANNONBALL LLC; DAVID BOSSY; TARGET CORPORATION; KOHL'S ILLINOIS, INC.; UNKNOWN OWNERS; and NONRECORD CLAIMANTS, | ) ) ) ) | |
| | ) | Honorable |
| Defendants | ) ) | Alan W. Cargerman Timothy J. McCann and |
| (Home Depot U.S.A., Inc., Defendant and Counterplaintiff-Appellant). | ) ) | Bradley J. Waller, Judges, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice Hudson concurred in the judgment and opinion.

## OPINION

¶ 1    Bank of America, as successor by merger to LaSalle Bank National Association (LaSalle Bank), filed a mortgage foreclosure complaint against Home Depot U.S.A. (Home Depot), *et al.*, to enforce various lending agreements that Bank of America had with Cannonball LLC (Cannonball), in connection with the development of the Kendall Marketplace shopping center (shopping center), a multibuilding, multitenant commercial development in Yorkville, Illinois.

2014 IL App (2d) 130858

Home Depot's counterclaim sought, *inter alia*, a declaration that, pursuant to its agreements with Cannonball, it had certain covenants that ran with the land and were binding against Bank of America. Bank of America and Home Depot filed cross-motions for summary judgment. The trial court determined that the covenants at issue did not run with the land, granted summary judgment in favor of Bank of America, and denied Home Depot's motion for summary judgment. Subsequently, the trial court entered an order confirming the sale of the property at issue.

¶ 2    On appeal, Home Depot argues that summary judgment should have been granted in its favor and denied to Bank of America. Home Depot argues that the covenants run with the land and bind Bank of America pursuant to the explicit terms of the pertinent recorded documents and the sequence of recording those documents. We agree and reverse.

¶ 3                                    I. BACKGROUND

¶ 4    In the spring of 2007, Cannonball entered into various agreements leading to the development of the shopping center. LaSalle Bank and Cannonball entered into a construction loan agreement for the purpose of acquiring real property and constructing the shopping center. Around this time, Cannonball sold certain tracts (anchor tracts) within the shopping center to Home Depot, Target Corporation (Target), and Kohl's Illinois, Inc. (Kohl's) (collectively, the anchor stores). Cannonball retained the central and remaining outlying portions of the shopping center for sale or lease to other retailers, and it retained roads, driveways, sidewalks, and parking areas that were not part of the anchor tracts. The construction loan agreement was secured by a mortgage in favor of LaSalle Bank and granting a lien on Cannonball's property (the mortgaged property), consisting of the shopping center except for the anchor tracts.

¶ 5    Also around this time, Cannonball and the anchor stores together entered into an operation and easement agreement (OEA) that granted nonexclusive easements to, *inter alia*, parking,

2014 IL App (2d) 130858

driveway, and sidewalk areas of each party's tract and the "Common Drive." Section 6.7 of the OEA provides:

> "The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall bind the Parcels described therein and inure to the benefit of and be binding upon each Party."

¶ 6    In addition, Yorkville issued and sold bonds to provide money to assist in the development of the shopping center with on- and off-site improvements. To recover the money, Yorkville imposed against all tracts within the shopping center a special tax that was called the "Special Service Area Tax" or the "SSA tax."

¶ 7    Cannonball and the anchor stores entered into separate purchase agreements. In March 2007, Home Depot and Cannonball entered into a "Real Property Purchase Agreement" (purchase agreement) under which Home Depot purchased from Cannonball approximately 10 half-acres of land in the shopping center. Paragraph 20(l) of the purchase agreement provides:

> "(l) Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto (as permitted pursuant to the provisions of this Agreement)."

¶ 8    Pursuant to the purchase agreement, Cannonball agreed to reimburse Home Depot for part of the SSA tax Home Depot paid (reimbursement right). Paragraph 22(h) of the purchase agreement provides:

> "Seller hereby agrees that Seller shall be obligated to reimburse Purchaser for any portion of such SSA tax assessment which exceeds an amount equal to $0.50 per square foot of Purchaser's Floor area (as defined in the OEA), exclusive of the garden center. If Seller fails to pay any such excess SSA tax assessment within thirty (30) days after Purchaser bills Seller therefore, then in addition to any other rights and remedies available

- 3 -

2014 IL App (2d) 130858

to Purchaser, Purchaser shall have lien rights against Seller's land in the Shopping Center in accordance with the terms of the Development agreement. The terms of this Section 22(h) shall survive the Closing and shall be included in a memorandum of agreement to be executed, delivered and recorded by Seller and Purchaser at Closing. The form of the memorandum of agreement shall be approved by Seller and Purchaser within the Inspection Period; provided, however, Purchaser agrees that the memorandum of agreement shall not specifically reference the economic terms of the foregoing reimbursement obligation from Seller to Purchaser pursuant to this *Section 22(h) which shall be a covenant which shall run with the land and bind Seller's grantees, successors and assigns including provisions regarding the SSA Tax.*"   (Emphasis added.)

¶ 9       Cannonball and Home Depot entered into a development agreement, dated May 15, 2007. Section 7.8(c) of the development agreement provides in relevant part:

"[P]ursuant to Section 22(h) of the Purchase Agreement, Developer is obligated to reimburse Home Depot for any portion of such [tax] assessment which exceeds, in aggregate, an amount equal to $.50 per square foot of Floor Area ***.   If Developer fails to pay any such excess [tax] assessment within thirty (30) days after Home Depot bills Developer therefore [*sic*], then in addition to any other rights and remedies available to Home Depot, Home Depot shall have lien rights against Developer's Property in accordance with the terms of this Agreement."

The development agreement also provides:

"12.1 Grant of Lien. Developer hereby grants and conveys to Home Depot a lien on Developer's Property to secure the performance by Developer of its obligations hereunder. Such lien shall be foreclosed in accordance with this Article 12.

* * *

- 4 -

2014 IL App (2d) 130858

> 12.4 <u>Priority</u>. The priority of a lien created pursuant to this Article 12 shall be established solely by reference to the date of the recordation of the Memorandum of Development Agreement pursuant to Section 17.4 below; provided, however, such lien shall be subordinate to the lien of any first mortgage or deed of trust.

* * *

> 17.2 <u>Binding Effect</u>. Subject to any provision hereof restricting assignment, this Agreement shall be binding upon and inure to the benefit of the executing parties and their respective successors, assigns, heirs, executors and administrators."

¶ 10    Cannonball, Home Depot, and LaSalle Bank entered into a payment and priority agreement, dated May 15, 2007, that provides, in relevant part:

> "Lender shall have no obligations to the City or any of the Anchors under the Development agreements unless Lender expressly assumes Developer's obligations thereunder in writing."

¶ 11    On May 24, 2007, and in the following order, the following documents were recorded with the office of the Kendall County recorder: the OEA; a "Memorandum of Agreement" regarding the purchase agreement between Cannonball and Home Depot; a "Memorandum of Development Agreement" regarding the development agreement between Cannonball and Home Depot; and the LaSalle Bank mortgage.   The recorded memorandum regarding the purchase agreement provides, in part:

> "Notice is hereby given of the execution and delivery by the parties of the Purchase Agreement (which Purchase Agreement is hereby incorporated herein by reference). Notice is specifically provided that Developer has certain reimbursement obligations under Section 22(h) of the Purchase Agreement and that if Developer fails to comply with such obligations, the Purchase Agreement creates a lien on the property described on Exhibit

- 5 -

2014 IL App (2d) 130858

> 'B' in accordance with lien provisions contained in the Development Agreement.
> Developer's obligations under Section 22(h) of the Purchase Agreement shall be a
> covenant which shall run with the land and shall be binding upon Seller's grantees,
> successors, and assigns."

¶ 12    After Cannonball defaulted under the construction loan agreement, Bank of America filed
a four-count amended complaint.   Counts I through III, against Cannonball and David Bossy
(Cannonball's loan guarantor), alleged breach of contract and sought money damages.   Count IV,
against Cannonball, Bossy, Home Depot, Target, and Kohl's, sought the foreclosure of the
mortgaged property.   Regarding Home Depot, Bank of America alleged only the following:

> "The recorded and unrecorded claims and interests of this Defendant, if any, including but
> not limited to any actual or potential rights to record liens or exercise any other rights
> against the Property, pursuant to the Home Depot Purchase Agreement, the Home Depot
> [development agreement] or any other agreements, are subordinate and inferior to the lien
> and interest of Agent."

¶ 13    Home Depot filed an answer to Bank of America's amended complaint, denying that its
rights were inferior to those of Bank of America.   Home Depot also asserted affirmative defenses
alleging that the terms of its agreements with Cannonball "affected" Cannonball's land.   In
addition, with its answer, Home Depot filed a counterclaim against Cannonball, seeking
$50,395.50, plus attorney fees and costs, and alleging that Cannonball breached the purchase and
development agreements by failing to reimburse Home Depot for SSA taxes it had paid.   This
claim was later voluntarily dismissed without prejudice.

¶ 14    On February 28, 2011, Bank of America filed motions for default judgment, summary
judgment, and judgment of foreclosure.   Bank of America's summary judgment motion sought to

- 6 -

2014 IL App (2d) 130858

foreclose and terminate Home Depot's tax reimbursement rights and lien rights as against any purchaser of the mortgaged property following the foreclosure sale.

¶ 15    Home Depot filed a counterclaim against Bank of America, seeking a declaration that Home Depot's rights under the purchase agreement, the development agreement, and the OEA ran with the land and were binding on the grantees, successors, and assigns of Cannonball, including Bank of America.   Home Depot also filed a motion for summary judgment.

¶ 16    On October 9, 2012, after hearing argument from counsel, the trial court, Judge Alan W. Cargerman presiding, granted summary judgment in favor of Bank of America and against Home Depot.   On May 1, 2012, the trial court, Judge Timothy J. McCann presiding, issued a written order of default judgment, summary judgment, and judgment of foreclosure and sale.   The trial court stated:

> "Bank of America's Motion for Summary Judgment against Home Depot, as it relates to Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights is granted pursuant to 735 ILCS 5/2-1005.   Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot and do not run with the Mortgaged Property.   Upon entry of the final order in this case, Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights and Home Depot['s] Claim of Lien are foreclosed and terminated pursuant to 735 ILCS 5/15-1506(c), provided, however, that Home Depot's Reimbursement Rights against Cannonball are not affected.   The purchaser of the Mortgaged Property at foreclosure sale, as well as its grantees, successors and assigns, shall have no obligation to reimburse Home Depot, or any person(s) claiming by, through or under it, for any portion of the SSA Tax assessed against the Home Depot Tract."

Regarding Home Depot's counterclaim against Bank of America, the trial court stated:

- 7 -

2014 IL App (2d) 130858

"Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot, do not run with the Mortgaged Property, and are not binding against Bank of America or any purchaser of the Mortgaged Property at this foreclosure sale, and Home Depot's Motion for Summary Judgment is denied as it relates to such rights. Home Depot's Motion for Summary Judgment is granted in regard to all other rights and obligations in the Home Depot Purchase Agreement, Home Depot Development Agreement and the OEA, which rights and obligations run with the Mortgaged Property and are binding on the purchaser of the Mortgaged Property at this foreclosure sale and its grantees, successors and assigns."

¶ 17    On April 1, 2013, Home Depot filed a motion to reconsider which the trial court denied on May 23. On June 17, 2013, a judicial sale of the mortgaged property was conducted by the Kendall County sheriff's department, and Bank of America was the successful bidder. On July 17, 2013, the trial court, Judge Bradley J. Waller presiding, entered an order confirming the sale. On August 15, 2013, a sheriff's deed was executed conveying the mortgaged property to Bank of America. On the same day, Home Depot filed its notice of appeal. Home Depot filed an amended notice of appeal on August 23, 2013.

¶ 18                                    II. ANALYSIS

¶ 19    Home Depot argues that summary judgment should have been granted to it and denied to Bank of America because the covenants run with the land. Summary judgment is appropriate only where the pleadings, depositions, admissions, and affidavits, viewed in the light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2010). "By filing cross-motions for summary judgment, the parties agree that no factual issues exist and this case

- 8 -

2014 IL App (2d) 130858

turns solely on legal issues subject to *de novo* review." *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 73.

¶ 20    The threshold issue in this case is whether the trial court properly "foreclosed and terminated" Home Depot's tax reimbursement and lien rights based on its determination that such rights "are personal between Cannonball and Home Depot and do not run with the Mortgaged Property." Home Depot argues that the purchase and development agreements are binding on Cannonball's successors and that the covenants granting Home Depot tax reimbursement and lien rights run with the land. Bank of America essentially argues that the agreements are personal agreements binding only Home Depot and Cannonball.

¶ 21    Initially, we note that, during oral argument, Home Depot conceded that any lien it had against the mortgaged property for tax reimbursement payments that came due and owing before Bank of America obtained title to the property could not be enforced against Bank of America. See *Pembrook Condominium Ass'n-One v. North Shore Trust & Savings*, 2013 IL App (2d) 130288, ¶ 14. Thus, this case involves only whether Home Depot will be able to enforce its tax reimbursement and lien rights against Bank of America and its successors and assigns in the future. Therefore, we must determine whether the covenants at issue run with the land.

¶ 22    To determine whether a covenant runs with the land, a court looks to whether: (1) the grantee and the grantor intended the covenant to run with the land; (2) the covenant touches and concerns the land; and (3) there is privity of estate between the party claiming the benefit and the party resting under the burden of the covenant. *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 188 (1983).

¶ 23    In the case at bar, Bank of America does not contest that Cannonball and Home Depot intended the covenants to run with the land and there is no doubt that they intended such. Section 22(h) of the purchase agreement provides that the tax reimbursement and lien rights "shall be a

- 9 -

2014 IL App (2d) 130858

covenant which shall run with the land and bind [Cannonball's] grantees, successors and assigns."
In addition, section 20(l) of the purchase agreement provides that the purchase agreement "shall be
binding upon *** the respective successors and assigns of the parties." Further, section 17.2 of
the development agreement provides that Cannonball's obligations are binding on its successors
and assigns. Moreover, the recorded memorandum of the purchase agreement states that
Cannonball's obligations under section 22(h) of the purchase agreement are a covenant to run with
the land and "shall be binding on Seller's grantees, successors, and assigns." A covenant should
be interpreted to give effect to the parties' intent when the covenant was made, as determined by its
express provisions. *Id.* Accordingly, we conclude that Cannonball and Home Depot intended
the tax reimbursement and lien rights to run with the land.

¶ 24 Regarding the second part of the test, a covenant touches and concerns the land if it affects
the use, value, and enjoyment of the property. Home Depot argues that this case is like other
cases that have held that covenants to pay money, taxes, or fees affect the use, value, and
enjoyment of property. Bank of America argues that Home Depot's tax reimbursement and lien
rights do not touch and concern the land, because these rights are "purely financial covenants" that
do not affect the property's use or enjoyment, increase or decrease its value, or affect any action to
be done or allowed on the property. Bank of America's labeling of the covenant at issue here as
"purely financial" is unpersuasive.

¶ 25 In *Streams Sports Club*, our supreme court held that an agreement to pay fees for a
recreational facility, which was adjacent to a condominium complex and part of a common
building plan, touched and concerned the land. The court explained:

> "The sports club is part of a common building plan that the defendant was aware of at the
> time she purchased her unit. Condominium owners can enjoy the benefits of convenient
> sports facilities and also have the burden of furnishing the $216 annual fee." *Id.* at 189.

- 10 -

2014 IL App (2d) 130858

¶ 26    In *United States Fidelity & Guaranty Co. v. Old Orchard Plaza, Ltd. Partnership*, 284 Ill. App. 3d 765 (1996), the plaintiff leased property from an owner that later defaulted on its mortgage. *Id.* at 767.    Prior to default, the plaintiff exercised its right under the lease to vacate the premises and receive a "termination payment." *Id.*    The defendant bank foreclosed on the property, and the plaintiff filed an intervenor's complaint seeking a declaratory judgment that one or more of the defendants were liable for the termination payment. *Id.* at 768.    The trial court dismissed the plaintiff's complaint. *Id.* at 771.    On appeal, the plaintiff argued that the termination payment provision was a covenant running with the land. *Id.* at 777.    The appellate court determined that the plaintiff "adequately alleged" that the covenant touched and concerned the land. *Id.*    The court reasoned:

> "Here, the covenant requiring the landlord to pay the tenant $2 million if the tenant does not exercise an option to extend the term of the lease directly affects the value of both the leasehold and of the property.    Clearly, without such a provision, the leasehold is worth less, and the fee simple is worth more." *Id.*

¶ 27    In *C-B Realty & Trading Corp. v. Chicago & North Western Ry. Co.*, 198 Ill. App. 3d 926 (1990), the plaintiffs, successors in title to a freight warehouse property, filed suit against the defendants, successors in interest to a railway. *Id.* at 929.    The parties' predecessors in interest entered into a contract allowing for the building of a railway bridge over the warehouse, and the defendants' predecessors promised to pay three-fourths of all taxes levied against the warehouse property. *Id.*    The contract provided that the parties agreed that the contract would be binding upon, and inure to the benefit of, the parties to the agreement and their respective successors and assigns. *Id.* at 932.    After trial, the trial court entered judgment in favor of the plaintiffs, and the appellate court held that the defendants' promise to maintain a watertight

- 11 -

2014 IL App (2d) 130858

bridge ran with the land because it affected the enjoyment of and directly concerned the land. *Id.* at 930, 931. The court stated:

"Similarly, in regard to the [payment of] taxes, such a promise relates directly to the land itself, and the use thereof. Payments made in connection with the use or ownership of land have been found to be covenants running with the land. [Citation.]" *Id.* at 931.

¶ 28 In *McAnelly v. Graves*, 126 Ill. App. 3d 528 (1984), the plaintiff entered into a coal lease and made an advance royalty payment to the original lessors, who then sold the leased property to the defendants. *Id.* at 530. One of the defendants terminated the lease without refunding to the plaintiff the advance royalty payment as provided by the lease, and the plaintiff sought recovery against the defendants and the original lessors. *Id.* The trial court dismissed the plaintiff's claim against the defendants. *Id.* On appeal, the plaintiff argued that the original lessors' promise to refund part of the advance royalty payment upon termination of the lease was a covenant running with the land. *Id.* at 532. The defendants argued that the obligation was personal only to the original lessors, who had received the advance payment from the plaintiff. *Id.* The appellate court reversed the trial court's dismissal of the plaintiff's claim. *Id.* at 536. The appellate court explained:

"While a grantee will not be bound by a covenant in the lease that is merely personal and collateral to the leased property, both the grantee and the lessee will be bound as against each other by covenants affecting the use, value and enjoyment of the property in question." *Id.* at 535.

The court further explained that both the benefit of the right of early termination and the burden to repay advanced royalties ran with the land. *Id.* at 535-36.

¶ 29 In this case, there is no doubt that the covenants at issue touch and concern the property as a matter of law. Home Depot's tax reimbursement and lien rights are part of agreements that

- 12 -

2014 IL App (2d) 130858

Bank of America's predecessor was aware of when it entered into the construction loan agreement with Cannonball. See *Streams Sports Club*, 99 Ill. 2d at 189. Home Depot's tax reimbursement and lien rights directly affect the value of both the mortgaged property and Home Depot's property. It is axiomatic that, without such benefits, Home Depot's property is worth less and that, without such burdens, the mortgaged property is worth more. See *United States Fidelity*, 284 Ill. App. 3d at 777. Cannonball's promise to pay part of Home Depot's taxes "relates directly to the land itself, and the use thereof" (*C-B Realty & Trading*, 198 Ill. App. 3d at 931) and is not simply a personal financial obligation between the parties. See *McAnelly*, 126 Ill. App. 3d at 535-36. Therefore, Home Depot's tax reimbursement and lien rights touch and concern the property.

¶ 30    Regarding the third part of the test:

"Privity of contract or estate has been defined as 'mutual *or successive* relationship to the same rights of property.' (Emphasis added.) [Citations.] The relationship may be by operation of law, by descent, or by voluntary or involuntary transfer. [Citation.] Privity of contract is '[t]hat connection or relationship which exists between two or more contracting parties.' [Citation.]" *Collins Co., Ltd. v. Carboline Co.*, 125 Ill. 2d 498, 511 (1988).

Bank of America does not contest that there is privity of estate between Home Depot and Bank of America. We determine that Bank of America and Home Depot share a mutual relationship to the shopping center's common areas by virtue of the purchase agreement, the OEA, and the development agreement and that, thus, privity of estate exists. See also *St. Paul Federal Bank for Savings v. Wesby*, 149 Ill. App. 3d 1059, 1064 (1986) ("[T]here is privity of estate in this case—that is, a chain of privity between the original covenantee, covenantor and the subsequent

- 13 -

2014 IL App (2d) 130858

parties to be bound by the covenant."). Therefore, in sum, Home Depot's tax reimbursement and lien rights are covenants that run with the land.

¶ 31    Bank of America argues that, assuming *arguendo* that Home Depot's tax reimbursement and lien rights run with the land, those rights were properly terminated because they are inferior and subordinate to Bank of America's mortgage.    More specifically, Bank of America argues that all inferior and subordinate liens are extinguished by foreclosure, even if they run with the land. Bank of America cites *State Life Insurance Co. v. Freeman*, 308 Ill. App. 127 (1941), to support its argument.    In *Freeman*, the appellate court held that a restrictive agreement that the defendant claimed to run with the land did not bind the mortgagee upon foreclosure.    *Id*. at 144.    The court reasoned that the restrictive agreement was recorded subsequent to the recording of the mortgage and that the mortgagee had not assented to the restrictive agreement.    *Id*.    In this case, the LaSalle Bank mortgage was recorded on the same day, but after, Home Depot's memorandum of the purchase agreement and memorandum of the development agreement were recorded.    Further, LaSalle Bank had actual knowledge of the documents containing Home Depot's tax reimbursement and lien rights before it recorded its mortgage, because the purchase and development agreements were part of the closing documents.    The effective date of a mortgage is the date of its recording.    *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 703 (2000).    Thus, Home Depot's tax reimbursement and lien rights, being in effect before the mortgage and running with the land, were not extinguished by foreclosure.

¶ 32    Next, Bank of America argues that Home Depot's tax reimbursement and lien rights were extinguished pursuant to the language in section 12.4 of the development agreement, which provides: "such lien shall be subordinate to the lien of any first mortgage or deed of trust."    Home Depot argues that the meaning of the language is that the construction loan was to be paid before Home Depot's lien could be enforced.

- 14 -

2014 IL App (2d) 130858

¶ 33    The intent of the parties is our primary objective when construing a contract.    *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007).    The best indication of the parties' intent is found in the plain and ordinary meaning of the language of the contract.    *Id.* at 233.    We will not "alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented."    *Thompson v. Gordon*, 241 Ill. 2d 428, 449 (2011).    Nothing in the provision at issue indicates the parties' intent to extinguish Home Depot's tax reimbursement and lien rights.    Neither the word "extinguish" nor any word with a similar meaning is contained in the provision.    Rather, the plain and ordinary meaning of the language indicates only that Home Depot's lien was "assign[ed] a lower priority" (Black's Law Dictionary 1467 (8th ed. 2004)) than Bank of America's first mortgage lien.    Therefore, Home Depot's tax reimbursement and lien rights were not extinguished by section 12.4 of the development agreement.

¶ 34    Bank of America also asserts that Home Depot's rights were extinguished by a provision of the payment and priority agreement:

> "Lender shall have no obligations to the City or any of the Anchors under any Development Agreements unless lender expressly assumes Developer's obligations thereunder in writing."

Bank of America ignores that this provision does not exclude obligations under the purchase agreement and that it is the purchase agreement that grants Home Depot tax reimbursement and lien rights.    Thus, the provision has no effect on the covenants at issue.

¶ 35    Accordingly, Home Depot's tax reimbursement and lien rights are covenants that run with the land and bind Bank of America.    Thus, the trial court erred by granting summary judgment in favor of Bank of America and denying Home Depot's motion for summary judgment.

¶ 36                                    III. CONCLUSION

- 15 -

2014 IL App (2d) 130858

¶ 37    For the reasons stated, we reverse the trial court's order granting summary judgment in favor of Bank of America and denying Home Depot's motion for summary judgment.    We enter summary judgment in favor of Home Depot and against Bank of America.

¶ 38    Reversed.

# EXHIBIT C

## **AFFIDAVIT OF STEPHEN H. MALATO**

STATE OF ILLINOIS           )

                                )    SS:

COUNTY OF COOK           )

I, Stephen H. Malato, Esquire, hereby depose upon personal knowledge the following:

1.     I am a partner at the law firm of Hinshaw & Culbertson LLP located at 22 N. LaSalle Street, Chicago Illinois 60601.

2.     In 2007, I represented LaSalle Bank in closing a loan transaction with Cannonball LLC ("Cannonball") in connection with the Kendall Marketplace project (the "Project') which granted LaSalle Bank a first lien mortgage (the "Mortgage") on the Property.

3.     In connection with my representation of LaSalle Bank, I obtained a title insurance policy (the "Title Policy") from Near North National Title ("NNNT") in favor of LaSalle Bank.

4.     NNNT also served as LaSalle Bank's closing agent for the transaction and was responsible for coordinating with the other agents to the transaction in order to record the documentation in the appropriate order to fulfill the instructions given to it.

5.     In connection with financing for the Project, the City of Yorkville imposed a special tax against all tracts called the Special Service Area Tax (the "SSA Tax").

6.     Cannonball entered into purchase agreements with certain anchor tenants, including Home Depot. The Home Depot Purchase Agreement provided that Cannonball would reimburse Home Depot for a portion of the SSA Tax.

7.     Home Depot and Cannonball also entered into a site development agreement (the "SDA") for the Project.   The SDA referenced the SSA Tax reimbursement obligation and granted Home Depot the right to lien the property if the SSA Tax was not paid within 30 days. The SDA expressly provided that any lien would be subordinate to the Mortgage.

8.     Cannonball, Home Depot and LaSalle Bank entered into a payment and priority agreement (the "Payment and Priority Agreement") in relation to the Project that expressly limited LaSalle Bank's obligations to these parties.   The Payment and Priority Agreement specifically provided that LaSalle Bank "shall have no obligations to the City or any of the Anchors under the [SDAs] unless [LaSalle Bank] expressly assumes [Cannonball's] obligations thereunder in writing."

9.     At all points in the transaction, LaSalle Bank intended the Mortgage to be superior to any and all rights that Home Depot may have had to any reimbursement from Cannonball for the SSA Tax.   In fact, LaSalle Bank refused Home Depot's repeated requests to sign a subordination agreement to subordinate its rights to Home Depot's rights.   Because the Mortgage was superior to Home Depot's rights, it was my understanding and intent, as well as LaSalle Bank's understanding and intent, that those rights would be extinguished upon foreclosure of the Mortgage.

10.     This intent and understanding was communicated to, and recognized by, NNNT on numerous occasions prior to the closing.   In addition, NNNT was fully advised and knew of the Home Depot Purchase Agreement, the SDAs and the order in which the various documents were recorded.   In fact, NNNT determined that order and was required to do so to effectuate

- 2 -

LaSalle Bank's instructions and intent that the Mortgage would be superior to any rights Home Depot may have had.

11.    The Title Policy further insured that the Mortgage would be superior to any rights against the Property that Home Depot may have had through the Purchase Agreement and/or the SDA.  Specifically, among other provisions, Schedule B Part II of the Title Policy insured that all matters created by the terms and provisions contained in the Home Depot Purchase Agreement and SDA were subordinate to the Mortgage.

12.    I have reviewed an email dated May 11, 2007 from myself to Greg Fix, attorney for Cannonball, stating that "Given our relative rights are addressed in the Payment and Priority Agreement, I am ok with [the SDAs] being recorded before the mortgage."  As indicated in the email, given the clear documentation that the Mortgage was superior to any rights created in the SDAs and that LaSalle Bank would have no obligations to Home Depot under the SDA unless it expressly assumed those obligations in writing, the recording of the SDA before the Mortgage would not affect the priority of the Mortgage over Home Depot's rights.  In any event, the Title Policy specifically insured the superiority of the Mortgage over any rights created by the Home Depot Purchase Agreement or the SDA.

13.    It was never my intention or understanding, or the intention or understanding of LaSalle Bank, to allow Home Depot's rights regarding the SSA Tax to survive foreclosure of the Mortgage.  To the extent a court later determined that Home Depot's reimbursement rights were a covenant that ran with the land and survived foreclosure, that was not an encumbrance that was created, suffered, assumed or agreed to by LaSalle Bank.  In fact, that is the precise type of risk or eventuality for which LaSalle Bank purchased the Title Policy.

- 3 -

14.    In light of the foregoing and based upon my personal knowledge and involvement in the transaction, it is my understanding and belief that any loss sustained by LaSalle Bank, or its successor in interest, due to the survival Home Depot's SSA Tax reimbursement rights following foreclosure of the Mortgage is covered by the Title Policy.

Stephen H. Malato, Esquire

SWORN TO and subscribed before me this _14th_ day of _August_, 2015.

OFFICIAL SEAL
BARBARA A DION
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/17/16

Notary Public

- 4 -

# EXHIBIT D

## AFFIDAVIT OF ANTHONY CONRAD

STATE OF MARYLAND      )
                                  )    SS:

CITY OF BALTIMORE        )

     I, Anthony Conrad, hereby depose, based upon my own personal knowledge and the review of certain business records described herein, as follows:

     1.     I am a Vice President and OREO East Asset Manager for Bank of America, N.A. ("Bank of America") at is offices located at 100 South Charles Street, 3rd Floor, Baltimore, Maryland 21201.

     2.     In connection with my position with Bank of America, I oversaw the 2015 marketing and sale of the property known as Kendall Marketplace which is located in Yorkville, Kendall County, Illinois.

     3.     In connection with the sale of Kendall Marketplace, I became familiar with the litigation captioned *Bank of America, N.A. v. Cannonball LLC, et. al.*, No. 10-CH-869 (Ill. App. Ct. May 29, 2014) (the "Litigation").

     4.     I understand that, in the Litigation, the SSA Tax reimbursement obligation to Home Depot associated with Kendall Marketplace was held to be a covenant that runs with the land which survived Bank of America's foreclosure of the property.

     5.     I am further familiar with Bank of America's insurance claim under Policy of Title Insurance No. N01070317, issued by Chicago Title Insurance Company's predecessor in

interest, Ticor Title Insurance Company, for loss and damages resulting from the Litigation and the SSA Tax encumbrance.

6.      On July 9, 2015, after a national marketing campaign, Bank of America sold the retail component of Kendall Marketplace for $6,060,000. A true and correct copy of the Special Warranty Deed evidencing the sale of Kendall Marketplace is attached hereto as Exhibit 1.

7.      In connection with the sale, the parties executed an Illinois Real Estate Transfer Declaration evidencing the $6,060,000 purchase price. A true and correct copy of the Illinois Real Estate Transfer Declaration for Kendall Marketplace is attached hereto as Exhibit 2.

8.      In connection with the offering memorandum for Kendall Marketplace, Bank of America's listing broker, Jones Lang LaSalle ("JLL"), prepared a cash flow analysis. Based on the pro forma 2015 net operating income, the transaction capitalization rate – at a purchase price of $6,060,000 – is 7.89%.

9.      Attached hereto as Exhibit 3 is a true and correct copy of the Kendall County tax information for Home Depot's property at Kendall Marketplace, Parcel 02-20-381-001, for the 2014 Tax Year. As reflected in the entry highlighted on page two of this document, the total SSA Tax for Home Depot's parcel was $190,757.84 for 2014.

10.     Pursuant to Section 22(h) of the Home Depot Purchase and Sale Agreement, Home Depot is required to pay $0.50 per square foot for the SSA Tax. Because Home Depot occupies 100,797 square feet, its obligation for the SSA Tax is limited to $50,398.50. The remaining $140,359.34 is the SSA Tax reimbursement obligation amount for 2014.

11.     Applying a 7.89% capitalization rate to the $140,359 annual SSA Tax reimbursement obligation yields a total obligation of $1,778,948.

12.     If the $140,359 reimbursement expense had been deducted from the total expenses for Kendall Marketplace in calculating the net operating income, the resulting purchase price would have been $7,838,948.

13.     The difference between the purchase price with the reimbursement expense, ($7,838,948) and the actual purchase price ($6,060,000) is $1,778,948.

14.     Based on the foregoing, in addition to amounts spent to defend against Home Depot's claims in the Litigation, the loss and damage that Bank of America has sustained as a result of the SSA Tax encumbrance on the Kendall Marketplace property is approximately $1,780,000.

15.     I have further reviewed the Proof of Loss to which this affidavit is attached and verify that the factual information relating to Bank of America's insurance claim that it contains is true and accurate to the best of my information and belief.

_____
Anthony Conrad

SWORN TO and subscribed

before me this _19th_ day

of _August_, 201_

_Karen M. Koch_
Notary Public

[Notary Seal: KAREN M KOCH, COMM. EXP. NOTARY PUBLIC, MARCH 4, 2018, ANNE ARUNDEL COUNTY, MD]

- 3 -

# EXHIBIT 1

THIS DOCUMENT WAS PREPARED BY·

Riemer & Braunstein LLP
71 S Wacker Drive, Suite 2515
Chicago, IL 60606
Attn Michael F McGuire, Esq

201500010841

DEBBIE
GILLETTE
KENDALL COUNTY, IL

RECORDED: 7/13/2015 3:13 PM
RHSP FEE: 10.00
PAGES: 7



## SPECIAL WARRANTY DEED

This Special Warranty Deed is made as of this 9th day of July, 2015, by **BANK OF AMERICA, N.A.**, a national banking association ("**Grantor**"), to KENDALL HOLDINGS I, LLC, whose address is c/o Greenwood Global, Inc , 707 Skokie Boulevard, Suite 600, Northbrook, Illinois 60062 ("**Grantee**")

WITNESSETH, that Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10 00) and other good and valuable consideration in hand paid by Grantee, the receipt whereof is hereby acknowledged by Grantor, by these presents does hereby REMISE, RELEASE, ALIEN AND CONVEY unto Grantee, and to its successors and assigns, FOREVER, the property described on **Exhibit A** attached hereto and made a part hereof, which property is situated in the County of Kendall and State of Illinois (the "**Property**") The Property hereby conveyed is being conveyed subject to those title exceptions and other matters set forth on **Exhibit B** attached hereto and made a part hereof

Together with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever of Grantor, either in law or equity, of, in and to the Property with the hereditaments and appurtenances TO HAVE AND TO HOLD the said Property with the appurtenances, unto Grantee and its successors and assigns forever

And Grantor, for itself, and its successors, does covenant, promise and agree, to and with Grantee, and its successors and assigns, that it has not done or suffered to be done, anything whereby the said Property hereby granted is, or may be, in any manner encumbered or charged, except as herein recited, and that it WILL WARRANT AND DEFEND said Property against all persons lawfully claiming, or to claim the same, by, through or under Grantor, subject to the title exceptions and other matters set forth on **Exhibit B** attached hereto

[SIGNATURE PAGE FOLLOWS]

STATE OF ILLINOIS

STATE TAX

JUL 13 15

REAL ESTATE TRANSFER TAX
DEPARTMENT OF REVENUE

REAL ESTATE
TRANSFER TAX

000000605

0606000

FP 326656

COUNTY OF KENDALL
REAL ESTATE TRANSFER TAX
$3,030.00

1857040 1

**IN WITNESS WHEREOF**, Grantor has caused its name to be signed to these presents as of the day and year first above written

GRANTOR:

BANK OF AMERICA, N.A.,
a national banking association

By: *[signature]*
Name: *[handwritten]*
Title: *Vice President*

STATE OF *Maryland*

COUNTY OF *Anne Arundel*           **SS:**

I, the undersigned, a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY, that *[handwritten] as Vice President* of *Bank of America NA*, personally known to me to be the same person whose name is subscribed to the foregoing instrument as said officer, appeared before me this day in person and acknowledged that as such *Vice President* he/she signed and delivered said instrument as his/her free and voluntary act, and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth

GIVEN UNDER my hand and official seal this *6th* day of *July* 20__

*[signature]* Karen M Koch
Notary Public

*[notary seal: KAREN M KOCH NOTARY PUBLIC ANNE ARUNDEL COUNTY, MD]*

~~RETURN AFTER RECORDING TO:~~                SEND SUBSEQUENT TAX BILLS TO:

Mason, Wenk & Berman LLP                  Kendall Holdings I, LLC
630 Dundee Road, Suite 220                c/o Greenwood Global, Inc
Northbrook, Illinois 60062                707 Skokie Boulevard, Suite 600
Attention  Jamie L Romick, Esq            Northbrook, Illinois 60062

2

EXHIBIT A TO DEED

LEGAL DESCRIPTION

PARCEL 1

LOTS 1-19, 21, 55 AND 57 IN KENDALL MARKETPLACE SUBDIVISION, BEING A SUBDIVISION OF PART OF SECTIONS 19, 20 AND 29, TOWNSHIP 37 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, RECORDED MAY 7, 2007 AS DOCUMENT NUMBER 200700014779 IN THE UNITED CITY OF YORKVILLE, KENDALL COUNTY, ILLINOIS

PARCEL 2

EASEMENTS APPURTENANT FOR THE BENEFIT OF PARCEL 1 AS CREATED BY THE OPERATION AND EASEMENT AGREEMENT DATED AS OF MAY 15, 2007, RECORDED MAY 24, 2007 AS DOCUMENT NUMBER 200700016695, AS AMENDED BY FIRST AMENDMENT TO OPERATION AND EASEMENT AGREEMENT RECORDED JANUARY 7, 2008 AS DOCUMENT 200800000363, KENDALL COUNTY, ILLINOIS

Commonly known as  Kendall Marketplace, United City of Yorkville, IL  60560

PINs  02-20-353-008 (Part of Lot 1), 02-29-131-005 (Part of Lot 1), 02-29-101-001 (Lot 2), 02-29-101-002 (Lot 3), 02-29-101-003 (Lot 4), 02-29-101-004 (Lot 5), 02-29-131-001 (Lot 6), 02-29-131-002 (Lot 7), 02-29-131-003 (Lot 8), 02-29-131-004 (Part of Lot 9), 02-20-381-008 (Part of Lot 9), 02-20-381-007 (Lot 10), 02-20-381-006 (Lot 11), 02-20-381-005 (Lot 12), 02-20-381-004 (Lot 13), 02-20-381-003 (Lot 14), 02-20-381-002 (Lot 15), 02-19-481-002 (Lot 16), 02-20-353-004 (Part of Lot 17), 02-19-482-001 (Part of Lot 17), 02-19-482-003 (Part of Lot 18), 02-20-353-005 (Part of Lot 18), 02-19-482-002 (Part of Lot 19), 02-20-353-003 (Part of Lot 19), 02-19-483-001 (Lot 21), 02-19-482-004 (Part of Lot 55), 02-20-353-006 (Part of Lot 55), 02-20-353-002 (Lot 57)

Return to: First American Title Insurance
30 N LaSalle Street, Suite 2700
Chicago, IL 60602
Attn: D. E. Cross

3

## EXHIBIT B TO DEED

### PERMITTED EXCEPTIONS

1     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 1)

2     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of lot 1)

3     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 2)

4     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 3)

5     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 4)

6     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 5)

7     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 6)

8     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 7)

9     General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 8)

10    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 9)

11    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 9)

12    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 10)

13    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 11)

14    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 12)

15    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 13)

16    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 14)

17    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 15)

18    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 16)

19    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable. (Affects part of Lot 17)

20    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 17)

21    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 18)

22    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 18)

23    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 19)

24    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 19)

25    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 21)

26    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 55)

27    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects part of Lot 55)

28    General real estate taxes for the year(s) 2014 second installment, 2015 and subsequent years, liens not yet due or payable   (Affects Lot 57)

29    The land lies within the boundaries of Special Service Area Number 2006-113 as disclosed by  Ordinance No  2007-26 dated March 13, 2007 and recorded April 27, 2007 as disclosed by ordinance recorded as document 200700013896 and is subject to additional taxes under the  terms of said ordinance and subsequent related ordinances

30    Existing unrecorded leases, if any, and rights of all parties claiming thereunder

31    Notice contained in Memorandum of Agreement dated May 15, 2007 and recorded May 24, 2007  as document 200700016696 by and between Cannonball LLC, an Illinois limited liability company,  and Home Depot U S A , Inc , a Delaware Corporation, of certain SSA Tax reimbursement  obligations that create lien rights on Lots 1-19, 55, 57

      Case No  2014 IL App (2nd) 130858 found that the SSA tax reimbursement obligations and lien  rights referred to in the Memorandum of Agreement are covenants that run with The Land and  Lot 20   (affects Lots 1-19, 55, 57)

32    This item has been intentionally deleted

33    Memorandum of Development Agreement dated May 15, 2007 and recorded May 24, 2007 as  document 200700016698 by and between Cannonball LLC, an Illinois limited liability company,  and Home Depot U S A , Inc , a Delaware Corporation, and the terms and provisions contained  there, including certain SSA Tax reimbursement obligations that create lien rights on Lots 1-19, 55, 57

      Case No  2014 IL App (2nd) 130858 found that SSA Tax reimbursement obligations and lien  rights referred to in the Memorandum of Development Agreement are covenants that run with  The Land and Lot 20

      (affects Lots 1-19, 55 and 57)

34    Unrecorded Site Development Agreement as disclosed on prior title evidence dated May 15, 2007  entered into by and between Cannonball LLC, an Illinois limited liability company, and Kohl's  Illinois, Inc., a Nevada corporation, and the terms and provisions contained therein

2

Note SSA Tax reimbursement and lien rights, if any, contained in the Agreement were foreclosed and terminated pursuant to foreclosure proceeding Case No 10 CH 0869, in the Circuit Court of Kendall County, Illinois

35    Unrecorded Site Development Agreement and unrecorded Agreement of Covenants entered into by and between Cannonball LLC, an Illinois limited liability company, and Target Corporation, a Minnesota corporation, and the terms and provisions contained therein

Note Target's Reimbursement Rights and Potential and Contingent SSA Tax Lien Rights, as defined in the Order of Default Judgment, Summary Judgment and Judgment of Foreclosure and Sale were foreclosed and terminated pursuant to foreclosure proceeding Case No 10 CH 0869, in the Circuit Court of Kendall County, Illinois

36    Grant of Permanent Sewer and Water Easement Agreement recorded November 17, 1993 as document 9312303 by and between Cooper Home Furnishings, and the United City of the Village of Yorkville, a Municipal corporation, and the terms, conditions and provisions contained therein

37    Ordinance Number 2006-88 authorizing the execution of a Development Agreement for Kendall Marketplace dated August 22, 2006 and recorded January 10, 2007 as document number 200700001155, and the terms, conditions and provisions contained therein

38    Ordinance Number 2006-125 made by the United City of Yorkville, Illinois, authorizing the execution of an Amended and Restated Development Agreement for Kendall Marketplace dated October 24, 2006 and recorded January 24, 2007 as document 200700002839, and the terms, conditions and provisions contained therein

39    This item has been intentionally deleted

40    Operation and Easement Agreement for Kendall Marketplace Shopping Center, Yorkville, Illinois dated May 15, 2007 and recorded May 24, 2007 as document 200700016695 made by and between Target Corporation, Home Depot U S A , Inc , Kohl's Illinois, Inc and Cannonball, LLC, and the terms, conditions and provisions contained therein

First Amendment to Operation and Easement Agreement recorded January 7, 2008 as document 200800000363

41    Plat of Easement recorded May 29, 2008 as document 200800013224, and the terms, conditions and provisions contained therein (affects Lot 1)

42    Plat of Easement recorded May 29, 2008 as document 200800013223, and the terms, conditions and provisions contained therein (affects Lot 55)

43    Ordinance Number 2006-95 rezoning certain property in furtherance of a Development Agreement dated September 26, 2006 and recorded October 16, 2008 as document number 200800022492, and the terms, conditions and provisions contained therein

44    Building lines, easements, covenants, conditions and restrictions as set forth on Plat of Kendall Marketplace, recorded May 7, 2007 as document 200700014779, and together with any provisions relating thereto

45    Terms, conditions and provisions of the document creating the easement described in Schedule A, together with the rights of the adjoining owners in and to the concurrent use of said easement

46    Lease by and between Cannonball LLC, Lessor, and Dick's Sporting Goods, Inc , Lessee, dated October 22, 2007 as disclosed by a Memorandum recorded November 1, 2007 as document 200700032323, and all rights thereunder of and all acts done and suffered thereunder of said lessee or any parties claiming by, through or under said lessee

3

47    Lease by and between Cannonball LLC, Lessor, and Marshall's of IL, LLC, Lessee, dated December 21, 2007 as disclosed by a Memorandum recorded January 22, 2008 as document 200800001868, and all rights thereunder of and all acts done and suffered thereunder of said lessee or any parties claiming by, through or under said lessee

48    Lease by and between Cannonball LLC, Lessor, and PetSmart, Inc , Lessee, dated December 21, 2007 as disclosed by a Memorandum recorded February 25, 2008 as document 200800004703, and all rights thereunder of and all acts done and suffered thereunder of said lessee or any parties claiming by, through or under said lessee

49    Lease by and between Cannonball, L L C , Lessor, and ULTA Salon, Cosmetics & Fragrance, Inc , Lessee, dated July 25, 2008 as disclosed by a Memorandum recorded August 14, 2008 as document 200800018926, and all rights thereunder of and all acts done and suffered thereunder of said lessee or any parties claiming by, through or under said lessee

50    Rights of interested parties to maintain concrete walk located on Southwesterly lines of Lots 17, 18 and 55, as disclosed on survey made by Mackie Consultants, LLC, Order No 2482, dated May 22, 2015

1858159 2

4

# EXHIBIT 2



# PTAX-203
## Illinois Real Estate
## Transfer Declaration

**Please read the instructions before completing this form.**
This form can be completed electronically at tax.illinois.gov/retd.

*Do not write in this area.*
*County Recorder's Office use.*

## Step 1: Identify the property and sale information.

1   731-985 Erica Lane
   <span style="font-size:small">Street address of property (or 911 address, if available)</span>

   Yorkville                                              60560
   <span style="font-size:small">City or village</span>                                    ZIP

   Bristol
   <span style="font-size:small">Township</span>

2   Write the total number of parcels to be transferred.   27

3   Write the parcel identifying numbers and lot sizes or acreage.

   Property index number (PIN)          Lot size or acreage
   a   (See Attached)          _____
   b   _____          _____
   c   _____          _____
   d   _____          _____

   Write additional property index numbers, lot sizes or acreage in Step 3.

4   Date of instrument:  0 7 / 2 0 1 5
   <span style="font-size:small">Month       Year</span>

5   Type of instrument (Mark with an "X."):  __X__ Warranty deed
   ____ Quit claim deed   ____ Executor deed   ____ Trustee deed
   ____ Beneficial interest   ____ Other (specify):_____

6   ____ Yes  _X_ No  Will the property be the buyer's principal residence?

7   _X_ Yes  ____ No  Was the property advertised for sale?
   <span style="font-size:small">(i.e., media, sign, newspaper, realtor)</span>

8   Identify the property's current and intended primary use.
   Current  Intended  (Mark **one item per column** with an "X.")
   a ____   ____   Land/lot only
   b ____   ____   Residence (single-family, condominium, townhome, or duplex)
   c ____   ____   Mobile home residence
   d ____   ____   Apartment building (6 units or less) No. of units: _____
   e ____   ____   Apartment building (over 6 units)  No. of units: _____
   f ____   ____   Office
   g ____   ____   Retail establishment
   h _X_   _X_   Commercial building (specify): Shopping Center
   i ____   ____   Industrial building
   j ____   ____   Farm
   k ____   ____   Other (specify): _____

9   Identify any significant physical changes in the property since January 1 of the previous year and **write the date of the change.**
   Date of significant change:  ___ / ___ ___ ___ ___
   <span style="font-size:small">Month       Year</span>
   (Mark with an "X.")
   ____ Demolition/damage  ____ Additions  ____ Major remodeling
   ____ New construction   ____ Other (specify): _____

10  Identify only the items that apply to this sale. (Mark with an "X.")
   a ____ Fulfillment of installment contract —
        year contract initiated : ___ ___ ___ ___
   b ____ Sale between related individuals or corporate affiliates
   c ____ Transfer of less than 100 percent interest
   d ____ Court-ordered sale
   e ____ Sale in lieu of foreclosure
   f ____ Condemnation
   g ____ Short sale
   h _X_ Bank REO (real estate owned)
   i ____ Auction sale
   j ____ Seller/buyer is a relocation company
   k ____ Seller/buyer is a financial institution or government agency
   l ____ Buyer is a real estate investment trust
   m ____ Buyer is a pension fund
   n ____ Buyer is an adjacent property owner
   o ____ Buyer is exercising an option to purchase
   p ____ Trade of property (simultaneous)
   q ____ Sale-leaseback
   r ____ Other (specify): _____

   s ____ Homestead exemptions on most recent tax bill:
        1 General/Alternative      $_____
        2 Senior Citizens          $_____
        3 Senior Citizens Assessment Freeze  $_____

## Step 2: Calculate the amount of transfer tax due.

**Note:** Round Lines 11 through 18 to the next highest whole dollar. If the amount on Line 11 is over $1 million and the property's current use on Line 8 above is marked "e," "f," "g," "h," "i," or "k," complete Form PTAX-203-A, Illinois Real Estate Transfer Declaration Supplemental Form A. If you are recording a beneficial interest transfer, do not complete this step. Complete Form PTAX-203-B, Illinois Real Estate Transfer Declaration Supplemental Form B.

| | | |
|---|---|---|
| 11 Full actual consideration | 11 | $ 6,060,000.00 |
| 12a Amount of personal property included in the purchase | 12a | $ 0.00 |
| 12b Was the value of a mobile home included on Line 12a? | 12b | Yes _X_ No |
| 13 Subtract Line 12a from Line 11. This is the net consideration for real property. | 13 | $ 6,060,000.00 |
| 14 Amount for other real property transferred to the seller (in a simultaneous exchange) as part of the full actual consideration on Line 11 | 14 | $ 0.00 |
| 15 Outstanding mortgage amount to which the transferred real property remains subject | 15 | $ 0.00 |
| 16 If this transfer is exempt, use an "X" to identify the provision. | 16 | b ___ k ___ m ___ |
| 17 Subtract Lines 14 and 15 from Line 13. **This is the net consideration subject to transfer tax.** | 17 | $ 6,060,000.00 |
| 18 Divide Line 17 by 500. Round the result to the next highest whole number (e.g., 61,002 rounds to 62). | 18 | 12,120 |
| 19 Illinois tax stamps — multiply Line 18 by 0.50. | 19 | $ 6,060.00 |
| 20 County tax stamps — multiply Line 18 by 0.25. | 20 | $ 3,030.00 |
| 21 Add Lines 19 and 20. **This is the total amount of transfer tax due.** | 21 | $ 9,090.00 |

This form is authorized in accordance with 35 ILCS 200/31-1 et seq. Disclosure of this information is REQUIRED. This form has been approved by the Forms Management Center.   IL-492-0227

**Step 3: Write the legal description from the deed.** Write, type (minimum 10-point font required), or attach the legal description from the deed. If you prefer, submit an 8½" x 11" copy of the extended legal description with this form. You may also use the space below to write additional property index numbers, lots sizes or acreage from Step 1, Line 3.

(See Attached)

**Step 4: Complete the requested information.**
The buyer and seller (or their agents) hereby verify that to the best of their knowledge and belief, the full actual consideration and facts stated in this declaration are true and correct. If this transaction involves any real estate located in Cook County, the buyer and seller (or their agents) hereby verify that to the best of their knowledge, the name of the buyer shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois. Any person who willfully falsifies or omits any information required in this declaration shall be guilty of a Class B misde-meanor for the first offense and a Class A misdemeanor for subsequent offenses. Any person who knowingly submits a false statement concerning the identity of a grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses.

**Seller Information (Please print.)**

| | | | |
|---|---|---|---|
| Bank of America, N.A. | | | |
| Seller's or trustee's name | Seller's trust number (if applicable - not an SSN or FEIN) | | |
| 100 South Charles Street, 3rd Floor | Baltimore | MD | 21201 |
| Street address (after sale) | City | State | ZIP |
| (See Attached) | ( 410 ) 547-4545 | | |
| Seller's or agent's signature | Seller's daytime phone | | |

**Buyer Information (Please print.)**

| | | | |
|---|---|---|---|
| Kendall Holdings I, LLC | | | |
| Buyer's or trustee's name | Buyer's trust number (if applicable - not an SSN or FEIN) | | |
| c/o Greenwood Global, Inc., 707 Skokie Boulevard, Suite 600 | Northbrook | IL | 60062 |
| Street address (after sale) | City | State | ZIP |
| (See Attached) | ( ) | | |
| Buyer's or agent's signature | Buyer's daytime phone | | |

Mail tax bill to:

| | | | |
|---|---|---|---|
| Kendall Holdings I, LLC, c/o Greenwood Global, Inc., 707 Skokie Blvd., Suite 600 | Northbrook | IL | 60062 |
| Name or company          Street address | City | State | ZIP |

**Preparer Information (Please print.)**

| | | | |
|---|---|---|---|
| Michael McGuire, Riemer & Braunstein LLP | | | |
| Preparer's and company's name | Preparer's file number (if applicable) | | |
| 71 S. Wacker Drive, Suite 3515 | Chicago | IL | 60606 |
| Street address | City | State | ZIP |
| *[signature]* | ( 312 ) 780-1166 | | |
| Preparer's signature | Preparer's daytime phone | | |

Preparer's e-mail address (if available)

**Identify any required documents submitted with this form.** (Mark with an "X.")  __X__ Extended legal description  __X__ Form PTAX-203-A
      ____ Itemized list of personal property  ____ Form PTAX-203-B

**To be completed by the Chief County Assessment Officer**

1 ____ ____ ____ ____ ____ ____
  County  Township  Class  Cook-Minor  Code 1  Code 2

2 Board of Review's final assessed value for the assessment year prior to the year of sale.
  Land ____ ____ ____ , ____ ____ ____
  Buildings ____ ____ ____ , ____ ____ ____
  Total ____ ____ ____ , ____ ____ ____

3 Year prior to sale ____ ____ ____ ____
4 Does the sale involve a mobile home assessed as real estate? ____ Yes ____ No
5 Comments

Illinois Department of Revenue Use

Tab number

PTAX-203 (R-10/10)

**"SELLER"**

**BANK OF AMERICA, N.A.**, a national
banking association

By: _____
Name: Anthony P. Conrad
Title: Vice President

**"BUYER"**

**KENDALL HOLDINGS I, LLC**, an Illinois
limited liability company

By: Greenwood Global, Inc., its Manager


By: _____
Name:
Title:

[Signature Page to PTAX-203]

**"SELLER"**

**BANK OF AMERICA, N.A.,** a national banking association

By: _____
Name: Anthony P. Conrad
Title: Vice President

**"BUYER"**

**KENDALL HOLDINGS I, LLC,** an Illinois limited liability company

By: Greenwood Global, Inc., its Manager

By: _____
Name:
Title:

[Signature Page to PTAX-203]

## LEGAL DESCRIPTION OF PROPERTY

PARCEL 1:

LOTS 1-19, 21, 55 AND 57 IN KENDALL MARKETPLACE SUBDIVISION, BEING A SUBDIVISION OF PART OF SECTIONS 19, 20 AND 29, TOWNSHIP 37 NORTH, RANGE 7 EAST OF THE THIRD PRINCIPAL MERIDIAN, RECORDED MAY 7, 2007 AS DOCUMENT NUMBER 200700014779 IN THE UNITED CITY OF YORKVILLE, KENDALL COUNTY, ILLINOIS.

PARCEL 2:

EASEMENTS APPURTENANT FOR THE BENEFIT OF PARCEL 1 AS CREATED BY THE OPERATION AND EASEMENT AGREEMENT DATED AS OF MAY 15, 2007, RECORDED MAY 24, 2007 AS DOCUMENT NUMBER 200700016695, AS AMENDED BY FIRST AMENDMENT TO OPERATION AND EASEMENT AGREEMENT RECORDED JANUARY 7, 2008 AS DOCUMENT 200800000363, KENDALL COUNTY, ILLINOIS.

Commonly known as: Kendall Marketplace, United City of Yorkville, IL

### PROPERTY INDEX NUMBERS AND APPROXIMATE LOT SIZE

| | |
|---|---|
| 02-20-353-008 (Part of Lot 1) & 02-29-131-005 (Part of Lot 1) | 1,645,847 sq. ft. |
| 02-29-101-001 (Lot 2) | 59,871 sq. ft. |
| 02-29-101-002 (Lot 3) | 59,368 sq. ft. |
| 02-29-101-003 (Lot 4) | 62,314 sq. ft. |
| 02-29-101-004 (Lot 5) | 72,954 sq. ft. |
| 02-29-131-001 (Lot 6) | 68,610 sq. ft. |
| 02-29-131-002 (Lot 7) | 54,257 sq. ft. |
| 02-29-131-003 (Lot 8) | 52,590 sq. ft. |
| 02-29-131-004 (Part of Lot 9) & 02-20-381-008 (Part of Lot 9) | 49,498 sq. ft. |
| 02-20-381-007 (Lot 10) | 72,650 sq. ft. |
| 02-20-381-006 (Lot 11) | 56,013 sq. ft. |
| 02-20-381-005 (Lot 12) | 39,725 sq. ft. |
| 02-20-381-004 (Lot 13) | 44,884 sq. ft. |
| 02-20-381-003 (Lot 14) | 44,896 sq. ft. |
| 02-20-381-002 (Lot 15) | 44,682 sq. ft. |
| 02-19-481-002 (Lot 16) | 76,424 sq. ft. |
| 02-20-353-004 (Part of Lot 17) & 02-19-482-001 (Part of Lot 17) | 55,738 sq. ft. |
| 02-19-482-003 (Part of Lot 18) & 02-20-353-005 (Part of Lot 18) | 57,891 sq. ft. |
| 02-19-482-002 (Part of Lot 19) & 02-20-353-003 (Part of Lot 19) | 53,314 sq. ft. |
| 02-19-483-001 (Lot 21) | 141,178 sq. ft. |
| 02-19-482-004 (Part of Lot 55) & 02-20-353-006 (Part of Lot 55) | 375,937 sq. ft. |
| 02-20-353-002 (Lot 57) | 888,143 sq. ft. |

# EXHIBIT 3

Kendall County | Information for Parcel 02-20-381-001, Tax Year 2014       Page 1 of 2



# Kendall County, Illinois

## Information for Parcel 02-20-381-001, Tax Year 2014
Generated 07/06/15 at 18:27:36

## Property Information

| | |
|---|---|
| **Tax Year** <br> 2014 | **Tax Code** <br> BR068 - KENDALL MRKTPL 115 |
| **Township** <br> Bristol Township | **Neighborhood** |
| **Property Class** <br> 0060-IMPROVED COMMERCIAL | **Land Use** <br> - |
| **Tax Status** <br> Taxable | **Lot Size** <br> IRREG |
| **Net Taxable Value** <br> 1,713,853 | **Tax Rate** <br> 22.736220 |
| **Site Address** <br> 735 EDWARD LN <br> YORKVILLE, IL 60560 | **Total Tax** <br> $389,665.40 |
| **Owner Name and Address** <br> HOME DEPOT USA INC <br> PROPERTY TAX DEPARTMENT 6887 <br> PO BOX 105842 <br> ATLANTA, GA 30348-5842 | **Mailing Name and Address** <br> HOME DEPOT USA INC <br> PROPERTY TAX DEPARTMENT 6887 <br> PO BOX 105842 <br> ATLANTA, GA 30348-5842 |
| **Legal Description** <br> LOT 20 KENDALL MARKETPLACE CITY OF YORKVILLE | |

## Assessments

| Level | Homesite | Dwelling | Farm Land | Farm Building | Mineral | Total |
|---|---|---|---|---|---|---|
| DOR Equalized | 548,333 | 1,165,520 | 0 | 0 | 0 | 1,713,853 |
| Department of Revenue | 548,333 | 1,165,520 | 0 | 0 | 0 | 1,713,853 |
| Board of Review Equalized | 548,333 | 1,165,520 | 0 | 0 | 0 | 1,713,853 |
| Board of Review | 548,333 | 1,165,520 | 0 | 0 | 0 | 1,713,853 |
| S of A Equalized | 548,333 | 1,165,520 | 0 | 0 | 0 | 1,713,853 |
| Supervisor of Assessments | 548,333 | 1,165,520 | 0 | 0 | 0 | 1,713,853 |
| Township Assessor | 548,333 | 1,165,520 | 0 | 0 | 0 | 1,713,853 |
| Prior Year Equalized | 564,129 | 1,149,724 | 0 | 0 | 0 | 1,713,853 |

## Payments

| Installment | Date Due | Tax Billed | Penalty Billed | Cost Billed | Drainage Billed | Total Billed | Amount Paid | Total Unpaid |
|---|---|---|---|---|---|---|---|---|
| First | 06/03/2015 | $194,832.70 | $0.00 | $0.00 | $0.00 | $194,832.70 | $194,832.70 | $0.00 |
| Second | 09/03/2015 | $194,832.70 | $0.00 | $0.00 | $0.00 | $194,832.70 | $194,832.70 | $0.00 |
| Total | | $389,665.40 | $0.00 | $0.00 | $0.00 | $389,665.40 | $389,665.40 | $0.00 |

## Payment Detail

| Installment | Receipt Number | Date Paid | Paid By | Amount |
|---|---|---|---|---|
| First | 2014003119 | 05/11/2015 | HOME DEPOT USA | $194,832.70 |
| Second | 2014003119 | 05/11/2015 | HOME DEPOT USA | $194,832.70 |
| Total | | | | $389,665.40 |

## No Exemption Information

## No Farm Land Information

## Parcel Genealogy

| Parent Parcels | | | | |
|---|---|---|---|---|
| Child Of | Action | Tax Year | Change Effective Year | Completed? |
| 02-20-351-004 | Split | 2007 | 2007 | Yes |
| 02-20-351-005 | | | 2007 | Yes |

| Child Parcels | | | | |
|---|---|---|---|---|
| Parent Of | Action | Tax Year | Change Effective Year | Completed? |

## Legal Descriptions

| Legal Description | Section/Township/Range | Document |
|---|---|---|
| LOT 20 KENDALL MARKETPLACE CITY OF YORKVILLE | | 0714779 |

## Related Names

| Name | Relationship | Status |
|---|---|---|
| HOME DEPOT USA INC | Parcel Owner | Current |

## Sales History

| Year | Document # | Sale Type | Sale Date | Valid Sale | Gross Selling Price | Net Selling Price |
|---|---|---|---|---|---|---|
| 2007 | 200716692 | Warranty Deed | 05/01/2007 | Yes | 1,841,720 | 1,841,720 |
| 2007 | 200716689 | Warranty Deed | 05/01/2007 | Yes | 14,682,692 | 14,682,692 |

## Tax Sale Summary

| Year | Certificate | Type | Date Sold | Sale Status | Status Date | Penalty Date |
|---|---|---|---|---|---|---|

## Site Addresses

| House Number | House Number Suffix | | Street Name | |
|---|---|---|---|---|
| 735 | | | EDWARD LN | |
| City | State | | Zip Code | Location |
| YORKVILLE | IL | | 60560 | |

## Taxing Bodies

| District | Tax Rate | Extension |
|---|---|---|
| COUNTY | 0.8085 | $13,857.02 |
| BRISTOL-KENDALL FPD | 0.8041 | $13,780.75 |
| FOREST PRESERVE | 0.1826 | $3,128.98 |
| JR COLLEGE #516 | 0.5973 | $10,237.53 |
| YORKVILLE LIBRARY | 0.3299 | $5,654.00 |
| YORKVILLE/BRISTOL SD | 0.0000 | $0.00 |
| KENDALL MRKTPL SSA 2006-113 | 11.1303 | $190,757.84 |
| BRISTOL TOWNSHIP | 0.1354 | $2,319.87 |
| BRISTOL ROAD DISTRICT | 0.2818 | $4,828.78 |
| SCHOOL DIST CU-115 | 7.7083 | $132,108.25 |
| CITY OF YORKVILLE | 0.7581 | $12,992.38 |
| **Total** | **22.7362** | **$389,665.40** |

## Images

| No images found. |
|---|