### IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| **BANK OF AMERICA, N.A., a national banking association, as successor-in-interest to LaSalle Bank, N.A., in its individual capacity and as authorized Agent,** | **Case No. 17-cv-00407** |
| | Judge Mary M. Rowland |
| **Plaintiff,** | |
| **v.** | |
| **CHICAGO TITLE INSURANCE COMPANY, a Nebraska corporation, as successor-in-interest to Ticor Title Insurance Company,** | |
| **Defendant.** | |

### MEMORANDUM OPINION & ORDER

Before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, Bank of America's motion [92] is granted and Chicago Title Insurance Company's ("Chicago Title") motion [103 & 104] is denied.

### BACKGROUND

**1. The Kendall Marketplace Transaction**

In 2007, Cannonball, LLC ("Cannonball") sought to build and develop a shopping center in Yorkville, Illinois called Kendall Market Place. (Dkt. 94 ¶ 5). LaSalle Bank, Bank of America's predecessor in interest, and Cannonball entered

into a construction loan agreement for Kendall Marketplace. (*Id.*). The loan was secured by a Construction Mortgage on the property. (*Id.*).

In connection with its development of Kendall Marketplace, Cannonball sold approximately ten and a half acres to Home Depot pursuant to a Real Property Purchase Agreement ("Purchase Agreement"). (Dkt. 94 ¶ 5). Section 22(h) of the Purchase Agreement required Cannonball to reimburse Home Depot for excess taxes imposed by Yorkville—the SSA Tax Reimbursement Obligation.[1] (Dkt. 102 ¶¶ 19-20). It also granted Home Depot the right to place a lien on Cannonball's Property for untimely payment of the SSA tax and stated, "Section 22(h) shall survive the Closing" and the SSA Tax Reimbursement Obligation "shall be a covenant which shall run with the land and bind Seller's grantees, successors and assigns." (*Id.*). Cannonball and Home Depot also executed a development agreement ("Development Agreement") that recites Cannonball's obligations under Section 22(h) of the Purchase Agreement. In addition, Section 12.4 of the Development Agreement expressly provides that Home Depot's rights would be subordinate to the Mortgage: "such lien shall be subordinate to the lien of any first mortgage or deed of trust." (Dkt. 94 ¶ 7).

Cannonball, Home Depot, and LaSalle Bank also entered into a payment and priority agreement ("Payment and Priority Agreement") that expressly limited LaSalle Bank's obligations. (Dkt. 94 ¶ 8). It provided that the "Lender shall have no

---

[1] "Yorkville issued and sold bonds to provide money to assist in the development of the shopping center with on-and off-site improvements. To recover the money, Yorkville imposed against all tracts within the shopping center a special tax that was called the 'Special Service Area Tax' or the 'SSA tax.'" *Bank of America, N.A. v. Cannonball LLC*, 2014 Il App (2d) 130858, ¶ 6.

obligations to the City or any of the Anchors under the Development agreements unless Lender expressly assumes Developer's obligations thereunder in writing." (*Id.* at ¶ 9).

**2. The Title Insurance Policy**

In connection with the Mortgage, LaSalle Bank purchased an insurance policy with Ticor Title's policy-issuing agent, Near North National Title ("NNNT"). (Dkt. 102 ¶ 35). LaSalle Bank's attorney, Stephen Malato negotiated the insurance policy. (*Id.* at ¶ 10). LaSalle Bank sought to insure the superiority of the Mortgage over other interests. The insuring clause provides:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, AND EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, TICOR TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the Insured by reason of:
>
> &ast; &ast; &ast;
>
> 2. Any defect in or lien or encumbrance on the title;
>
> &ast; &ast; &ast;
>
> 6. The priority of any lien or encumbrance over the lien of the insured mortgage.

(Dkt. 94 ¶ 19). On May 3, 2007, prior to closing of the Kendall Marketplace Transaction, Mr. Malato sought a Special Endorsement providing "assurances that the lender's lien is superior to the liens that might come out of the site development agreements." (Dkt. 102 ¶¶ 36-37). NNNT responded by email, stating: "An endorsement for the Home Depot Lien Rights is not a problem, it is subordinate to

the lien of the construction mortgage."[2] (*Id*. at ¶ 42). The requested Special Endorsement states:

> The company hereby insures the insured that the priority of the lien of the mortgage insured in this Policy will not be impaired by the recordation of a lien document asserting lien rights arising under any of the following documents:
>
> * * *
>
> 1. The Home Depot Site Development Agreement recorded May 24, 2007 as document 20070016696;
>
> * * *
>
> Nothing contained in this Policy of this endorsement should be construed as insuring the validity of the right to lien as created under the agreements described therein.
>
> This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy of any prior endorsements.

(Dkt. 102 ¶ 45).

The Policy includes an additional endorsement titled, "ALTA 9 ENDORSEMENT." (Dkt. 94 ¶ 22). The ALTA 9 Endorsement insured LaSalle Bank against loss if an instrument listed on Schedule B contains a "covenant, conditions or restrictions on the land" and "provides for a private charge or assessment." (Dkt. 94 ¶22). That endorsement stated:

---

[2] Chicago Title maintains that "Mr. Malato's email and its attached Development Agreement excerpt made no reference to the tax reimbursement and lien rights" (Dkt. 104, 5), and that "[t]here is no evidence that [NNNT] received the Purchase Agreement or the full Development Agreement prior to Closing." (Dkt. 102 ¶ 46). Bank of America contests this assertion, claiming that NNNT was advised and knew of the Purchase Agreement, the Development Agreement, and LaSalle Bank's intention that the Mortgage would be superior to all other rights. (Dkt. 94 ¶ 16). Bank of America also notes that the Policy includes references to the Memoranda of the Purchase Agreement and the Development Agreement, the documents of which NNNT claims it was unaware. (Dkt. 111, 8).

The Company hereby insures the insured against loss or damage which the insured shall sustain by reason of the following:

1. The existence, at Date of Policy, of any of the following:
     (A) Covenants, conditions or restrictions under which the lien of that mortgage referred to in Schedule A can be divested, subordinated, or extinguished, or its validity, priority or enforceability impaired.

     (B) Unless expressly excepted in Schedule B:
                              * * *
     (2) Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which in addition, … (iii) provides for a private charge or assessment.

(*Id*.). Schedule B, Part II of the Policy states:

In addition to the matters set forth in Part I of this schedule, the title to the estate or interest in the land described or referred to in schedule A is subject to the following matters, …:

                              * * *

4. Memorandum of Agreement recorded May 15, 2007 as document number 200700016696 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware Corporation, are parties to (1) a Real Property Purchase Agreement and (2) a Development Agreement, and the terms and provisions contained therein.
Note: Contains a provision to create a lien on the Land.
                              * * *
6. Memorandum of Development Agreement recorded May 15, 2007 as document number 200700016698 by and between Cannonball LLC, an Illinois limited liability company, and Home Depot U.S.A., Inc., a Delaware corporation and the terms and provisions contained therein.
Note: Contains a provision to create a lien on the Land.

(*Id*.).

## 3. The Closing of the Kendall Marketplace Transaction

On May 24, 2007, the Purchase Agreement, Development Agreement, and the Construction Mortgage were recoded—in that order—with the Office of the Kendall

County Recorder. (Dkt. 94 ¶ 17). On that same day, Ticor Title issued the title insurance policy (the "Policy"). (*Id*.).

Prior to the closing, Cannonball, HomeDepot and LaSalle Bank engaged in email correspondence. Chicago Title argues the email string shows that LaSalle Bank had actual knowledge of Home Depot's tax reimbursement rights under the Purchase Agreement, and that LaSalle Bank consented to the recording of Home Depot's tax reimbursement and lien rights prior to recording of the Mortgage. (Dkt. 102 ¶¶ 47, 48, 58, 73). Bank of America argues the same email string shows that Mr. Malato repeatedly stated his understanding that the sequence of recording would not impact the Bank's eventual rights upon foreclosure with respect to the SSA Tax Reimbursement Obligation.[3] (Dkt. 94 ¶ 11). Bank of America additionally argues that LaSalle did not intend for the lien to be an encumbrance that runs with the land, even though it allowed the lien to be recorded first—a fact Chicago Title contests.

## 4. The Foreclosure Action and Appeal

---

[3] The email string is between Home Depot's counsel and Cannonball's counsel. Home Depot stated it intended its rights to tax reimbursement to survive a foreclosure, and it would either need LaSalle Bank's consent to subordinate the mortgage or it would need to record its lien right first. (Dkt. 102 ¶¶ 55-57). The complete email string was forwarded to Mr. Malato, asking whether the Bank had a preference for the recording sequence. Mr. Malato replied: "Yes to recording before the mortgage. Our relative rights are addressed in the Payment and Priority Agreement." (*Id*. at ¶ 55). As noted above, the Payment and Priority Agreement expressly limited LaSalle Bank's obligations. (Dkt. 94 ¶ 9). In a separate email string addressing the same question, Mr. Malato stated: "The Home Depot Site Development Agreement provided for a lien, but it was expressly subordinate to the lien of a first mortgage. So we would be ok with the sales tax payments being secured in the manner provided in the SDA." (Dkt. 102 at ¶ 57). In any event, in the state court foreclosure action, Bank of America conceded that Cannonball and Home Depot intended the encumbrance to run with the land: "Bank of America does not contest that Cannonball and Home Depot intended the covenants to run with the land and there is no doubt that they intended as such." *Bank of America, N.A. v. Cannonball LLC*, 2014 Il App (2d) 130858, ¶ 23.

Eventually, Cannonball defaulted on its loan obligation. (Dkt. 94 ¶ 24). Bank of America sought to foreclose the Construction Mortgage in the Circuit Court of Kendall County. (Dkt. 102 ¶ 69). Home Depot filed a counterclaim seeking a declaration that the SSA Tax Reimbursement Obligation ran with the land and was binding on the grantees, successors and assigns of Cannonball, including Bank of America. (Dkt. 94 ¶ 24). The trial court denied Home Depot's motion for summary judgment on the SSA Tax Reimbursement Obligation issue, holding that the SSA Tax Reimbursement Obligation was personal between Cannonball and Home Depot and was not a covenant that ran with the land. (*Id.*).

Home Depot appealed. The Appellate Court reversed the trial court's order in part, concluding that Home Depot's SSA Tax Reimbursement Obligation and lien rights are covenants that run with the land and binding on Bank of America. The Appellate Court ruled that "Home Depot's tax reimbursement and lien rights are part of agreements that Bank of America's predecessor was aware of when it entered into the construction loan agreement with Cannonball." *Bank of America, N.A. v. Cannonball LLC*, 2014 Il App (2d) 130858, ¶ 29. The Appellate Court further stated:

> In this case, the LaSalle Bank mortgage was recorded on the same day, but after, Home Depot's memorandum of the purchase agreement and memorandum of the development agreement were recorded. Further, LaSalle Bank had actual knowledge of the documents containing Home Depot's tax reimbursement and lien rights before it recorded its mortgage, because the purchase and development agreements were part of the closing documents. The effective date of a mortgage is the date of the recording…Thus Home Depot's tax reimbursement and lien rights, being in effect before the mortgage and running with the land, were not extinguished by foreclosure.

*Id.* at ¶ 31 (internal citations omitted). In addition, the Appellate Court acknowledged that Home Depot's lien was subordinate to the Construction Mortgage under Section 12.4 of the Development Agreement, but rejected Bank of America's argument that the lower priority of Home Depot's lien resulted in termination of those rights upon foreclosure. The Court stated:

> Nothing in the provision at issue indicates the parties' intent to extinguish the Home Depot's tax reimbursement and lien rights…Rather, the plain and ordinary meaning of the language indicates only that Home Depot's lien was 'assigned a lower' priority than Bank of America's first mortgage lien. Therefore, Home Depot's tax reimbursement and lien rights were not extinguished by section 12.4 of the development agreement.

*Id.* (internal citations omitted).

Chicago Title defended Bank of America in the foreclosure action and on appeal. (Dkt. 102 ¶ 76). Because of the encumbrance, Bank of America "sold the property for less than its value had the title been free and clear." (Dkt. 93, 1). Bank of America now seeks an order that Chicago Title breached the Policy by failing to reimburse Bank of America for its financial loss. (*Id.* at 15).

## **LEGAL STANDARD**

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking

8

summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In considering cross-motions for summary judgment, the Court must construe all inferences in favor of the party against whom the motion under consideration is made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

Summary judgment is a particularly appropriate mechanism for resolving cases involving the interpretation of written contracts. *International Union of United Auto., Aerosapce and Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003). "Because contracts are interpreted as a matter of law, claims that turn on the interpretation and construction of a contract, rather than on disputed material facts, are suitable for resolution on a motion for summary judgment." *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*, 928 F. Supp. 2d. 976, 981 (N.D. Ill. 2013), aff'd on other grounds, 794 F.3d 666 (7th Cir. 2015) (citing *Kmart Corp. v. Footstar, Inc.*, No. 09 CV 3607, 2012 WL 1080262, at *12 (N.D. Ill. Mar. 30, 2012)).

## DISCUSSION

The parties have filed cross-motions for summary judgment. Bank of America argues that the express language of the Policy covers the loss from the encumbrance and that Chicago Title breached the Policy by failing to reimburse Bank of America for its loss. Chicago Title argues that Bank of America is barred from recovering under the known loss doctrine and under Exclusion 3(a), which excludes coverage

for encumbrances "created, suffered, assumed or agreed to by the insured claimant." (Dkt. 104, 8).

In the instant case there are few, if any, material facts in dispute. In Illinois, the construction of an insurance policy is a question of law. *County Mut. Ins. Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311, 856 N.E.2d 338, 342 (Ill. 2006); *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 108 (1992). An insurance policy is to be construed as a whole, "giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 223 Ill. 2d 352, 362, 860 N.E.2d 307, 314 (Ill. 2006). "If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." *Cent. Ill. Light Co. v. Home Ins. Co.*, 213 Ill. 2d 141, 153, 821 N.E.2d 206, 213 (Ill. 2004). "Although insurance policies are construed liberally in favor of coverage, this rule of construction comes into play only when the policy language is ambiguous." *Livorsi Marine*, 222 Ill. 2d at 311.

## 1. The Text of the Policy

Bank of America argues that the Policy expressly covers an encumbrance such as the SSA Tax Reimbursement Obligation. It notes that the insuring clause insures against "[a]ny … encumbrance on the title" and insures "[t]he priority of any … encumbrance over the lien of the insured mortgage." (Dkt. 94 ¶ 19). Bank of America further argues that Schedule B of the Policy specifically insures that the agreements listed on Schedule B, Part II are "subordinate to the lien or charge of

10

the insured mortgage." (*Id*. at ¶ 23). The Memoranda of both the Home Depot Purchase Agreement and Development Agreement are listed on Schedule B, Part II of the policy, and thus, according to Bank of America, they are covered. Schedule B, Part I provides that loss or damage "by reason of" the documents listed on that schedule is not covered. But as Bank of America notes, none of the documents containing the SSA Tax Reimbursement Obligation (such as the Purchase Agreement and the Development Agreement) are listed on Schedule B, Part I. According to Bank of America, the inclusion of the Home Depot Agreements on Schedule B, Part II but not on Schedule B, Part I demonstrates the Policy's clear and express intent to cover any loss resulting from the Home Depot Agreements and lien. Finally, Bank of America argues that the ALTA 9 Endorsement insures against loss or damage by reason of "[a]ny instrument referred to in Schedule B as containing any covenant, conditions or restrictions on the land" which also "provides for a private charge or assessment." (*Id*. at ¶ 22). As stated previously, the Home Depot Memoranda of the Purchase Agreement and Development Agreement, both of which include covenants and encumbrances and provide for a private assessment, are listed in Schedule B, Part II. Thus, Bank of America argues, the SSA Tax Reimbursement Obligation is covered by the ALTA 9 Endorsement.

Chicago Title offers a different reading of Schedule B, Part II. Chicago Title's main argument is that Schedule B, Part II "actually excepts the tax reimbursement and lien rights from coverage, insuring only the priority of the Mortgage over liens arising out of the Purchase Agreement and the Development Agreement." (Dkt. 110,

11

7). This argument hinges on the phrase "the Company insures that such matters are subordinate to the lien or charge of the insured mortgage upon said estate or interest," contained in Schedule B, Part II. Chicago Title reads this language as providing that the Mortgage takes priority over the lien, not that Home Depot's rights would be extinguished by a possible foreclosure.[4] To be clear, the Illinois Appellate Court already determined that the Home Depot lien is an encumbrance that runs with the land and would not be extinguished upon foreclosure.[5] The issue in the instant motion is whether the insurance policy issued by NNNT covers a loss arising out of the Home Depot lien. The arguments put forth by Bank of America demonstrate that the Policy covers such a loss. The Court is unpersuaded by Chicago Title's reading of Schedule B, Part II. The language cited does not mean that Schedule B, Part II *excepts* coverage. On the contrary, when the two parts of Schedule B are read together, Schedule B, Part II clearly provides for coverage of the listed documents. The Court is persuaded that had the parties intended to except the Home Depot liens from coverage, they would have included them in Schedule B, Part I. They did not do so.

Chicago Title's next argues that the Special Endorsement limits coverage by merely insuring that the Mortgage takes priority over certain liens. Chicago Title cites to the text of the Special Endorsement to claim that the Special Endorsement

---

[4] In support, Chicago Title cites to testimony from John Lamberts: "The placing of a document on Schedule B, Part II does not guarantee its eradication by reason of a foreclosure… [I]t's saying that lender has first dibs on the proceeds when there is a foreclosure sale…" (Dkt. 110, 7-8).

[5] The Illinois Appellate Court reached this determination based on the language of the agreements between Home Depot and Cannonball. *Bank of America, N.A. v. Cannonball LLC*, 2014 Il App (2d) 130858, ¶ 29.

controls and trumps all other Policy provisions. The Special Endorsement states: "[t]o the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this [Special Endorsement], this [Special Endorsement] controls." (Dkt. 110, 8).

Bank of America responds that the Special Endorsement does not limit coverage and should not be read in a way that negates the Policy's other insuring clauses. *See Sagar Megh Corp. v. United National Ins. Co.*, 999 F. Supp.2d 1018, 1025 (N.D. Ill) ("An insurance policy and its endorsements are read together to ascertain the meaning of an insurance contract") (citing *Mank v West American Ins. Co.*, 249 Ill.App.3d 827 (Ill. App. Ct. 1983)). Despite the fact that the Special Endorsement states that it controls in the event of a conflict, Bank of America notes that the Special Endorsement is intended to expand coverage, not limit it. According to Bank of America, "when a special endorsement removes other coverage it states such. Here it does not." (Dkt. 113, 14). Bank of America additionally cites to the testimony of Mr. Malato, who negotiated the Policy on behalf of LaSalle Bank. Mr. Malato testified that he did not intend for the Special Endorsement to modify other parts of the Policy and instead it was "supposed to be additional coverage, not limiting in anyway." (Dkt. 113, 14). The record supports Mr. Malato's testimony that LaSalle Bank requested the Special Endorsement prior to closing to further ensure the Mortgage would be protected by the Policy. (Dkt. 102 ¶¶ 36-37).

The Court is unpersuaded by Chicago Title's arguments and agrees with Bank of America's reading of the Policy. The Court is particularly persuaded by the

fact that the Purchase Agreement and Development Agreement are listed in Schedule B, Part II, and not Schedule B, Part I. Additionally, the ALTA 9 Endorsement clearly provides coverage for the Home Depot lien.[6]  Finally, the Court concurs that the Special Endorsement expands coverage under the Policy; it does not serve to limit the other Policy provisions. There is no indication, other than Chicago Title's arguments, in the text of the Policy or in the record that the Special Endorsement was an attempt to limit coverage. In fact, the evidence presented establishes the opposite. (Dkt. 113, 13-14). The text of the Policy covers the SSA Tax Reimbursement Obligation.

Having determined that the Policy provides coverage, the Court next turns to Chicago Title's arguments under the known loss doctrine and Exclusion 3(a).

**2. The Known Loss Doctrine**

Illinois courts repeatedly state that "insurance is based on contingent risks." *Allianz Ins. Co. v. Guidant Corp.*, 355 Ill.App.3d 721, 734 (2005). The "known loss doctrine" allows insurers to defeat claims relating to any undisclosed losses that were already realized at the policy's inception. *Central Mut. Ins. Co. v. Useong Intern., Ltd.*, 394 F.Supp.2d 1043 (N.D. Ill. 2005). When the insured knows or has reason to know when it purchases an insurance policy that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes an uninsurable "known loss." *Id.* (citing *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 103 (1992)). The Illinois Supreme

---

[6] Chicago Title fails to address Bank of America's arguments that coverage is provided in the ALTA 9 Endorsement. So while the Court is persuaded the ALTA 9 Endorsement provides an additional basis to find coverage is required, Chicago Title has waived any argument to the contrary.

Court has stated that the known loss doctrine may be invoked if the insured "knew or had reason to know…that there was a substantial probability that loss or liability would ensue due to the [conduct] for which it is seeking coverage." *Id.* "The purpose of the known loss doctrine is to prevent the insured from obtaining insurance on a loss that has already occurred or is certain to occur in the future, without the knowledge of the insurer." *Sagar Megh Cor. v. United National Ins. Co.*, 999 F.Supp.2d 1018, 1025-26 (N.D. Ill. 2013). "There is no bright-line test to determine whether and at what point in time the insured knew or had reason to know of the substantial probability of the loss at issue. The extent of the insured's knowledge of the loss must be determined on a case-by-case basis." *Outboard Marine Corp.*, 154 Ill.2d at 104. It is the insurer's burden to show that a known loss exists. *Central Mut. v. Useong*, 394 F.Supp.2d at 1050.

Chicago Title argues that Bank of America's loss is uninsurable under the known loss doctrine because LaSalle Bank knew or had reason to know that Home Depot's lien rights would cause a loss in the event of foreclosure. In support of this assertion, Chicago Title notes that when LaSalle Bank purchased the Policy, it had agreed to record the Home Depot Agreements before the Mortgage.[7] (Dkt. 102 ¶¶ 47, 48, 58, 73). Thus, according to Chicago Title, LaSalle Bank knew of the potential loss, which shifted the risk from a contingent one to a risk of which LaSalle Bank knew or should have known. (Dkt. 104, 8).

---

[7] In support, Chicago Title cites to the Illinois Appellate Court opinion which held that "LaSalle Bank had actual knowledge of the documents containing Home Depots tax reimbursement and lien rights before it recorded its mortgage, because the purchase and development agreements were part of the closing documents." *Bank of America, N.A. v. Cannonball LLC*, 2014 Il App (2d) 130858, ¶ 31.

In response, Bank of America argues that, in order to trigger the known loss doctrine, the insured must know at the time it purchased the policy that a specific event will lead to *liability*, and that knowledge of a specific event itself is insufficient to bar coverage. *Outboard Marine Corp.*, 154 Ill.2d at 104-106; *Zurich Specialties London Ltd. v. Village of Bellwood*, No. 07 C 2171, 2011 WL 248444, at *12 (N.D. Ill. Jan. 26, 2011). Bank of America relies on *Zurich Specialties London Ltd. v. Village of Bellwood*, where the insured engaged in illegal wiretapping beginning in 1994. 2011 WL 248444, at *12. As early as 2000, the Village was on notice that the wiretapping may be unlawful and notified its insurer. *Id*. In 2001, an individual sued the Village. *Id*. The insurers argued that the known loss doctrine precluded coverage because the Village knew of the illegal wiretapping several years before the inception of the policies. *Id*. The court disagreed, stating "mere knowledge of the [illegal wiretapping], however, does not clearly establish that the insured knew of a substantial probability of loss [at the inception of the policy]. The issue is not whether the insured knew of the taping but rather whether they knew or had reason to know that a probable loss would occur due to the taping." *Id*. (citing *Outboard Marine Corp.*, 154 Ill.2d at 104-106); *see also Spearman Indus., Inc. v. St. Paul Fire and Marine Ins. Co.*, 138 F.Supp.2d 1088, 1100 (N.D. Ill. 2001) (declining to apply the known loss doctrine because, although the insured's roof suffered preexisting wear and tear, the insured could not have known when it bought the policy that a storm would damage its roof several months later).[8]

---

[8] The known loss doctrine "applies only where the insured is aware of a threat of loss so immediate that it might be stated that the loss was already in progress and such was known at the time of

Bank of America asserts that the same reasoning applies here. It claims that at the time LaSalle Bank purchased the Policy, "everyone involved hoped and expected that the development would be a success. Failure of the project, and the need for Bank of America to file a foreclosure action was not on the horizon." (Dkt. 113, 10). Bank of America claims that at the time it purchased the Policy, the risk of loss was too remote to trigger the known loss doctrine, and that LaSalle Bank's knowledge of the Home Depot lien rights is insufficient to trigger the known loss doctrine under *Zurich*. Chicago Title counters that "[w]hile the financial loss was realized when Bank of America sold the Property, the actual loss began at Closing when the value of the Mortgaged Property was diminished by the recording of the encumbrance ahead of the Mortgage." (Dkt. 115, 3).

Although LaSalle Bank knew of the encumbrance on the property and knew that the encumbrance would be recorded before the Mortgage, the loss and corresponding need for coverage would not occur until the Property was sold at a foreclosure sale. At the inception of the Policy, this loss was too speculative to trigger the known loss doctrine.[9] Accordingly, the Court finds the known loss doctrine does not apply.

---

application or issuance of the policy." 3 Eric Mills Holmes, Holmes's Appleman on Insurance 2d 16.4 at 290 (1998).

[9] Chicago Title's arguments under the known loss doctrine fail for an additional reason. Even if Chicago Title is correct, and the SSA Tax Reimbursement Obligation constitutes a known loss, NNNT knew of this loss when it issued the Policy. "The purpose of the known loss doctrine is to prevent the insured from obtaining insurance on a loss that has already occurred or is certain to occur in the future, *without the knowledge of the insurer.*" *Sagar Megh Corp. v. United National Ins. Co.*, 999 F.Supp.2d 1018, 1025-26 (N.D. Ill. 2013). As discussed below, the record suggests that NNNT had knowledge of the Home Depot Lien rights, as the Memoranda of the Purchase Agreement and Development Agreement were listed on Schedule B of the Policy NNNT issued. The purpose of

### 3. Exclusion 3(a)

The text of the Policy provides several exclusions from coverage. The only relevant exclusion for the instate case is Exclusion 3(a), which provides that Chicago Title need not pay for any claims for damage that rise out of encumbrances "created, suffered, assumed or agreed to by the insured claimant." (Dkt. 102 ¶ 8). The "created or suffered" exclusion "is a standard one in title insurance contracts, and it is apparently '[o]ne of the most litigated' clauses in the field." *Home Federal Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732 (7th Cir. 2012) (citing Palomar, *Title Insurance Law*, § 6:10) (applying Indiana law). In Illinois, "[t]he burden is on the insurer to establish that a policy exclusion applies," and "[e]xclusion provisions that limit or exclude coverage must be construed liberally in favor of the insured and strictly against the insurer." *Czapski v. Maher*, 2011 IL App (1st) 100948, ¶ 17.

Chicago Title argues that Exclusion 3(a) applies because LaSalle Bank "created, suffered, assumed or agreed to" the SSA Tax Reimbursement Obligation when it knew that the covenant running with the land existed[10] and consented to recording the Home Depot Agreements before its Mortgage. Chicago Title also argues that LaSalle Bank had actual knowledge of, yet failed to disclose to NNNT, the Purchase Agreement and lien rights, thus acting inequitably. Bank of America provides several arguments in response: 1) Exclusion 3(a) is limited to intentional

---

the known loss doctrine would be thwarted if Chicago Title could avoid coverage for a claim it actually knew about.

[10] As described above, the Illinois Appellate Court determined that LaSalle Bank had actual knowledge of the documents creating the covenant running with the land because those documents were part of the closing documents. *Bank of America, N.A. v. Cannonball LLC*, 2014 Il App (2d) 130858, ¶ 31.

or wrongful acts, and there is no evidence of intentional or wrongful acts here, 2) Exclusion 3(a) cannot apply because NNNT knew of the SSA Tax Reimbursement Obligation, and 3) Exclusion 3(a) requires an express or implied agreement, neither of which is present here.

In summarizing the majority approach on this exclusion, the Seventh Circuit stated, "the 'created or suffered' language is intended to protect the insurer from liability for maters caused by the insured's own misconduct, breach of duty, or otherwise inequitable dealings." *Home Federal Sav. Bank*, 695 F.3d at 732-33 (compiling cases). The Seventh Circuit further noted:

> The cases discussing the applicability of the 'created or suffered' exclusion generally have stated that the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved. The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss.

*Id.* (quoting *Brown v. St Paul Title Ins. Co.*, 634 F.2d 1103, 1107-08 n.8 (8th Cir. 1980) (applying Missouri law)); *see also Shamrock Bank of Florida v. First American Title Ins. Co.*, No. 13 C 92, 2014 WL 1304694, at * 14 (S.D. Ill. Mar. 28, 2014) (applying Illinois law and relying on *Home Federal Sav. Bank*, 695 F.3d at 732-33).

Despite this description from the Seventh Circuit, Chicago Title relies on the First Circuit case of *American Title Ins. Co v. Lane Powell PC*, 764 F.3d 114 (1st Cir. 2014). Unlike the Seventh Circuit, *Lane Powell* does not require that the insured engage in misconduct or inequitable dealings. *Id.* at 122. That case held

that Exclusion 3(a) applied because the insured's employees testified and "candidly admitted that they were well aware that Lane Powell's mortgage would be junior to the [other] mortgages." *Id*. This Court declines to follow this out-of-circuit reasoning and follows the Seventh Circuit's guidance on the exclusionary language. Further, even if this Court followed *Lane Powell*, that case is largely distinguishable. The insureds in Lane Powell *admitted* that their mortgage was junior to other mortgages. *Id*. In contrast, the insureds in this case repeatedly maintained that their Mortgage was superior to Home Depot's lien, only consented to the recording order on the assumption that the superiority of their Mortgage was memorialized in the Payment and Priority Agreement, and sought a Special Endorsement stating that their Mortgage was superior to any lien rights. (Dkt. 102 ¶¶ 37, 42, 47-48, 55-58, 73; Dkt. 94 ¶ 11). Despite the fact that LaSalle Bank had actual knowledge of the encumbrance, the record demonstrates that the insureds repeatedly asserted their Mortgage's superiority—a situation quite different from *Lane Powell*.

Chicago Title claims that it has demonstrated intentional misconduct and inequitable dealings on the part of LaSalle Bank. (Dkt. 104, 8-9). According to Chicago Title, NNNT never received the Purchase Agreement prior to issuing the insurance policy because LaSalle Bank withheld these documents.[11] (*Id*.; Dkt. 102 ¶ 46). It is therefore "inequitable for LaSalle Bank to claim coverage for an encumbrance of which it knew and failed to disclose." (Dkt. 115, 8). Bank of America points out that NNNT listed the Memoranda of the Purchase Agreement and

---

[11] NNNT also notes that it could not have discovered the Home Depot lien rights by searching the record "because the encumbrance did not exist prior to Closing." (Dkt. 115, 10-11).

Development Agreement on Schedule B of the Policy. In fact, Schedule B, Part II of the Policy includes the following underlined language after listing the Memoranda of the Purchase Agreement and the Development Agreement: "Note: Contains a provision to create a lien on the land." (Dkt. 110, 7) (emphasis in original). Thus, Bank of America argues, NNNT had constructive notice of the agreements and the fact that they resulted in liens. (Dkt. 94 ¶ 22). The Court agrees with Bank of America. It is not credible for NNNT to list documents in an insurance Policy it issued, and then claim it was unaware of the contents of those documents. On the contrary, NNNT must be deemed to have knowledge of documents it listed in its own policy. Ultimately, the record does not support Chicago Title's arguments; there is no evidence of intentional misconduct or inequitable conduct by LaSalle Bank here.

Finally, Chicago Title argues that LaSalle Bank assumed or agreed to the encumbrance because it knew that the encumbrance would run with the land and allowed the encumbrance to be recorded before the Mortgage. Bank of America provides a suite of arguments in response: it neither expressly nor impliedly agreed to the encumbrance; any agreement to create an encumbrance must comply with the statute of frauds; there was no meeting of the minds to create an encumbrance that runs with the land as evidenced by Mr. Malato's repeated statements that the Mortgage would be superior to any liens; agreeing to the order of recordation was conditioned on the Payment and Priority Agreement; and Chicago Title has not

demonstrated an implied agreement. Of course, Chicago Title provides counterarguments to each of these points.

However, the Court need not reach these arguments. The record does not support the assertion that LaSalle Bank expressly or impliedly agreed to the encumbrance. And as noted above, the majority of courts require some level of culpable conduct on the part of the insured. "[C]ourts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss." *Home Federal Sav. Bank*, 695 F.3d at 732-33. Such is the case here. The record at most indicates that LaSalle Bank may have been negligent in its dealing with Home Depot and the recording order. Chicago Title has not carried its burden of showing that the Exclusion applies.

## 4. Reformation

In the event the Court disagrees with Chicago Title's arguments and holds that the Policy provides coverage, Chicago Title asks the Court to reform the Policy. (Dkt. 104, 13). Chicago Title claims that if the Policy insures the loss caused by the encumbrance, that coverage is the result of a mutual mistake. In support, Chicago Title relies on the same arguments regarding coverage under Schedule B, Part II and the Special Endorsement. Namely, that Schedule B, Part II excepts coverage and that the Special Endorsement controls, limits coverage, and represents the coverage "bargained for" by the parties. (Dkt. 115, 13-14). Bank of America counters with the familiar arguments: the primary insuring clause, Schedule B, Part II, and

the ALTA 9 Endorsement provide coverage; LaSalle Bank intended for these provisions to provide coverage; and Mr. Malato repeatedly expressed his understanding that the Mortgage would take priority over any liens and sought a Special Endorsement to that effect. (Dkt. 111, 14-15).

"[I]nsurance policies may be reformed for the same reasons as any other written contract." *Board of Trustees of U. of Ill. v. Ins. Corp. of Ireland, Ltd.*, 969 F.2d 329, 332 (7th Cir. 1992) (applying Illinois law). Under Illinois law, a contract may be reformed when the requesting party demonstrates by clear and convincing evidence that the document contains a provision that was not agreed upon and is the result of a mutual mistake of fact. *Wheeler-Dealer, Ltd. v. Christ*, 379 Ill.App.3d 864, 869 (2008). The purpose of reformation is to change a written instrument by inserting some omitted provision or deleting an existing provision so the document conforms to the original agreement between the parties. *Id.* (citing *Schaffner v. 514 West Grant Place Condominium Ass'n*, 324 Ill.App.3d 1033, 1044 (2001)). "The mistake must be one of fact, not of law, and it must be mutual and common to both parties." *Wheeler-Dealer,* 379 Ill.App.3d at 869 (citing *Sheldon v. Colonial Carbon Co.*, 116 Ill.App.3d 797, 800 (1983)). "The mutual v. unilateral mistake distinction is an important one in a reformation analysis, as courts have been 'reluctant to allow a party to avoid a contract on the ground of [unilateral] mistake, even as to a basic assumption, if the mistake was not shared by the other party.'" *Anco v. ACCO Brands USA LLC*, No. 10 C 4275, 2012 WL 774945, at *4 (N.D. Ill. Mar. 7, 2012)

(citing *Young v. Verizon's Bell Atl, Cash Balan Plan*, 667 F.Supp.2d 850, 894 (N.D. Ill. 2009), *aff'd* 615 F.2d 808 (7th Cir. 2010)).

Chicago Title has not demonstrated by clear and convincing evidence that a variance exists between the parties' original agreement and the writing of the Policy. *See Briarcliffe Lakeside Townhouse Owners Ass'n v. Wheaton*, 170 Ill.App.3d 244, 251 (1988). Given Mr. Malato's testimony, the various emails, and the text of the policy, the record indicates that at most Chicago Title has demonstrated that it made a mistake, and a unilateral mistake is not a ground for avoiding the contract. *Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1034-35 (7th Cir. 2000). The Court will not reform the Policy.

## **CONCLUSION**

For the reasons stated above, Bank of America's motion for summary judgment [92] is granted and Chicago Title's motion for summary judgment [103 & 104] is denied.

E N T E R:

Dated: April 17, 2020

_____
MARY M. ROWLAND
United States District Judge